GLANCY PRONGAY & MURRAY LLP
Kevin F. Ruf (SBN 136901)
kruf@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160

Brian P. Murray (*pro hac vice forthcoming*)
bmurray@glancylaw.com
Garth A. Spencer (*pro hac vice forthcoming*)
gspencer@glancylaw.com
230 Park Avenue, Suite 530
New York, New York 10169
Telephone:  (212) 682-5340
Facsimile:   (212) 884-0988

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

HOWARD WINSTON,

                Plaintiff,

     vs.

WESTERN ASSET MANAGEMENT
COMPANY, WESTERN ASSET
MANAGEMENT COMPANY LTD.,
WESTERN ASSET MANAGEMENT
COMPANY LIMITED, WESTERN
ASSET MANAGEMENT
COMPANY PTE. LTD., and
SECURITY INVESTORS, LLC,

               Defendants.

Case No. CV _____

COMPLAINT

# **TABLE OF CONTENTS**

I. SUMMARY OF THE ACTION.............................................................1

II. JURISDICTION AND VENUE........................................................4

III. PARTIES ....................................................................................7

IV. INVESTMENT COMPANIES AND THEIR REGULATION .........................8

    A.    Types of Investment Companies ......................................9

    B.    Investment Company Organization and Operations ...........................11

    C.    Investment Companies are Controlled by Their Investment Advisers.........................................................12

    D.    Congress Protects Shareholders: The Investment Company Act of 1940.........................................................15

    E.    Congress Strengthens Shareholder Protections: Section 36(b)...........17

    F.    Shareholders Must Proactively Enforce Their Rights........................19

V. RECENT INVESTMENT COMPANY TRENDS ...............................20

    A.    Downward Pressure on Fund Expenses ..............................20

    B.    Conversion of Certain Closed-End Funds............................22

VI. THE WESTERN ASSET AND GUGGENHEIM FUND COMPLEXES........25

    A.    Western Asset ......................................................26

    B.    Guggenheim ........................................................27

VII. PLAINTIFF'S PRIOR EFFORTS TO REDUCE THE FUNDS' FEES .........29

VIII. WIW AND ITS SERVICE PROVIDERS ................................35

    A.    Investment Advisory Services................................39

    B.    Administrative and Other Services .................................43

IX. WIA AND ITS SERVICE PROVIDERS................................45

    A.    Investment Advisory Services................................49

    B.    Administrative and Other Services .................................51

    C.    Investment Advisory Services for WIA and WIW are Similar .........53

X. COMPARABLE FUND: WAFSX ....................................................................56
    A.   Investment Advisory Services..........................................................58
    B.   Administrative and Other Services ................................................60
    C.   Investment Advisory Services for WAFSX and the Funds are Similar .............................................................................................60

XI. COMPARABLE SERVICE: WESTERN ASSET PRIVATE CLIENTS ........63
    A.   US TIPS Full Discretion Service ..................................................63
    B.   Investment Advisory Services for Western Asset Private Clients and the Funds are Similar...........................................................65

XII. WIW'S EXCESS FEE CLAIM AGAINST SI ...........................................66
    A.   Nature and Quality of Services Performed by SI............................66
    B.   Comparative Fee Structures .........................................................69
    C.   WIW's Profitability to SI ...............................................................70
    D.   Economies of Scale Realized by SI ................................................70
    E.   Fall-Out Financial Benefits to Guggenheim .................................70
    F.   Independence and Care of WIW's Board of Trustees .....................72

XIII. WIW'S EXCESS FEE CLAIM AGAINST WESTERN ASSET .................83
    A.   Nature and Quality of Services Performed by Western Asset...........83
    B.   Comparative Fee Structures .........................................................85
    C.   WIW's Profitability to Western Asset ............................................91
    D.   Economies of Scale Realized by Western Asset...............................92
    E.   Fall-Out Financial Benefits to Western Asset..................................94
    F.   Independence and Care of WIW's Board of Trustees .......................96

XIV. WIA'S EXCESS FEE CLAIM AGAINST WESTERN ASSET ..................96
    A.   Nature and Quality of Services Performed by Western Asset...........96
    B.   Comparative Fee Structures .........................................................97
    C.   WIA's Profitability to Western Asset ..........................................102
    D.   Economies of Scale Realized by Western Asset.............................103
    E.   Fall-Out Financial Benefits to Western Asset................................104
    F.   Independence and Care of WIA's Board of Trustees .......................104

XV. EXCESSIVE FEES HARM THE FUNDS.................................................111

COUNT I.............................................................................................112

COUNT II............................................................................................114

COUNT III...........................................................................................115

PRAYER FOR RELIEF ......................................................................117

Plaintiff Howard Winston ("Plaintiff"), on behalf of the Western Asset/Claymore Inflation-Linked Securities & Income Fund ("WIA") and the Western Asset/Claymore Inflation-Linked Opportunities & Income Fund ("WIW," and together with WIA, the "Funds"), brings this action against Defendants Western Asset Management Company ("WAMCO"), Western Asset Management Company Ltd. ("WA Japan"), Western Asset Management Company Limited ("WA London"), Western Asset Management Company Pte. Ltd. ("WA Singapore"), and Security Investors, LLC ("SI"). Plaintiff alleges the following upon information and belief except for allegations as to himself, which are alleged upon personal knowledge. The allegations are based in part upon an investigation conducted by and through Plaintiff's counsel, which included a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information. Plaintiff believes that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This action is about investment managers enriching themselves at the expense of their captive investment funds' shareholders by charging excessive fees to the funds, with the approval of the funds' inattentive and conflicted trustees.

2. Plaintiff brings this action against Defendants on behalf of the Funds pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), codified at 15 U.S.C. § 80a-35(b) (hereinafter, "Section 36(b)").

3. Defendants, as the Funds' investment advisers, manage the Funds' investment portfolios and charge fees to the Funds for providing investment advisory services. Under Section 36(b), Defendants have fiduciary duties to the Funds with respect to the fees they charge to the Funds.

4. Through Section 36(b), Congress empowered courts to scrutinize the fee agreements between registered investment companies and their investment advisers.

Historically, investment companies and their investment advisers have had cozy relationships in which the adviser sets up the investment company and appoints the company's board members, and so controls the company. Because of this inherently conflicted relationship, an investment company's board often lacks incentives to scrutinize the actions of the adviser or to aggressively bargain against the adviser. Congress enacted Section 36(b) to address these problems and to protect investment company shareholders from excessive fees.

5.     Defendants breached their Section 36(b) fiduciary duties to the Funds by charging investment advisory fees that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants, and could not have been the product of arm's-length bargaining.

6.     In each of the last several years the Funds have paid the Defendants approximately $8 million for investment advisory services. WIW has paid SI an annual fee of roughly $6 million, equal to 0.60% of WIW's total assets. WIA has paid WAMCO an annual fee of roughly $2 million, equal to 0.40% of WIA's total assets. Defendants SI and WAMCO pay other Defendants portions of these fees pursuant to sub-advisory agreements.

7.     Prevailing rates charged for comparable services are less than half of the excessive rates charged by WAMCO and SI to the Funds. In fact, when forced to compete for business when rendering similar investment advisory services to other funds or private clients in a somewhat competitive marketplace, Defendants and their affiliates routinely charge substantially reduced rates, of approximately 0.20% of net assets. As discussed *infra*, Defendants provide similar investment advisory services to another Western Asset fund for annual fees of 0.20% of net assets, and to private clients for marginal fees as low as 0.15% of assets.

2

8.      The below table shows the investment advisory fees paid by the Funds in their most recently ended fiscal year, and as a comparison hypothetical fees calculated at the rate of 0.20% of year-end net assets:

**Table 1. Comparison of Fund Fees Paid to Fees for Comparable Services**

| | WIW | WIA |
|---|---|---|
| **Net assets at 11/30/17** | $782,412,426 | $381,611,978 |
| **Investment advisory fees paid for year ended 11/30/17** | $6,489,372 | $2,115,515 |
| **Hypothetical fee of 0.20% of net assets** | $1,564,825 | $763,224 |
| **Excessive advisory fees (actual fees minus 0.20% hypothetical)** | $4,924,547 | $1,352,291 |
| **Percentage of overpayment** | 415% | 277% |

9.      The investment advisory fees are only a part of the Defendants' generally excessive fees. The following table summarizes the annual fees charged by Defendants and their affiliates to the Funds (both for current fee arrangements and new fee arrangements proposed to take effect on or about April 27, 2018):

**Table 2. Summary of Fees Charged by Defendants and Affiliates**

| Service | Annual Fees |
|---|---|
| ***WIW's Current Fees*** | |
| Investment advisory (and certain administrative) | 0.60% of total assets |
| Administrative | 0.04% of total assets |
| TOTAL | 0.64% of total assets |
| | |
| ***WIW's Fees Effective April 27, 2018*** | |
| Investment advisory | 0.35% of total assets |
| Administrative | 0.05% of total assets |
| TOTAL | 0.40% of total assets |
| | |
| ***WIA's Current Fees*** | |
| Investment advisory | 0.40% of total assets |
| Administrative | 0.04% of total assets |
| "Servicing" (administrative) | 0.15% of total assets |
| TOTAL | 0.59% of total assets |
| | |
| ***WIA's Fees Effective April 27, 2018*** | |
| Investment advisory | 0.35% of total assets |
| Administrative | 0.05% of total assets |
| TOTAL | 0.40% of total assets |

3

10.     All of the advisory fees paid by the Funds to their various investment advisers and sub-advisers are excessive. The advisory fees charged by WIW's primary adviser, SI, are even more excessive because it appears to have delegated all advisory duties to sub-advisers, itself performing essentially no work and retaining millions of dollars in advisory fees each year.

11.     While the Funds' trustees (the "Trustees") are in theory supposed to protect shareholders' interests and negotiate investment advisory fees in good faith, the Trustees are conflicted and inattentive to the Funds' business. Over the decade-plus lifespan of the Funds the Trustees failed to even attempt to obtain fee reductions until Plaintiff recently threatened legal action against the Trustees.

12.     In late November 2017 Plaintiff sent the Funds' boards letters demanding that the Trustees remedy breaches of fiduciary duties including their approval of excessive fee arrangements. In February 2018, following discussions with Plaintiff, the Funds announced that beginning on or about April 27, 2018, the Funds' investment advisory fees will be somewhat reduced going forward. This announcement is effectively an admission that the previously existing fee arrangements are excessive. The fee arrangements proposed to take effect on or about April 27, 2018 will remain excessive, though somewhat less so than before.

13.     Plaintiff brings this action to recover for the Funds the excessive and unlawful investment advisory fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Funds' payment of those fees.

14.     Because the conduct complained of herein is continuing in nature, Plaintiff seeks recovery for a period from one year prior to the commencement of this action through the date of final judgment after trial.

## II. JURISDICTION AND VENUE

15.     The claims asserted herein arise under Section 36(b) of the ICA, codified at 15 U.S.C. § 80a-35(b).

4

16.     This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the ICA, codified at 15 U.S.C. §§ 80a-35(b)(5) and 80a-43. This Court also has jurisdiction of the claims pursuant to 28 U.S.C. § 1331.

17.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, codified at 15 U.S.C. § 80a-43. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391, because Defendants maintain offices in this district and/or transact business in this district.

18.     Defendant WAMCO acts as a "general manager" of Defendants WA Japan, WA London, and WA Singapore, as that term is defined under California law, and therefore service on those Defendants is properly achieved by service on WAMCO in California. *See U.S. ex rel. Miller v. The Public Warehousing Company KSC*, 636 Fed. Appx. 947 (9th Cir. 2016). Each of WAMCO, WA Japan, WA London, and WA Singapore is a wholly-owned subsidiary of Legg Mason, Inc. According to the Funds' annual reports, "although Western Asset's [WAMCO's] business is operated through separate legal entities, such as the Non-U.S. Managers [WA Japan, WA London, and WA Singapore], its business is highly integrated and senior investment personnel at Western Asset have supervisory oversight responsibility over the investment decisions made by the Non-U.S. Managers." Defendants WAMCO, WA Japan, WA London, and WA Singapore file a single, combined Form ADV – Part 2 brochure with the SEC, which discusses these four entities collectively, "references to 'Western Asset' and 'Firm' represent [WAMCO, WA Japan, WA London, and WA Singapore]," and states, "Western Asset Management is a global asset management firm comprised of six legal entities that operate as part of Western Asset Management's overall business." The Western Asset website repeatedly refers to Western Asset as a "globally integrated" business. Furthermore, WAMCO, WA Japan, WA London, and WA Singapore share overlapping directors and principal executive officers including Charles A. Ruys de Perez, Thomas C. Merchant, and Laura A. Boydston.

19.    Although the Funds' bylaws contain forum selection clauses designating certain Massachusetts courts as the venue for certain actions, those bylaws provisions do not apply here. The Funds' both have amended bylaws dated September 23, 2015, which feature identical sections titled "Article 13 Exclusive Forum." Those bylaws sections read in relevant part:

> 13.1 <u>Exclusive Forum</u>. Unless the Trust consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Trust, (b) any action asserting a claim of breach of a fiduciary duty owed by any Trustee, officer, employee or agent of the Trust to the Trust or the Trust's shareholders, (c) any action asserting a claim arising pursuant to the laws of The Commonwealth of Massachusetts, or any provision of the Declaration of Trust or these Bylaws (in each case, as the same may be amended or supplemented from time to time), or any other law applicable to the Trust, or (d) any action asserting a claim governed by the internal affairs doctrine, shall be the Business Litigation Session of the Massachusetts Superior Court in Suffolk County or a federal court sitting within the City of Boston. Any person who, or entity that, holds, purchases or otherwise acquires an interest in shares of the Trust (including any "beneficial owner", within the meaning of Section 13(d) of the Exchange Act) shall be deemed (i) to have notice of, and to have consented to and agreed to comply with, the provisions of this Section 13.1, and (ii) to have waived any argument relating to the inconvenience of the forums referenced above in connection with any action or proceeding described in this Section 13.1.

20.    These bylaws provisions do not apply here for multiple reasons. First, the Defendants do not have standing to enforce the bylaws provisions because they are not parties to the bylaws, are not related entities of parties to the bylaws, and are not intended third-party beneficiaries of the bylaws. *See, e.g.*, *Mitsui Sumitomo Ins. USA, Inc. v. Tokio Marine & Nichido Fire Ins. Co., Ltd.*, No. 12-cv-9953, 2013 WL 12136602 at *4 (C.D. Cal. Aug. 8, 2013). None of the Funds, their Trustees, or officers are parties to this case, nor would they even have standing to bring the claims al-

6

leged here against the Defendants. *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 541 (1984). Second, it would be inequitable to enforce these bylaws provisions against Plaintiff in this action, because they were unilaterally adopted by the Funds without any notice to shareholders. *See Galaviz v. Berg*, 763 F. Supp. 2d 1170, 1175 (N.D. Cal. 2011). After this unilateral amendment, the Funds then failed to disclose the amended bylaws to shareholders for over two years in violation of SEC rules, only disclosing the amendments after receipt of Plaintiff's demand letters threatening various legal actions including this very lawsuit. Third, the ICA expressly provides that, "[a]ny suit or action to enforce any liability or duty created by, or to enjoin any violation of," the Investment Company Act, "may be brought in any such district or in the district wherein the defendant is an inhabitant or transacts business." ICA Section 44, codified at 15 U.S.C. §80a-43. Fourth, each of Plaintiff, WAMCO, and SI reside in this District, no party resides in Massachusetts, no relevant transaction occurred in Massachusetts, and Massachusetts law is not at issue.

### III. PARTIES

21.    Plaintiff Howard Winston is a shareholder of both Funds and has continuously owned shares in both Funds for the 12-month period leading up to the filing of this action. Plaintiff resides in this District.

22.    Defendant Western Asset Management Company ("WAMCO") is a corporation organized under the law of California. WAMCO's principal offices are located at 385 East Colorado Boulevard, Pasadena, California 91101. WAMCO is the primary investment adviser to WIA and is an investment sub-adviser to WIW. On or about April 27, 2018 WAMCO is expected to become the primary investment adviser to WIW.

23.    Defendant Western Asset Management Company Ltd. ("WA Japan") is a company organized under the laws of Japan with an address of 36F Shin-Marunouchi

Building 5-1 Marunouchi 1-Chome Chiyoda-Ku, Tokyo 100-6536, Japan. WA Japan is an investment sub-adviser to both Funds.

24. Defendant Western Asset Management Company Limited ("WA London") is a private limited company organized under the laws of England and Wales with a registered office address at 10 Exchange Square, Primrose Street, London, EC2A 2EN. WA London is an investment sub-adviser to both Funds.

25. Defendant Western Asset Management Company Pte. Ltd. ("WA Singapore") is a private limited company organized under the laws of Singapore with a registered address of 1 George Street #23-01, Singapore 049145. WA Singapore is an investment sub-adviser to both Funds.

26. WAMCO, WA Japan, WA London, and WA Singapore are collectively referred to herein as the "Western Asset Defendants."

27. Defendant Security Investors, LLC ("SI") is a limited liability company organized under the law of Kansas. SI maintains an office at 100 Wilshire Boulevard, Suite 500, Santa Monica, California 90401. SI is the primary investment adviser to WIW, though it is expected that WAMCO will replace SI in this capacity on or about April 27, 2018.

## IV. INVESTMENT COMPANIES AND THEIR REGULATION

28. Investment companies are collective investment vehicles that pool money from investors to purchase a portfolio of securities. Investors purchase shares in investment companies, and the shares generally represent a proportionate interest in the company's portfolio of securities.

29. Investment companies are widely owned by individual investors and are popular retirement planning tools. U.S. registered investment companies have over $19 trillion dollars in net assets, and over 44% of U.S. households own shares in such investment companies.

### A.      Types of Investment Companies

30.      WIW and WIA are closed-end funds. The differences between the main types of investment companies are relevant to understand how the Defendants are able to continue charging the Funds excessive fees, as explained below.

31.      The three most prevalent types of investment company are (i) open-end funds, (ii) closed-end funds, and (iii) exchange-traded funds. The terms "investment company" and "fund" will be used interchangeably in this Complaint.

32.      Open-end funds, commonly referred to as mutual funds, are the most popular type of investment company, with history dating back to the 1920s. There are currently about 9,511 U.S. registered open-end funds holding about $16.3 trillion of net assets.

33.      Investors purchase shares in open-end funds directly from the funds themselves. The funds issue new fund shares to the purchasing investors, and the funds use investors' money to purchase investment securities. Conversely, when investors wish to sell their open-end fund shares, the funds must redeem the shares directly from the investors at a price determined by the fund based on the current market value of the its assets and liabilities (called net asset value, or NAV). Determination of NAV and the issuance and redemption of open-end fund shares generally takes place each business day after the close of trading on the securities markets.

34.      Closed-end funds are among the oldest types of investment companies (dating to the 1890s), but are now less common than open-end funds. There are currently about 530 U.S. registered closed-end funds holding about $262 billion of net assets.

35.      In contrast to open-end funds, closed-end funds more closely resemble individual corporate stocks. Closed-end funds generally raise capital only once and issue a fixed number of shares. Although this process may be repeated in a limited number of follow-on share offerings, closed-end funds do not come close to the rou-

tine, daily creation and redemption of shares that characterizes open-end funds. Closed-end fund shares are listed for trading on a securities exchange. Investors buy and sell shares with each other and are not purchasing shares directly from the fund as it is with open-end funds. Prices are determined by supply and demand for a fund's shares in the market, not by the net asset value of the fund's investments. For this reason, the share price of a closed-end fund may vary significantly from the fund's per share NAV, trading either at a premium or a discount.

36.     A primary disadvantage of closed-end funds as compared with open-end funds is that closed-end funds may trade at a substantial discount to NAV for a prolonged period of time. A primary advantage of closed-end funds is that they are not forced to regularly buy and sell securities to create and redeem fund shares. For this reason closed-end funds are easier and cheaper to administer than open-end funds. Also for this reason, closed-end funds are well suited to investing in assets that are illiquid or costly to trade.

37.     The closed-end structure of WIW and WIA has enabled Defendants to extract excessive fees from the Funds over a number of years. Because investors cannot demand that the Funds redeem their shares, Defendants do not risk seeing the Funds' assets (and corresponding fees) shrink as investors vote with their feet. The closed-end structure in essence guarantees the investment adviser a fixed pool of assets from which to take fees, regardless of problems with the fund's management or performance.

38.     Exchange-traded funds, or ETFs, are a relatively recent invention dating only to the early 1990s, though they are rapidly gaining in popularity in large part due to their association with lower fees. There are currently about 1,716 U.S. registered ETFs holding about $2.5 trillion in net assets.

39.     ETFs combine features of traditional open-end funds and features of closed-end funds. ETF shares trade on securities exchanges among investors and can

10

be bought and sold throughout the day at market-based prices. However, ETFs do not have a fixed number of shares. Rather, ETF shares may be created or redeemed at any time between the ETF and a financial intermediary called an authorized participant (or "AP"), in response to market demand for the ETF's shares. In this process the ETF and AP exchange fund shares for a basket of underlying investment securities that comprise the fund's portfolio. The total value of the underlying securities that must be transferred in such an exchange is set based on the ETF's net asset value. When an ETF's shares trade at a large discount or premium, APs have a strong financial incentive to redeem or create ETF shares in order to profit from the difference between market price and NAV. In this manner, while ETF share prices can also vary from the ETF's per share NAV, such variation is generally much less than in the case of closed-end funds which have no such mechanism pulling the market price back toward the Funds' per share NAV.

### B.    <u>Investment Company Organization and Operations</u>

40.    The current regulatory regime for investment companies dates to the Securities Act of 1933 and the Securities Exchange Act of 1934. Its principal statutory framework is supplied by the Investment Company Act of 1940 and the Investment Advisers Act of 1940.

41.    An investment company is overseen by a board of directors or trustees that manages the affairs of the company. Unlike other companies, an investment company generally has no employees or facilities of its own. Rather, the investment company's board of trustees contracts with other parties for basic services required to operate the fund.

42.    Chief among these fund service providers is the investment adviser (or manager), which manages the fund's portfolio of securities, researches potential investments, and decides which securities to purchase for or sell from the portfolio.

43.     The investment adviser may delegate some or all of its responsibilities to one or more sub-advisers, hired to manage a portion of the fund's investment portfolio.

44.     Other fund operations are separately provided by custodians, auditors, accountants, counsel, transfer agents, and/or distributors.

45.     All of a fund's external service providers receive compensation from the fund (or in the case of an investment sub-adviser, from the primary adviser) for their services. The total amount of a fund's annual expenses is expressed as a percentage of the fund's assets, and is called the fund's expense ratio.

46.     Certain fund services, in particular investment advice, are traditionally compensated in amounts based on a percentage of the fund's assets, rather than based on a flat rate for the services performed or based on the results delivered to the fund. Such compensation is typically expressed in basis points (one basis point is one hundredth of one percent, or one cent for every $100 invested). Such compensation is typically calculated based on a fund's net assets (total assets less liabilities). However, in the case of closed-end funds it is not uncommon for investment advisers to charge fees based on total assets (without reduction for a fund's liabilities), although this practice is not justified and is harmful to shareholders (as discussed *infra*).

**C.    Investment Companies are Controlled by Their Investment Advisers**

47.     As a practical matter, investment companies do not operate independently, but rather operate as parts of fund families or complexes (*e.g.*, Fidelity, Vanguard, Guggenheim, Western Asset). A typical fund family may consist of several dozen funds, an investment adviser, and related service providers that are under common control with the investment adviser.

48.     Investment advisers and their affiliates create investment companies in order to obtain fees from the funds' shareholders in exchange for providing services to the funds. Frequently, individuals affiliated with such investment advisers are ap-

pointed to serve on the funds' boards of trustees, and are appointed as the funds' officers.

49.    Consequently, conflicts of interest are rampant in the relationship between investment advisers and the investment companies they control. Although investment companies and their boards are supposed to serve the interests of their shareholders, the structure of fund families creates opportunities and incentives for investment advisers and board members to profit by abusing the interests of fund shareholders.

50.    For example, prior to the enactment of laws (discussed below) requiring funds to have independent board members review and approve investment advisory fees, individuals affiliated with investment advisers could both propose the investment adviser's fees (wearing their "investment adviser" hats) and ratify such fees (wearing their "fund board member" hats).

51.    Investment companies generally do not shop around among different investment advisers to obtain the best services at the lowest price. In the ordinary course of business funds rarely even contemplate changing investment advisers. As such, funds have little ability to negotiate the terms and conditions proposed by their investment advisers. Historically, funds' dependence on their investment advisers has allowed investment advisers to specify the terms of the contractual relationships between them and their captive funds.

52.    While it is in the interest of the fund and its shareholders to secure investment advisory fees that are as low as possible, the investment adviser's interests are the opposite: to secure investment advisory fees as high as possible. Historically, such conflicts of interests have been resolved in investment advisers' favor. As a result, funds often pay excessive investment advisory fees.

53.    Congress has repeatedly recognized that the structure of the investment company industry creates inherent conflicts of interest between funds and their in-

13

vestment advisers. As the Senate stated in a 1969 report accompanying proposed amendments to the ICA (which amendments included Section 36(b)):

> Because of the unique structure of this industry, the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships. Since a typical fund is organized by its investment adviser which provides it with almost all management services . . . a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

S. Rep. No. 91–184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 (hereinafter, "Senate Report"), at 4901.

54.    The Supreme Court has also repeatedly discussed the systemic conflicts in the investment company industry:

> As we have previously noted, Congress adopted the ICA because of its concern with the potential for abuse inherent in the structure of investment companies. Unlike most corporations, an investment company is typically created and managed by a preexisting external organization known as an investment adviser. Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (quotes and citations omitted).

55.    Although Congress tried to address this conflicted structure by requiring greater "independence" for fund boards, such requirements have failed to produce the intended results. This was colorfully explained by Warren Buffet, legendary investor and chairman of Berkshire Hathaway, Inc., as later quoted by a federal district court:

14

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management—whether management was good, bad or indifferent. Not to negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

56.     These themes are likewise noted throughout the academic literature regarding investment companies:

> Among observers of mutual funds, discussion of the separation of funds and managers has produced two related themes. The first is that despite the separation of mutual funds and their managers, mutual funds tend to be dominated by their managers. . . A second theme is that this managerial dominance is deeply problematic.

John Morley, *The Separation of Funds and Managers: A Theory of Investment Fund Structure and Regulation*, 123 YALE L. J. 1228, 1236-37 (2014).

57.     In summary, it is a well-known fact that investment companies and their directors often serve the interests of the investment adviser over those of the fund and its shareholders.

### D.     Congress Protects Shareholders: The Investment Company Act of 1940

58.     In 1940, responding to numerous problems and abuses in the then-lightly regulated fund industry, Congress enacted the ICA in order to protect fund shareholders. In its "Findings and Declaration of Policy" preamble in section one of the ICA, Congress recognized that "the national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interests

of [fund shareholders]." Investment Company Act of 1940, Pub. L. No. 76-768, § 1 (codified as amended as 15 U.S.C. § 80a-1(b)(2)).

59.     In order "to mitigate and, so far as it is possible, to eliminate the conditions [] that adversely affect [] the interests of investors," the ICA, as originally enacted in 1940, sought to enhance fund boards' independence by: (1) requiring that at least 40% of a fund's board consist of persons neither employed by nor affiliated with the investment adviser; and (2) requiring that such boards review and approve written contracts between the mutual fund and the investment adviser (and other key service providers). *Id*. at §§ 1(b), 10, 15 (codified as amended at 15 U.S.C. §§ 80a-1(b), 80a-10, 80a-15). As originally enacted, the ICA placed fund boards in the role of independent watchdog, and relied on fund boards to protect fund shareholders' interests against the funds' investment advisers.

60.     Notwithstanding these and other of the ICA's initial provisions, in the decades following 1940 advisers continued to extract excessive fees from their captive funds. The ICA's original provisions, which relied heavily on fund boards to police fund fees, proved insufficient.

61.     For example, an SEC-commissioned study found that investment advisers often charged higher fees to funds than they charged to the advisers' other clients, and that even following enactment of the ICA the structure of the fund industry continued to result in rich compensation for advisers. *See* A Study of Mutual Funds Prepared for the SEC by the Wharton School of Finance and Commerce, *reprinted in* H. R. Rep. No. 87-2274 (1962), at 28-30, 34, 66-67. The study explicitly concluded that the unaffiliated directors mandated by the ICA were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id*. at 34.

62.     Likewise, a subsequent report authored by the SEC itself found that as funds grew in size, the investment advisory fees they paid became increasingly dis-

proportionate to the advisory services they received in exchange. *See* Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 89-2337 (1966) (hereinafter "SEC Report"). Specifically, noting that investment advisers were generally compensated on the basis of a fixed percentage of a fund's assets (rather than on services rendered or actual expenses), the SEC determined that this form of payment could produce unreasonable fees in light of the economies of scale realized in managing a larger portfolio. SEC Report at 94, 102.

63.     Furthermore, evidence indicated that where fund shareholders sought to challenge the propriety of director-approved fund advisory fees, such efforts failed because of the strict legal standards employed by courts to evaluate such fees. *See* SEC Report at 132-43 (noting use of corporate waste standard to review fees approved by fund directors, so that only "unconscionable" or "shocking" fees created liability). Such standards effectively allowed directors' approval of excessive advisory fees to place those fees beyond legal challenge from fund shareholders. *Id.*

**E.     Congress Strengthens Shareholder Protections: Section 36(b)**

64.     The above-discussed evidence led directly to amendment of the ICA in 1970, as the Senate explicitly acknowledged in its report accompanying such amendments:

> In total this bill represents a 3-year effort on the part of your committee to deal with the problems described in the 1962 Wharton School of Finance and Commerce study of mutual funds, the 1963 special study of the securities markets made by the Securities and Exchange Commission and the Commission's 1966 report on public policy implications of investment company growth.

Senate Report, at 4897-98.

65.     Three provisions of the 1970 amendments to the ICA are noteworthy here. First, Congress strengthened board independence by rewriting ICA section 10 (15 U.S.C. §80a-10) to require at least 40% of board members to be "uninterested" persons, rather than merely persons unaffiliated with the investment adviser.

66.     Second, Congress required greater board diligence with respect to evaluation and approval of advisory fees, by adding to ICA section 15 (15 U.S.C. §80a-15) that "It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve as investment adviser of such company."

67.     Third, Congress eased the legal standards for fund shareholders seeking to challenge investment advisory fees, by enacting the new Section 36(b), which (1) created a fiduciary duty for investment advisers and their affiliates with respect to payments they received from funds; and (2) provided fund shareholders (as well as the SEC) with a private right of action against the investment adviser for breach of such fiduciary duty.

68.     Section 36(b)'s enactment indicates Congressional recognition that the problem of excessive fees could not be solved solely requiring greater independence and diligence from fund boards. Rather, Congress recognized that due to the conflicts of interest inherent in the fund industry, curtailing excessive fees requires empowering fund shareholders to directly challenge those fees.

69.     Although the ICA as amended in 1970 still relied on fund boards to evaluate and determine fund fees, the 1970 amendments demonstrated clear Congressional intent to lessen the judicial deference accorded to boards' fee determinations.

70.     With regard to excess fee lawsuits, Congress instructed courts to consider the circumstances surrounding a board's approval of allegedly excessive fees, and to give the approval as much or as little weight as warranted:

> The directors of a fund have the initial responsibility for approving management contracts. Section 36(b)(2) therefore instructs the courts to consider the approval given by the directors of the fund to such compensation and provides that their approval shall be given such consideration as the court deems appropriate under all the circumstances. Among other things, the court might wish to evaluate whether the deliberations of the directors were a matter of substance or a mere formality.

Senate Report, at 4910.

71.     Congress also indicated that its intent in enacting Section 36(b) was to decrease the legal obstacles facing fund shareholders seeking to challenge excessive fees, and to relax the applicable legal standards used by courts to consider such challenges:

> [The ICA's original] provisions did not provide any mechanism by which the fairness of management contracts could be tested in court. Under general rules of law, advisory contracts which are ratified by the shareholders, or in some states approved by a vote of the disinterested directors, may not be upset in the courts except upon a showing of "corporate waste." As one court put it, the fee must "shock the conscience of the court." Such a rule may not be an improper one when the protections of arm's-length bargaining are present. But in the mutual fund industry where, these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of "corporate waste" is unduly restrictive and recommends that it be changed.
>
> * * *
>
> Thus, upon a challenge in court to compensation or payments, the ultimate test, even if the compensation or payments are approved by the directors and stockholders, will not be whether it involves a "waste" of corporate assets but will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee.

Senate Report, at 4901 and 4910.

**F.     Shareholders Must Proactively Enforce Their Rights**

72.     Although Congress also granted the SEC authority to address excessive fund fees, in practice the SEC has rarely done so. This lack of enforcement by the SEC is understandable in light of the SEC's resource constraints and competing priorities.

73.     In its fiscal year 2016 the SEC Division of Investment Management had only 204 employee positions and a budget of $61 million (of which less than one-third was dedicated to enforcement efforts), despite its responsibility to oversee the entire fund industry consisting of over 10,000 fund portfolios with over $19 trillion in assets. The SEC noted in its fiscal year 2017 budget request, "In particular, resources are needed to . . . lessen the impact of the disparity between the number of exam staff and the growing number, size, and complexity of registered firms, particularly in the in-

vestment management industry." SEC FY 2017 Congressional Budget Justification at 63, *available at* https://www.sec.gov/about/reports/secfy17congbudgjust.pdf.

74.     Thus, while the statutory scheme enacted by Congress relies on a combination of fund trustees, the SEC, and shareholders to protect shareholders' interests, in light of the inherently conflicted nature of the fund industry and the severe resource constraints facing the SEC, it is all the more important for investors to be empowered to protect their own rights against the excessive fees charged by investment advisers to their captive funds.

## V. RECENT INVESTMENT COMPANY TRENDS

75.     Two recent trends among investment companies are relevant here. First, a trend toward decreasing fees. Second, certain funds with investments similar to WIA and WIW have recently converted from closed-end to open-end structures.

### A.     <u>Downward Pressure on Fund Expenses</u>

76.     Over the last two decades, average investment company expenses have declined dramatically, putting competitive pressure on fund complexes to reduce overall fees including investment advisory fees. This reduction in expenses has in part resulted from a growing recognition among investors, regulators, and the financial press of the central importance of fees to the overall performance of investment funds. *See, e.g.*, SEC Investor Bulletin, *Mutual Fund Fees and Expenses*, SEC Pub. No. 162 (May 2014); Russel Kinnel, MORNINGSTAR, *Fund Fees Predict Future Success or Failure* (May 5, 2016) *available at* http://www.morningstar.com/articles/752485/fund-fees-predict-future-success-or-failure.html.

77.     From 2003 (roughly the Funds' inception) to 2016, the asset-weighted average total expense ratio (including investment advisory and all other fees) for bond mutual funds steadily decreased by nearly a third, from 0.75% to 0.51% of net assets.

78.     Certain sub-categories of bond funds, that employ investment strategies similar to the Funds at issue in this action, obtained even lower expense ratios. By

2016 the asset-weighted average total expense ratio for mutual funds focusing on investment grade bonds was 0.37% of net assets.

79.     Based on information and belief funds investing primarily in U.S. government bonds have an even lower asset-weighted average expense ratio, because such funds require less work from an adviser. Whereas the adviser of an investment grade fund must study the credit quality of numerous different bond issuers, comparatively little or no credit quality analysis needs to be performed with respect to the U.S. federal government.

80.     One reason for the decrease in average fees is the increasing popularity of low-cost "passive" investment funds. Passive funds merely seek to replicate the performance of an index rather than trying to select securities that will have above-average returns. Passive funds are generally offered at significantly lower costs than actively managed funds (in part because they do not pay for expensive investment advisers).

81.     A related reason for the decrease in average expense ratios is increased competition among fund sponsors to attract investment. As passive funds have attracted investment from their active counterparts, the active funds have been forced to limit expenses in order to remain competitive.

82.     However, such competition does not affect all types of funds. If an open-end fund charges high fees that cause shareholders to redeem shares then that fund's net assets will shrink causing a corresponding decrease in the investment adviser's fees. However, if a closed-end fund charges high fees, sales of fund shares by shareholders will not decrease the fund's assets, and will not cause the investment adviser's fees to decrease, but will only cause a decrease in the fund's market trading price. As such investment advisers to closed-end funds are effectively insulated from market pressures that might otherwise cause them to lower their fees to remain competitive.

83.     Although the Funds were launched in or about 2003, their contracts with service providers, including with the Defendants for investment advisory services, have maintained the same high fee levels from inception through the present date (although, following Plaintiff's threat of legal action against the Funds' Trustees, fees are expected to be somewhat reduced beginning on or about April 27, 2018). In fact, there is no indication that the Funds' trustees even once made any attempt to negotiate lower investment advisory fees for the Funds in the 14 years from 2003 to 2017.

**B.     Conversion of Certain Closed-End Funds**

84.     For approximately the last 15 years there has been a growing trend of increasing shareholder activism to address the problem of closed-end funds that trade at large, persistent discounts to NAV. Such discounts are problematic because they prevent fund shareholders from realizing the full value of the fund's assets.

85.     This trend has caused a number of closed-end funds that trade at wide discounts to reevaluate their fee arrangements, structures, and management policies, whether voluntarily or under pressure from activists.

86.     Common steps demanded by activists and taken by closed-end funds to reduce discounts include (i) reductions in fees, (ii) having the fund repurchase substantial amounts of its shares, (iii) converting the fund to an open-end or ETF structure, or (iv) liquidating the fund and returning cash or investment securities to shareholders.

87.     When a closed-end fund converts to an open-end or ETF structure the discount problem is eliminated, as the fund's shareholders are then able to redeem their shares at or close to NAV. However, such redemptions reduce a fund's assets and investment advisers' fees. Efforts to "open-end" a closed-end fund are therefore often resisted by investment advisers and their captive funds, even though open-ending is in the shareholders' best interests.

88.     Nonetheless, when faced with sufficiently compelling logic and/or suffi-ciently powerful shareholders, certain closed-end funds have taken the step to convert to an open-end structure for shareholders' benefit.

89.     Two closed-end funds with strong similarities to the Funds have recently open-ended. The Federated Enhanced Treasury Income Fund ("FTT") was reor-ganized into a newly created open-end fund in 2015. The AllianceBernstein Income Fund, Inc. ("ACG") merged into a pre-existing open-end fund in 2016. Like the Funds, both FTT and ACG invested primarily in U.S. Treasury securities with limited flexibility to invest in other assets to produce additional income.

90.     Also like the Funds, both FTT and ACG attempted to avoid converting to open-end structures, by changing their investment policies to allow investment in risk-ier and higher yielding assets in an attempt to justify their then-existing structures and fees. For example, ACG's board approved a proposal to eliminate ACG's fundamental policy to invest at least 65% of its assets in U.S. government securities, though this proposal was rejected by ACG's stockholders at a March 27, 2014 meeting.

91.     Following the conversion of FTT and ACG, the Funds are the only re-maining closed-end funds that invest primarily in U.S. Treasury securities. This is be-cause the closed-end structure is poorly suited to an investment portfolio comprised primarily of U.S. Treasury securities. The closed-end structure, however, is well-suited to charging excessive fees over a prolonged timeframe.

92.     A main advantage of the closed-end structure is to enable a fund to invest in illiquid securities without incurring high transaction costs as fund shares are created and redeemed. However, U.S. Treasury securities are among the most liquid invest-ments in existence. As such, when weighed against the disadvantages of the closed-end structure (*i.e.* the potential for a large and persistent discount to NAV), such a structure does not make sense for an investment portfolio consisting primarily of U.S. Treasury securities.

93.    A closed-end structure makes even less sense for an investment portfolio consisting primarily of U.S. Treasury securities when combined with high fees. U.S. Treasury securities are among the safest, and therefore lowest yielding, investments available. High fees will consume a substantial portion of the modest returns obtainable from investing in U.S. Treasury securities.

94.    Where a portfolio of U.S. Treasury securities is effectively locked into a closed-end structure with high fees that the investment adviser and fund trustees refuse to decrease, the logical outcome is a large and persistent discount to NAV as investors decide not to purchase the fund's shares. In the case of FTT and ACG this problem was fixed when the funds converted to an open-end format. In the case of the Funds, the problem has continued for years as the Funds' Trustees and the Defendants have refused to decrease investment advisory fees to reasonable levels.

95.    At least two of the Funds' Trustees have substantial familiarity with closed-end fund shareholder activism to reduce discounts. In 2017 alone, three different closed-end funds in the Guggenheim complex, for each of which Ronald Nyberg is a Trustee, took steps to reduce their discounts after prodding by activist investors. *See* Press Release (July 11, 2017) Advent/Claymore Enhanced Growth & Income Fund Announces Expiration and Preliminary Results of Tender Offer;[1] Press Release (Sept. 7, 2017) Advent/Claymore Closed-End Funds Announce Expiration and Preliminary Results of Tender Offers;[2] Press Release (May 1, 2017) The Board of Trustees of Advent/Claymore Closed-End Funds Announces Potential Tender Offers by AVK and AGC and Declares Distributions, Including an Increased Distribution Rate for AVK.[3]

---

[1] *Available at* https://www.guggenheiminvestments.com/CMSPages/ GetFile.aspx?guid=6027cc8a-b346-4f5b-b13f-82e0987591f3

[2] *Available at* https://www.guggenheiminvestments.com/CMSPages/ GetFile.aspx?guid=6027cc8a-b346-4f5b-b13f-82e0987591f3

[3] *Available at* https://www.guggenheiminvestments.com/CMSPages/ GetFile.aspx?guid=87872fc6-f087-43ad-9e2d-e2540c737e79

In 2012 Ronald Toupin, Jr. served as a panelist at an Investment Company Institute closed-end fund conference where his panel specifically focused on shareholder activism to reduce discounts. *See* 2012 Closed-End Fund Conference Program (Nov. 27, 2012).[4]

96.    Notwithstanding their knowledge of these issues, the Trustees have taken only insufficient and much delayed steps to narrow the Funds' discounts, and only after Plaintiff's threat of litigation.

## VI. THE WESTERN ASSET AND GUGGENHEIM FUND COMPLEXES

97.    The Funds operate as parts of the integrated Western Asset and Guggenheim fund complexes, rather than operating independently.

98.    For example, in the course of describing the Trustees' duties the Funds' annual reports refer to the "fund complex" of which WIW and WIA are parts, and list the numbers of other funds in the "complex" that each Trustee oversees. Similarly, WIW's preliminary proxy statement filed March 23, 2018 describes Trustees Nyberg and Toupin as "serving on the boards of investment companies within the Guggenheim Advisors fund complex."

99.    That the Funds operate as parts of the Guggenheim and Western Asset fund complexes, and that the Defendants view themselves as operating fund complexes, is further illustrated by minutes from the meetings of the Funds' Boards of Trustees. For example, in minutes of a joint May 5, 2015 meeting the Trustees of both Funds approved the Funds' participation in various insurance agreements covering "certain investment companies in the . . . Legg Mason Funds complex, Western Asset Funds complex and the Western Asset Claymore Funds complex," as well as their "investment advisers, administrators, affiliated principal underwriter, Board Members and officers." This level of coordination among numerous different funds and their af-

---

[4] *Available at*
https://www.ici.org/events/upcoming/forms/conf_12_cef_program

filiated service providers is only possible because of the control exercised over the funds by the common service providers.

100.   Furthermore, nearly all in-person meetings of the Funds' Boards of Trustees are conducted at the offices of Western Asset or Guggenheim, further demonstrating the extent to which the Funds operate merely as parts of these unified complexes.

101.   Brief descriptions of the Western Asset and Guggenheim fund complexes follow.

A.   **Western Asset**

102.   Defendants WAMCO, WA Japan, WA London, WA Singapore, together with their affiliates (collectively, "Western Asset") are an integrated investment management company specializing in actively managed fixed-income investments.

103.   As of December 31, 2017 Western Asset had 862 employees located in 9 offices throughout the world including Pasadena, California. Western Asset managed $442 billion as of December 31, 2017.

104.   Western Asset's clients include, among others, high net worth individuals, charitable organizations, and registered investment companies. Among the investment companies are approximately 40 open-end funds and approximately 20 closed-end funds (including the Funds). Many of the same individuals serve as trustees and officers of numerous Western Asset-advised funds.

105.   Western Asset is comprised of six legal entities including the four Western Asset Defendants. Western Asset was founded in 1971 and was acquired by Legg Mason, Inc. ("Legg Mason") in 1986. Legg Mason is a global asset management company.

106.   Western Asset is a substantial part of Legg Mason's overall business. Legg Mason had a total of $767 billion in assets under management at December 31, 2017. Legg Mason recognized revenue of $2.9 billion in 2017.

107.   Legg Mason and Western Asset primarily generate revenue by charging fees for investment management services. Typically such fees are calculated as a percentage of a client's assets.

108.   Legg Mason and its affiliates and subsidiaries (including Western Asset) manage investments for approximately 130 open-end funds, 30 closed-end funds, and 7 ETFs. Many of the same individuals serve as trustees and officers of numerous Legg Mason-advised funds.

109.   Western Asset has a history of securities law violations and breaches of fiduciary duties owed to its clients. In January 2014 the SEC issued an order, pursuant to a settlement with WAMCO, in which the SEC found that WAMCO had willfully violated the Investment Company Act. *See* Investment Company Act of 1940 Release No. 30893 (Jan. 27, 2014).

110.   Specifically, the SEC found that WAMCO breached its fiduciary duties by causing various fund clients to enter into securities trades with each other in a manner that favored the interests of some clients over others. The SEC found that the legal violations were caused by WAMCO's deficient policies, controls, and supervision. The SEC ordered WAMCO to cease and desist from violating the securities laws, censured WAMCO, and ordered WAMCO to pay a $1 million civil fine. As part of the settlement WAMCO also made compensatory payments to impacted clients in the amount of $7,440,881 in the aggregate.

**B.   Guggenheim**

111.   Defendant Security Investors, LLC is an indirect wholly-owned subsidiary of Guggenheim Partners, LLC (Guggenheim Partners, LLC, SI, and their affiliates are collectively referred to herein as "Guggenheim").

112.   Guggenheim is a global investment and advisory firm with $305 billion in assets under management. Guggenheim has over 2,300 employees and is headquar-

tered in New York, New York and Chicago, Illinois. Guggenheim also maintains an office in Santa Monica, California.

113.    Guggenheim provides investment advice and related services to a range of clients including high net worth individuals, pension funds, and registered investment companies. Among the investment companies are approximately 85 open-end funds, 10 closed-end funds (including the Funds), and 65 ETFs. Many of the same individuals serve as trustees and officers of numerous Guggenheim-advised funds.

114.    Western Asset and Claymore Group together created the Funds in or about 2003. In 2009 Guggenheim acquired Claymore Group. When Guggenheim acquired Claymore Group it took over Claymore Group's role as a service provider to the Funds.

115.    On information and belief, Guggenheim primarily generates revenue by charging fees for investment management and related services. Typically such fees are calculated as a percentage of a client's assets.

116.    Guggenheim has a history of securities law violations and breaches of fiduciary duties owed to its clients. In August 2015 the SEC issued an order, pursuant to a settlement with a Guggenheim affiliate, Guggenheim Partners Investment Management LLC ("GPIM"), in which the SEC found that GPIM had willfully violated the Investment Advisers Act. *See* Investment Advisers Act of 1940 Release No. 4163 (Aug. 10, 2015).

117.    Specifically, the SEC found that GPIM breached its fiduciary duties by failing to disclose potential conflicts of interest involving a GPIM executive and a client, and by negligently charging a client for work never performed. The SEC found that the legal violations were caused by GPIM's deficient compliance policies and procedures. The SEC ordered GPIM to cease and desist from violating the securities laws, censured GPIM, and ordered GPIM to pay a $20 million civil fine.

118.   At the time of writing this Complaint, GPIM is once again under investigation by the SEC's enforcement staff. *See* Justin Baer and Margot Patrick, *Guggenheim Partners' Asset-Management Unit Is Under SEC Investigation, Sources Say*, WALL STREET JOURNAL (Apr. 15, 2018).

## VII. PLAINTIFF'S PRIOR EFFORTS TO REDUCE THE FUNDS' FEES

119.   Plaintiff has repeatedly and by various means, over the course of more than two years, attempted to convince the Funds' Trustees to take actions to benefit the Funds' shareholders, such as converting to an open-end structure and reducing excessive fees. Only after seeing those efforts rebuffed has Plaintiff resorted to litigation.

120.   In October 2015 Plaintiff raised his concerns about the Funds privately by writing the Chairman of the Funds' Boards of Trustees, Michael Larson. Because Mr. Larson did not reply and the Trustees did not address Plaintiff's concerns, Plaintiff published an article in the hopes of convincing the Trustees to act in the interests of all shareholders. *See* Howard Winston, *WIA and WIW Holders Deserve More From Chairperson Michael Larson and the Board of Directors* (Nov. 2, 2015).[5] Plaintiff also raised his concerns with the Funds' Chief Compliance Officer, Todd F. Kuehl, and with William Korver, a director at Guggenheim Investments which is an affiliate of SI and Guggenheim.

121.   Then, in what appeared to be a first step to address some of Plaintiff's concerns (regarding the Funds' large discount to NAV), on March 2, 2016 the Funds announced that:

> the Boards of Trustees have authorized management to repurchase in the open market up to approximately 10 percent of the Funds' outstanding common shares when the shares are trading at a discount to net asset value and when such purchases could enhance shareholder value. The Funds are under no obligation to purchase shares at any specific discount levels or in any specific amounts. Each Fund's repurchase activity will be disclosed in the shareholder report for the relevant fiscal period.

-----

[5] *Available at* https://seekingalpha.com/article/3631056-wia-wiw-holders-deserve-chairperson-michael-larson-board-directors

122.   However, in the more than two years since that announcement, the Funds have not repurchased any shares, despite the fact that their shares have traded at a large discount at all times. As such, this announcement appears to have been little more than window dressing in an attempt to appease Plaintiff, while at the same time avoiding any concrete steps that would have the effect of reducing Defendants' fees derived from the Funds.

123.   Also on March 2, 2016, and apparently in a misdirected response to Plaintiff's concerns about the Funds, both WIW and WIA announced changes to certain of their investment policies to take effect immediately. According to a press release issued by WIW and WIA, "The changes broaden the range of securities in which the Funds can invest, while maintaining the overall strategies of investing at least 80 percent of total managed assets in inflation-linked securities."

124.   Under the new policies each Fund would be allowed to (i) engage in currency strategies subject to a limit of 40 percent of total managed assets, (ii) utilize commodity-related strategies for up to 10 percent of its total managed assets, and (iii) invest in assets rated below investment grade with a limit of 10 percent of total managed assets for WIA and 40 percent for WIW.

125.   These revised investment policies, unilaterally changed without shareholder approval, appear to be an attempt to justify the Funds' high fees by investing in riskier and more exotic assets than their core holdings of U.S. Treasury Inflation-Protected Securities ("TIPs").

126.   Shortly following Plaintiff's initial efforts to correct the Funds' problems and the announcement of the Funds' policy changes on March 2, 2016, and also in response to Plaintiff's efforts, the Funds disclosed for the first time a potential conflict of interest involving Western Asset and the Funds' purportedly independent Chairman. Namely, that Western Asset has provided advice with respect to perhaps billions of dollars of Bill Gates's fortune for the last two decades. This fact is highly signifi-

cant because Mr. Larson is a long-time employee of Bill Gates and serves as Gates's Chief Investment Officer, with responsibility for tens of billions of dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust. Western Asset's substantial work for Bill Gates therefore represents a previously undisclosed source of potential conflicts for Mr. Larson, as he is in a position to potentially obtain preferred treatment for Gates from Western Asset by allowing Western Asset to profit at Fund shareholders' expense. The new disclosure consists of only a vague footnote in the Funds' proxy statements (beginning with those filed on April 5, 2016), and is nowhere near an adequate explanation of the relationships involved and the resulting potential conflicts.

127.  Following these announcements and disclosures, by November 2017 it had become apparent to Plaintiff that the Funds' mismanagement would continue, that no share repurchases would be made, and that the Funds' excessive fees would not be reduced. On November 27, 2017 Plaintiff sent letters to the Funds' Boards of Trustees to demand that they take action to remedy a number of breaches of fiduciary duties by the Trustees (the demand letters are reproduced as **Exhibit 1** and **Exhibit 2**). Among these demands were that the Funds take action to reduce their excessive fees, and to obtain compensation for excessive fees in past periods. Other demands related to the large, persistent market discount to NAV, certain conflicts of interest involving the Funds' Chairman Mr. Larson, and the Trustees' general inattention to the Funds' affairs. Among the remedial actions requested, Plaintiff demanded that the Funds initiate lawsuits against the Trustees for their breaches of fiduciary duties. The demand letters also specifically advised that Plaintiff intended to commence legal actions against Defendants under Section 36(b).

128.  Upon receipt of Plaintiff's demand letters the Funds formed Demand Review Committees consisting of Trustees Ronald Nyberg and Ronald Toupin, Jr. The

31

Demand Review Committees engaged legal counsel and investigated the issues raised in the demand letters.

129.   In December of 2017 and January of 2018 Plaintiff and the Demand Review Committees exchanged additional correspondence relating to the issues raised in the demand letters. Plaintiff produced over 2,000 pages of documents to the Demand Review Committees in support of his demands. Plaintiff flew across the country, on short notice and at his own expense, to appear in person and meet the Demand Review Committees in Washington, DC on January 3, 2018. At that meeting Plaintiff answered numerous questions from the Committees' counsel. Afterward, Plaintiff sent the Demand Review Committees a letter to follow up on various issues raised in the January 3 meeting.

130.   Then, in a letter dated January 12, 2018, the Demand Review Committees informed Plaintiff that:

> following an extensive investigation into the matters raised in the Demand Letters . . . The Boards have . . . concluded that the Funds do not have meritorious claims regarding the allegations in the Demand Letters. The Boards therefore have determined that it would not be in the best interests of the Funds or their shareholders to take the actions demanded in the Demand Letters.

131.   Notwithstanding the Trustees' refusal to sue themselves for breaches of fiduciary duties owed to the Funds' shareholders, the Funds appear to have taken a number of other remedial actions in response to Plaintiff's demand letters of November 27, 2017.

132.   In 8-K current report forms filed with the SEC on December 19, 2017, both Funds announced that "On December 19, 2017, Jane Trust resigned from the Board of Trustees of the Fund. She continues to serve as President of the Fund." Jane Trust is Senior Managing Director of Legg Mason & Co., LLC, an affiliate of Legg Mason and Western Asset. Because of her positions with Legg Mason and Western Asset affiliates, Ms. Trust was considered an "interested trustee" of the Funds for securities law purposes.

133.   Those same 8-Ks attached as exhibits Amended and Restated Bylaws for the Funds, dated as of September 23, 2015. Form 8-K is generally required to be filed with the SEC four business days from the date of the event that triggers the duty to file the 8-K. However, the Amended and Restated Bylaws had not been filed in 2015, or any time thereafter. In fact, the Funds' SEC filings gave no indication that their by-laws had ever been amended. The only versions of the Funds' bylaws previously filed with the SEC were the original versions from 2003. Prior to December 19, 2017, nei-ther Fund had ever filed a Form 8-K.

134.   The only significant change in the Funds' amended bylaws was the addi-tion of Article 13, titled "Exclusive Forum," which purports to limit certain litigation related to the Funds to certain state or federal courts in Massachusetts. This proactive attempt to make it more difficult for shareholders to enforce their rights (which was for a long time unknown to shareholders due to the Funds' failure to disclose the amended bylaws) serves as an illustrative contrast to the Trustees' failure over many years to even once try to reduce the Funds' fees. The forum selection clauses in the Funds' bylaws do not apply to the present action for multiple reasons as explained above at paragraph 20.

135.   In other 8-K forms filed with the SEC on December 29, 2017, the Funds indicated that their current custodian, State Street Bank and Trust, would soon be re-placed in that role by The Bank of New York Mellon.

136.   In an annual report filed with the SEC on form N-CSR on February 2, 2018, WIA disclosed that:

> Management recently informed the Servicing Agent that the Servicing Agent may have received payments in excess of a previously agreed upon cap on its compensation. The Servicing Agent informed the Fund that the Servicing Agent believes that it has not received any payments in excess of a cap. To settle this matter, the Servicing Agent and the Fund have agreed that the Servicing Agent will contribute to the Fund $350,000 of the potential overage and retain the remaining amount of approximately $700,000 as consideration for services rendered which the Board of Trustees believes the Servicing Agent earned based on services rendered to the Fund.

33

137.   In proxy statements filed with the SEC on Schedule 14A on February 16, 2018, the Funds announced various changes including reductions in fees, the replacement of SI as a service provider to the Funds, and the renaming of the Funds:

> WIA and WIW announced changes in the funds' management arrangements designed to reduce shareholder expenses and enhance management efficiencies for the funds. As a result of the changes approved by the Board of each fund, aggregate annual advisory, administration and servicing fee rates for WIA are expected to decrease by 16.5 basis points ("bps" 1 bp = 0.01%) while fee rates on WIW, subject to shareholder approval of new contracts, are expected to decrease by 24 bps.
>
> Shareholder savings on WIA will result from Western Asset reducing its contractual investment advisory fee rate from 40 to 35 bps and Legg Mason Partners Fund Advisor, LLC ("LMPFA") replacing Security Investors, LLC ("Security Investors"), and assuming its servicing and administration responsibilities for the fund, for a total of 5 bps including the services LMPFA already provides to the fund. These changes will be effective on or about April 27, 2018.
>
> Shareholder savings on WIW will result from Western Asset and LMPFA replacing Security Investors and assuming its responsibilities for the fund. Similar to WIA, Western Asset will provide investment advisory services directly to WIW for 35 bps, subject to shareholder approval, rather than as sub-adviser to Security Investors, and LMPFA will assume Security Investors' servicing responsibilities for a total of 5 bps including the services LMPFA already provides to the fund. These changes will be implemented beginning on or about April 27, 2018 on an interim basis and will be subject to WIW shareholder approval of new investment advisory and sub-advisory agreements. The interim arrangements will provide WIW with 150 days in which to obtain shareholder approval of new contracts with the new lower fee structure in place during the interim period. WIW currently expects to include a vote on these new contracts at its annual meeting of shareholders scheduled for May 30, 2018.
>
> Western Asset's portfolio management team for the funds, and the funds' investment strategies, will not change as a result of restructuring the management arrangements for the funds.
>
> Effective on or about April 27, 2018, WIA will be renamed Western Asset Inflation-Linked Income Fund and WIW will be renamed Western Asset Inflation-Linked Opportunities & Income Fund.

138.   According to WIW's preliminary proxy statement filed March 23, 2018, the proposal to reduce WIW's fees was developed by WAMCO and its affiliate in February 2018.

34

139.   Although the February 16, 2018 announcement contemplates a future re-duction in investment advisory expenses for the Funds, it says nothing about any at-tempt to recover previously paid excessive investment advisory fees.

140.   Furthermore, although the announcement contemplates that the Funds will pay investment advisory fees of 35 basis points (still calculated based on total as-sets instead of net assets) from April 27, 2018 on, this level of fees is still far in excess of arm's-length rates. An arm's-length rate for the Funds' investment advisory ser-vices would be at most 20 basis points calculated based on net assets.

141.   On March 1, 2018 Plaintiff sent the Funds requests for certain books and records in order to investigate the Trustees' actions taken in response to his demand letters. On or about March 15, 2018 the Funds sent Plaintiff certain financial records and heavily redacted board minutes in response to his books and records requests.

## VIII. WIW AND ITS SERVICE PROVIDERS

142.   The Western Asset/Claymore Inflation-Linked Opportunities & Income Fund is a closed-end registered investment company. It is organized as a Massachusetts business trust and commenced operations on or about February 24, 2004.

143.   WIW's investment objectives are described as follows, "The Fund's primary investment objective is to provide current income. Capital appreciation, when consistent with current income, is a secondary investment objective."

144.   WIW describes its non-fundamental investment policies as follows, "Under normal market conditions and at the time of purchase, the Fund will,":

• Invest at least 80% of its total managed assets in inflation-linked securities

• Invest no more than 40% of its total managed assets in below investment grade securities

• Invest up to 100% of its total managed assets in non-U.S. dollar investments, which gives the Fund the flexibility to invest up to 100% of its total assets in non-U.S. dollar inflation-linked securities (up to 100% of its non-U.S. dollar exposure may be unhedged)

• Engage in currency strategies, using instruments such as currency forwards, futures and options, to take long and short foreign currency positions subject to a limit of exposure from such strategies to 40% of total managed assets. This capacity is in addition to the capacity to have 100% unhedged exposure to non-U.S. dollar currencies through the purchase of fixed income securities

• Utilize commodity-related strategies for up to 10% of its total managed assets. Exposure to commodities is expected to be achieved through the use of a variety of instruments, such as futures contracts, options and other derivatives, or through investments in exchange-traded products that offer exposure to commodities. The Fund does not expect to hold physical commodities.

145.   In summary, "The Fund seeks to offer an inflation hedge through investments in global inflation-linked securities, and primarily in U.S. Treasury Inflation-Protected Securities ("TIPS"). The Fund also seeks to offer shareholders certain additional advantages through the ability to invest in other fixed income asset classes, which may result in higher total returns and higher distribution rates. These asset classes include select investments in high-yield and investment grade credit, emerging markets and structured products."

146.   WIW's self-selected benchmark indexes are (i) the Bloomberg Barclays U.S. Government Inflation-Linked 1-10 Year Index, (ii) the Bloomberg Barclays U.S. Government Inflation-Linked All Maturities Index, and (iii) a custom benchmark index comprised of 90% Bloomberg Barclays U.S. Government Inflation-Linked All Maturities Index, 5% Bloomberg Barclays U.S. Credit Index and 5% JPMorgan Emerging Markets Bond Index Plus.

147.   At January 31, 2018 WIW's portfolio was composed of asset classes as follows:

**Image 1. WIW Portfolio Concentration**



148.   At January 31, 2018 WIW's portfolio consisted of securities of credit quality reflected below:

**Image 2. WIW Credit Quality**



149.   As of January 31, 2018 the effective duration of WIW's portfolio was 7.00 years.

150.   WIW's portfolio turnover rate for the year ended November 30, 2017 was 57%, and has averaged 69% for the past five years.

151.   As of January 31, 2018 the top ten holdings in WIW's portfolio by value were:

**Table 3. WIW Top 10 Holdings**

| Security | Portfolio weight |
|---|---|
| US TIPS, 2%, 01/15/2026 | 14.36% |
| US TIPS, 0.125%, 04/15/2018 | 6.92% |
| US TIPS, 1.125%, 01/15/2021 | 6.66% |
| US TIPS, 0.125%, 01/15/2023 | 6.37% |
| US TIPS, 0.125%, 07/15/2022 | 5.71% |
| US TIPS, 0.625%, 01/15/2026 | 4.94% |
| US TIPS, 0.125%, 04/15/2019 | 4.87% |
| US TIPS, 0.125%, 04/15/2020 | 3.78% |
| US TIPS, 1.375%, 02/15/2044 | 3.24% |
| US TIPS, 0.625%, 01/15/2024 | 2.88% |
| TOTAL | 59.73% |

152.   As of November 30, 2017 WIW had $1.077 billion of total assets, $294 million of total liabilities (including $292 million of leverage in the form of "open reverse repurchase agreements"), and $782 million of net assets.

153.   The following table shows the total investment return for WIW over the last five years, as reflected in WIW's SEC filings:

**Table 4. WIW Total Return 2013-2017**

| | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| **Total return, based on NAV (%)** | 6.99 | 4.69 | -3.42 | 1.09 | -8.74 | 0.12 |
| **Total return, based on Market Price (%)** | 7.42 | 9.85 | -5.83 | 4.03 | -11.77 | 0.74 |

154.   The following table shows the average discount to NAV at which WIW's shares have traded over the last five years:

**Table 5. WIW Discount to NAV 2013-2017**

| | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| **Average Discount (%)** | -11.42 | -12.36 | -14.39 | -13.01 | -12.97 | -12.83 |
| **High Discount (%)** | -10.10 | -9.87 | -12.41 | -11.44 | -10.50 | -10.86 |
| **Low Discount (%)** | -12.01 | -16.24 | -16.60 | -14.48 | -14.97 | -14.86 |

155.   WIW's Board of Trustees consists of Michael Larson (Chairman), Ronald A. Nyberg, and Ronald E. Toupin, Jr. Jane Trust also served as a Trustee until her resignation from the Board on or about December 19, 2017.

156.   WIW's officers are Jane Trust (President), Richard F. Sennett (Principal Financial and Accounting Officer and Treasurer), Todd F. Kuehl (Chief Compliance Officer), and Robert I. Frenkel (Secretary).

### A.   Investment Advisory Services

157.   WIW's primary investment adviser is SI. WIW's investment sub-advisers are WAMCO, WA Japan, WA London, and WA Singapore.

158.   WIW's portfolio managers are S. Kenneth Leech, Michael C. Buchanan, Frederick Marki, and Chia-Liang Lian. WIW's SEC filings state that, "At Western Asset . . . we utilize a fixed-income team approach, with decisions derived from interaction among various investment management sector specialists. The sector teams are comprised of Western Asset's senior portfolio management personnel, research analysts and an in-house economist." The analysts and economist are not identified in WIW's public filings.

159.   For the year ended November 30, 2017 WIW accrued $6,489,372 in management fees payable to SI, of which $2,920,217 was payable to WAMCO for sub-advisory services.

160.   From WIW's inception in or about 2003 through the present, the substantive terms of WIW's investment advisory arrangements have remained largely unchanged. The only significant changes being (i) the addition of WA Japan, WA London, and WA Singapore as sub-advisers in 2008, and (ii) a Guggenheim affiliate becoming WIW's investment adviser instead of a Claymore Group affiliate when Guggenheim acquired Claymore Group in 2009. The only other changes to WIW's investment advisory arrangements have been to entity names or other minor changes. A more significant change is contemplated to occur on or about April 27, 2018, when WAMCO is to replace SI as WIW's investment adviser, and investment advisory fees are to be somewhat reduced.

161.   WIW's original Investment Advisory Agreement was executed by WIW and Claymore Advisors LLC in or about 2003 (in the form attached as **Exhibit 3**, the "WIW Advisory Agreement"). Under this agreement, the adviser's primary responsibility was to, "regularly provide [WIW] with investment research, advice, management and supervision and . . . furnish a continuous investment program for [WIW] consistent with [WIW]'s investment objectives, policies and restrictions." *See* WIW Advisory Agreement, Ex. 3 at §3(a).

162.   The agreement also required the adviser to provide certain administrative services. *See* WIW Advisory Agreement, Ex. 3 at §3(b) and EXHIBIT A. However, as will be discussed *infra*, many of those administrative services were duplicative of services provided by WIW's administrator or other service providers. Other of the administrative services were routine, clerical, and of little value.

163.   The WIW Advisory Agreement also provides, "Other than as herein specifically indicated, the Advisor shall not be responsible for the expenses of the Trust," and sets forth a long list of expenses that the adviser is not responsible for. *See* WIW Advisory Agreement, Ex. 3 at §5(b).

164.   The Investment Advisory Agreement provided that in exchange for its services, WIW "shall pay the Advisor an annual fee, payable on a monthly basis, at the annual rate of 0.60% of [WIW]'s average weekly assets. 'Average Weekly Assets' means the average weekly value of the total assets of [WIW] (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage)." *See* WIW Advisory Agreement, Ex. 3 at §7. The WIW Advisory Agreement did not indicate what portion, if any, of the 0.60% fee was attributable to services other than investment advisory services.

165.   Also in or about 2003, a sub-advisory agreement, titled Investment Management Agreement, was executed by WIW, Claymore Advisors LLC, and WAMCO (in the form attached as **Exhibit 4**, the "WIW Sub-Advisory Agreement").

Under this agreement WAMCO's primary responsibility was to, "regularly provide [WIW] with investment research, advice, management and supervision and . . . furnish a continuous investment program for [WIW] consistent with [WIW]'s investment objectives, policies, and restrictions as stated in [WIW]'s current Prospectus and Statement of Additional Information." *See* WIW Sub-Advisory Agreement, Ex. 4 at §3(a).

166.   The WIW Sub-Advisory Agreement and the WIW Advisory Agreement use nearly identical language in their respective sections 3(a) to describe the investment advisory services to be performed, as shown in the redline comparison attached as **Exhibit 5**.

167.   The WIW Sub-Advisory Agreement provided that in exchange for its services, the adviser "shall pay [WAMCO] an annual fee, payable on a monthly basis, at the annual rate of 0.27% of [WIW]'s average weekly assets. 'Average Weekly Assets' means the average weekly value of the total assets of [WIW] (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage)." *See* WIW Sub-Advisory Agreement, Ex. 4 at §7.

168.   According to WIW's annual report for its year ended December 31, 2008, "At their September 8, 2008 meeting, the Trustees . . . approved the addition of the following three non-U.S. affiliates of Western Asset as additional investment sub-advisers of [WIW]: Western Asset Management Company Pte. Ltd. in Singapore . . . , Western Asset Management Company Limited in London . . . and Western Asset Management Company Ltd in Japan." The relevant sub-advisory agreements do not appear to have been made public. However, WIW has disclosed that WAMCO pays WA Singapore, WA London, and WA Japan annual fees of 0.27% of the amounts of WIW's total assets managed by them.

169.   According to WIW's annual report for its year ended November 30, 2017:

On May 3, 2016, the Fund entered into an Amended and Restated Investment Advisory Agreement with Security Investors, LLC . . . , which provides for payment of a monthly fee computed at the annual rate of 0.60% of the Fund's average weekly assets . . . [SI] has, in turn, entered into an Amended and Restated Investment Management Agreement with Western Asset Management Company and separate Amended and Restated Investment Management Agreements among [SI], Western Asset Management Company and each of Western Asset Management Company Ltd. . . . , Western Asset Management Company Limited . . . , and Western Asset Management Company Pte. Ltd. . . . In exchange for the services provided by [WAMCO], [SI] pays a portion of the fees it receives from the Fund to [WAMCO], at the annual rate of 0.27% of the Fund's average weekly assets.

This excerpt appears to describe the most recent revisions to WIW's investment management agreements as of the date of this Complaint (apart from the anticipated changes to take effect on or about April 27, 2018). Copies of the most recently revised documents do not appear to be publicly available, but are believed to be substantially similar to the agreements reproduced in **Exhibit 3** and **Exhibit 4**.

170.   In a proxy statement filed with the SEC on April 6, 2018, WIW provided shareholders with notice of a meeting to be held May 30, 2018, at which shareholders will vote on new investment advisory agreements. The proxy statement states that the new agreements have already been approved by the Board and "are scheduled to be effective on or about April 27, 2018 on an interim basis pending shareholder approval."

171.   The Form of Proposed Advisory Agreement included as Appendix A to the proxy statement is reproduced in **Exhibit 6** (the "WIW New Advisory Agreement"). The WIW New Advisory Agreement is very similar to the WIW Advisory Agreement with three main differences. First, WAMCO replaces SI as the primary investment adviser. *See* WIW New Advisory Agreement, Ex. 6, at preamble. Second, WAMCO is not required to perform certain administrative duties that SI was previously supposed to perform. *See* WIW New Advisory Agreement, Ex. 6, at §3. Third, fees payable to WAMCO will be 0.35% of total assets instead of the 0.60% of total assets currently payable to SI. *See* WIW New Advisory Agreement, Ex. 6, at §7.

172.   The WIW New Advisory Agreement and the WIW Advisory Agreement use nearly identical language in their respective sections 3(a) to describe the investment advisory services to be performed, as shown in the redline comparison attached as **Exhibit 7**.

173.   WIW's proxy statement filed April 6, 2018 also includes a Form of Proposed Sub-Advisory Agreement as Appendix B to the proxy statement, for each of WA Singapore, WA Japan, and WA London. Each of these three Forms of Proposed Sub-Advisory Agreement is nearly identical. The Form of Proposed Sub-Advisory Agreement for WA London is reproduced in **Exhibit 8** (the "WIW New Sub-Advisory Agreement").

174.   The WIW New Sub-Advisory Agreement is very similar to the WIW Sub-Advisory Agreement. The main difference is that the fees payable to WA London, WA Japan, and WA Singapore will increase to 0.35% of total assets managed by them from the 0.27% rate currently payable. *See* WIW New Sub-Advisory Agreement, Ex. 8, at §7.

### B.   Administrative and Other Services

175.   As of November 30, 2017 State Street Bank and Trust Company served as WIW's custodian. WIW has announced that State Street Bank and Trust Company will soon be replaced in that role by The Bank of New York Mellon.

176.   WIW's legal counsel is Ropes & Gray LLP.

177.   WIW's independent registered public accounting firm is PricewaterhouseCoopers LLP.

178.   WIW's transfer agent is Computershare Inc.

179.   Legg Mason Partners Fund Advisor, LLC ("LMPFA") serves as WIW's administrator. In or about 2004 WIW entered into an Administrative Services Agreement with a predecessor to LMPFA, named Legg Mason Fund Adviser, Inc.

("LMFA"), as reproduced in **Exhibit 9** (the "WIW Administrative Services Agreement").

180.   The administrator's main duty under the WIW Administrative Services Agreement is to provide various administrative services. *See* WIW Administrative Services Agreement, Ex. 9, at §3(a), SCHEDULE A. As shown in **Exhibit 15**, the enumerated administrative duties broadly overlap with those listed in the WIW Advisory Agreement. *See generally* Comparison of WIW Advisory Agreement Exhibit A to WIW Administrative Services Agreement Schedule A, Ex. 15.

181.   It is believed that the current version of WIW's Administrative Services Agreement is substantially identical to the WIW Administrative Services Agreement reproduced in **Exhibit 9**, with two significant changes. First, LMPFA became the administrator effective September 30, 2009. Second, the fees payable to the administrator increased effective January 1, 2012.

182.   Under the original WIW Administrative Services Agreement the administrator was to receive compensation equal to $125,000 per year. *See* WIW Administrative Services Agreement, Ex. 9, §6. From 2012 through the present, LMPFA's fees have increased to 0.04% of WIW's total assets per year, subject to an annual minimum of $225,000.

183.   Under WIW's new services arrangements scheduled to take effect on or about April 27, 2018, LMPFA will continue to perform its current duties and will assume all of SI's administrative duties in exchange for an increase in LMPFA's annual fees of 0.01%, up to a total of 0.05% of total assets per year.

184.   The following table summarizes WIW's annual fees payable to Defendants and their affiliates:

**Table 6. Summary of WIW Fees Payable to Defendants and Affiliates**

| Service | Provider | Annual Fees |
|---|---|---|
| *Current Arrangements* | | |
| Investment advisory (and certain administrative) | SI / WAMCO | 0.60% of total assets |
| • Investment advisory (and certain administrative) | SI | • 0.33% of total assets |
| • Investment sub-advisory | WAMCO | • 0.27% of total assets |
| Administrative | LMPFA | 0.04% of total assets |
| TOTAL | | 0.64% of total assets |
| | | |
| *Effective April 27, 2018* | | |
| Investment advisory | WAMCO | 0.35% of total assets |
| Administrative | LMPFA | 0.05% of total assets |
| TOTAL | | 0.40% of total assets |

## IX. WIA AND ITS SERVICE PROVIDERS

185.   The Western Asset/Claymore Inflation-Linked Securities & Income Fund is a closed-end registered investment company. It is organized as a Massachusetts business trust and commenced operations on or about September 25, 2003.

186.   WIA's investment objectives are described as follows, "The Fund's primary investment objective is to provide current income. Capital appreciation, when consistent with current income, is a secondary investment objective."

187.   WIA describes its non-fundamental investment policies as follows, "Under normal market conditions and at the time of purchase, the Fund will,":

- • Invest at least 80% of its total managed assets in inflation-linked securities

- • Invest no more than 10% of its total managed assets in assets rated below investment grade at the time of purchase (or, if unrated, assets of comparable quality as determined by management)

- • Invest at least 60% of its total managed assets in U.S. Treasury Inflation-Protected Securities ("TIPS")

- • Invest no more than 40% of its total managed assets in non-U.S. dollar investments, which gives the Fund the flexibility to invest up to 40% of its total managed assets in non-U.S. dollar inflation-linked securities (no more than 20% of its non-U.S. dollar exposure may be unhedged)

- • Engage in currency strategies, using instruments such as currency forwards, futures and options, to take long and short foreign currency positions subject to a limit of exposure from such strategies to 40% of

total managed assets. This capacity is in addition to the capacity to have 20% unhedged exposure to non-U.S. dollar currencies through the purchase of fixed income securities

• Utilize commodity-related strategies for up to 10% of its total managed assets. Exposure to commodities is expected to be achieved through the use of a variety of instruments, such as futures contracts, options and other derivatives, or through investments in exchange-traded products that offer exposure to commodities. The Fund does not expect to hold physical commodities.

188.   These policies are summarized as follows, "The Fund seeks to offer an inflation hedge through investments in global inflation-linked securities, and primarily in TIPS. The Fund also seeks to offer shareholders certain additional advantages through the ability to invest in other fixed-income asset classes, which may result in higher total returns and higher distribution rates. These asset classes include select investments in high-yield and investment-grade credit, emerging markets and structured products."

189.   WIA's self-selected benchmark indexes are (i) the Bloomberg Barclays U.S. Government Inflation-Linked 1-10 Year Index, (ii) the Bloomberg Barclays U.S. Government Inflation-Linked All Maturities Index, and (iii) a custom benchmark index comprised of 90% Bloomberg Barclays U.S. Government Inflation-Linked All Maturities Index and 10% Bloomberg Barclays U.S. Credit Index.

190.   At January 31, 2018 WIA's portfolio was composed of asset classes as follows:

46

**Image 3. WIA Portfolio Concentration**



191.   As of January 31, 2018 WIA's portfolio consisted of securities of credit quality reflected below:

**Image 4. WIA Credit Quality**



192.   As of January 31, 2018 the effective duration of WIA's portfolio was 6.76 years.

193.   WIA's portfolio turnover rate for the year ended November 30, 2017 was 59%, and has averaged 60% for the past five years.

194.   As of January 31, 2018 the top ten holdings in WIA's portfolio by value were:

**Table 7. WIA Top 10 Holdings**

| Security | Portfolio weight |
|---|---|
| US TIPS, 2%, 01/15/2026 | 11.10% |
| US TIPS, 0.125%, 04/15/2018 | 8.66% |
| US TIPS, 0.125%, 04/15/2020 | 7.15% |
| US TIPS, 1.125%, 01/15/2021 | 6.83% |
| US TIPS, 1.75%, 01/15/2028 | 6.61% |
| US TIPS, 0.125%, 04/15/2019 | 5.75% |
| US TIPS, 0.125%, 01/15/2023 | 4.79% |
| US TIPS, 0.125%, 07/15/2022 | 4.58% |
| US TIPS, 0.625%, 01/15/2026 | 4.06% |
| US TIPS, 1.375%, 02/15/2044 | 3.31% |
| TOTAL | 62.84% |

195.   As of November 30, 2017 WIA had $529 million of total assets, $147 million of total liabilities (including $146 million of leverage in the form of "open reverse repurchase agreements"), and $382 million of net assets.

196.   The following table shows the total investment return for WIA over the last five years, as reflected in WIA's SEC filings:

**Table 8. WIA Total Return 2013-2017**

| | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| **Total return, based on NAV (%)** | 6.77 | 4.28 | -3.00 | 3.68 | -8.29 | 0.69 |
| **Total return, based on Market Price (%)** | 7.15 | 9.61 | -5.95 | 5.20 | -10.15 | 1.17 |

197.   The following table shows the average discount to NAV at which WIA's shares have traded over the last five years:

**Table 9. WIA Discount to NAV 2013-2017**

| | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| **Average Discount (%)** | -10.92 | -11.9 | -14.22 | -12.68 | -11.13 | -12.17 |
| **High Discount (%)** | -9.36 | -9.18 | -12.40 | -11.18 | -7.57 | -9.94 |
| **Low Discount (%)** | -11.66 | -15.51 | -16.67 | -14.23 | -13.78 | -14.37 |

198.   WIA's Board of Trustees consists of Michael Larson (Chairman), Ronald A. Nyberg, and Ronald E. Toupin, Jr. Jane Trust also served as a Trustee until her resignation from the Board on or about December 19, 2017.

199.   WIA's officers are Jane Trust (President), Richard F. Sennett (Principal Financial and Accounting Officer and Treasurer), Todd F. Kuehl (Chief Compliance Officer), and Robert I. Frenkel (Secretary).

A.   **Investment Advisory Services**

200.   WIA's primary investment adviser is WAMCO. WIA's investment sub-advisers are WA Japan, WA London, and WA Singapore.

201.   WIA's portfolio managers are S. Kenneth Leech, Michael C. Buchanan, Frederick Marki, and Chia-Liang Lian. WIA's SEC filings state that, "At Western Asset . . . we utilize a fixed-income team approach, with decisions derived from interaction among various investment management sector specialists. The sector teams are comprised of Western Asset's senior portfolio management personnel, research analysts and an in-house economist." The analysts and economist are not identified in WIA's public filings.

202.   For the year ended November 30, 2017 WIA accrued $2,115,515 in management fees payable to WAMCO.

203.   From WIA's inception in or about 2003 through the present, the substantive terms of WIA's investment advisory arrangements have remained largely unchanged. The only significant changes being the addition of WA Japan, WA London, and WA Singapore as sub-advisers in 2008. The only other changes to WIA's investment advisory arrangements have been to entity names or other minor changes. A more significant change is contemplated to occur on or about April 27, 2018, when investment advisory fees are to be somewhat decreased.

204.   WIA's original Investment Management Agreement was executed by WIA and WAMCO in or about 2003 (in the form attached as **Exhibit 10**, the "WIA Advisory Agreement"). Under this agreement, WAMCO's primary responsibility was to, "regularly provide [WIA] with investment research, advice, management and supervision and . . . furnish a continuous investment program for [WIA] consistent

with [WIA]'s investment objectives, policies and restrictions." *See* WIA Advisory Agreement, Ex. 10, at §3(a).

205.   The WIA Advisory Agreement and the WIW Advisory Agreement use nearly identical language in their respective sections 3(a) to describe the investment advisory services to be performed, as shown in the redline comparison attached as **Exhibit 11**.

206.   The WIA Advisory Agreement also provides, "Other than as herein specifically indicated, the Advisor shall not be responsible for the expenses of the Trust," and sets forth a long list of expenses that the adviser is not responsible for. *See* WIA Advisory Agreement, Ex. 10 at §5(b).

207.   The WIA Advisory Agreement provided that in exchange for its services, WIA "shall pay [WAMCO] an annual fee, payable on a monthly basis, at the annual rate of 0.40% of [WIA]'s average weekly assets. 'Average Weekly Assets' means the average weekly value of the total assets of [WIA] (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage)." *See* WIA Advisory Agreement, Ex. 10 at §7. The WIA Advisory Agreement did not indicate what portion, if any, of the 0.40% fee was attributable to services other than investment advisory services.

208.   According to WIA's annual report for its year ended December 31, 2008, "At their September 8, 2008 meeting, the Trustees . . . approved the addition of the following three non-U.S. affiliates of Western Asset as additional investment sub-advisers of [WIA]: Western Asset Management Company Pte. Ltd. in Singapore . . . , Western Asset Management Company Limited in London . . . and Western Asset Management Company Ltd in Japan." The relevant sub-advisory agreements do not appear to have been made public.

209.   It is unclear from WIA's public SEC filings whether there are any amended versions of the 2003 WIA Advisory Agreement with WAMCO. If any such

amended versions do exist, they are believed to be substantially similar to the agreement reproduced in **Exhibit 10**. No substantive revisions to the WIA Advisory Agreement appear to have been made as of the date of this Complaint (apart from the anticipated changes to take effect on or about April 27, 2018).

210.   The sub-advisory agreements among WIA, WAMCO, WA London, WA Japan, and WA Singapore do not appear to have been made public.

211.   In a preliminary proxy statement filed with the SEC on February 22, 2018, WIA announced new fee arrangements. The preliminary proxy statement states that the new arrangements have already been approved by the Board and "will be effective on or about April 27, 2018." Under WIA's new arrangements, the annual advisory fee payable to WAMCO will decrease from 0.40% of total assets to 0.35% of total assets.

**B.   Administrative and Other Services**

212.   As of November 30, 2017 State Street Bank and Trust Company served as WIA's custodian. WIA has announced that State Street Bank and Trust Company will soon be replaced in that role by The Bank of New York Mellon.

213.   WIA's legal counsel is Ropes & Gray LLP.

214.   WIA's independent registered public accounting firm is PricewaterhouseCoopers LLP.

215.   WIA's transfer agent is Computershare Inc.

216.   LMPFA serves as WIA's administrator. On or about September 25, 2003 WIA entered into an Administrative Services Agreement with a predecessor to LMPFA, namely LMFA (the "WIA Administrative Services Agreement").[6] The administrator's main duty under the WIA Administrative Services Agreement is to provide various administrative services.

---

[6] *Available at* https://www.sec.gov/Archives/edgar/data/1254370/ 000104746903031627/a2118987zex-99_k3.txt

217.   It is believed that the current version of WIA's Administrative Services Agreement is substantially identical to the WIA Administrative Services Agreement executed on or about September 25, 2003, with two significant changes. First, LMPFA became the administrator effective September 30, 2009. Second, the fees payable to the administrator increased effective January 1, 2012.

218.   Under the original WIA Administrative Services Agreement the administrator was to receive compensation equal to $100,000 per year. From 2012 through the present, LMPFA's fees have increased to 0.04% of WIA's total assets per year, subject to an annual minimum of $225,000.

219.   SI is WIA's servicing agent. Until very recently (February 1, 2018), Guggenheim Funds Distributors, LLC ("GFDI"), an affiliate of SI and Guggenheim, was WIA's servicing agent.

220.   Under a Servicing Agreement (the "WIA Servicing Agreement") between WIA and Claymore Securities, Inc. executed in or about 2003, the servicing agent's main duty is to provide various administrative services.[7] The enumerated administrative duties broadly overlap with those listed in the WIA Administrative Services Agreement. *Compare* WIA Servicing Agreement at §2 *with* WIA Administrative Services Agreement at §3(b) and SCHEDULE A.

221.   It is believed that the current version of the WIA Servicing Agreement is substantially identical to the version executed in or about 2003, with the servicing agent changing to GFDI in or about 2009, and SI replacing GFDI on or about February 1, 2018.

222.   At all times the WIA Servicing Agreement has provided for compensation to the servicing agent equal to 0.15% of WIA's total assets each year.

---

[7] *Available at* https://www.sec.gov/Archives/edgar/data/1254370/ 000104746903031627/a2118987zex-99_k2.txt

223.   Under WIA's new fee arrangements scheduled to take effect on or about April 27, 2018, LMPFA will perform all administrative duties (including those previously performed by LMPFA, GFDI or SI) in exchange for an increase in LMPFA's annual fees of 0.01%, up to a total of 0.05% of total assets per year.

224.   The following table summarizes WIA's annual fees payable to Defendants and their affiliates:

**Table 10. Summary of WIA Fees Payable to Defendants and Affiliates**

| Service | Provider | Annual Fees |
| --- | --- | --- |
| *Current Arrangements* | | |
| Investment advisory | WAMCO | 0.40% of total assets |
| Administrative | LMPFA | 0.04% of total assets |
| "Servicing" (administrative) | SI / GFDI | 0.15% of total assets |
| TOTAL | | 0.59% of total assets |
| | | |
| *Effective April 27, 2018* | | |
| Investment advisory | WAMCO | 0.35% of total assets |
| Administrative | LMPFA | 0.05% of total assets |
| TOTAL | | 0.40% of total assets |

## C.   Investment Advisory Services for WIA and WIW are Similar

225.   WIW and WIA are extremely similar funds, although they are organized as separate legal entities and have slightly different investment policies.

226.   Both WIW and WIA are closed end funds. Both were created in or about 2003 jointly by the Western Asset and Claymore fund complexes, with Guggenheim later replacing Claymore in the Funds' management. WIW and WIA are for all practical purposes managed together as one by Guggenheim and Western Asset.

227.   WIW and WIA share the same Board members, officers, and portfolio managers.

228.   WIW and WIA share the same investment adviser or sub-advisers in WAMCO, WA London, WA Singapore, and WA Japan. Although SI is the primary investment adviser to WIW and not WIA, as discussed *infra* it appears that SI has in fact delegated all investment advisory duties to WAMCO. As such, WIW and WIA

for all practical purposes have identical investment advisers. WIW and WIA also share several other service providers in addition to having investment advice provided by the Western Asset Defendants.

229.   WIW and WIA have the same investment objective. Both have investment policies requiring at least 80% of total assets to be invested in inflation-linked securities. Both measure their results against two of the same benchmark indexes.

230.   In practice, both invest roughly 80% of their assets in U.S. TIPs, with the remainder of their portfolios consisting of emerging markets debt, high yield corporate debt, mortgage backed securities, non-U.S. TIPs, investment grade corporate debt, and asset backed securities. Both portfolios have similar effective duration. Both are invested roughly 80% in debt of AAA quality, with the next largest classification consisting of roughly 6% of each portfolio invested in BBB quality debt. Both have similar levels of turnover.

231.   WIW's top two securities owned by portfolio weight are the same as WIA's top two securities owned by portfolio weight. Nine of WIW's top ten securities owned by portfolio weight are also among WIA's top ten securities owned by portfolio weight.

232.   The following chart displays the total return for $10,000 invested in each of WIW and WIA from January 1, 2005 to December 31, 2017.

**Image 5. Comparison of WIW and WIA Total Return 2005-2017**



233.   The high degree of correlation visible in the above chart is confirmed by a numerical correlation analysis. Over the period January 1, 2005 to December 31, 2017 the annual returns of WIW and WIA have a correlation coefficient of 0.98.[8]

234.   Furthermore, as shown in **Exhibit 11**, the contractual language in the WIA Advisory Agreement that sets forth the investment advisory services to be performed is nearly identical to the language in the WIW Advisory Agreement that sets forth the investment advisory services to be performed.

235.   Because of the extremely high degree of similarity among the investment agreements, policies, and portfolios of WIW and WIA, it follows that their investment advisers provide comparable services. This conclusion is reinforced by the fact that they share the same investment advisers in the Western Asset Defendants, and even share the same individual portfolio managers.

---

[8] Correlation coefficients range from -1.00 to +1.00. A coefficient near +1.00 means the two data series have a strong positive correlation, a coefficient of 0.00 means there is no correlation, and a coefficient near -1.00 means two data series have a strong negative correlation.

# X. COMPARABLE FUND: WAFSX

236.   The Western Asset Inflation Indexed Plus Bond Fund ("WAFSX")[9] is an open-end registered investment company. It is organized as a series of Western Asset Funds, Inc., a Maryland corporation. WAFSX commenced operations on or about March 1, 2001.

237.   WAFSX's investment objectives are described as follows, "The Fund's investment objective is to maximize total return, consistent with preservation of capital."

238.   WAFSX describes its non-fundamental investment policies as follows, "Under normal market conditions, the Fund invests at least 80% of its net assets in inflation-indexed fixed-income securities and at least 70% of its net assets in U.S. Treasury Inflation Protected Securities."

239.   WAFSX's self-selected benchmark index is the Bloomberg Barclays U.S. TIPS Index.

240.   At February 28, 2018 WAFSX's portfolio was composed as follows:

**Image 6. WAFSX Portfolio Concentration**



| Portfolio Concentration | |
| --- | --- |
| US TIPs | 93.76% |
| Investment Grade Corporate Bonds | 4.40% |
| Emerging Market | 0.83% |
| High Yield Corporate Bonds | 0.43% |
| Mortgage-Backed Securities | 0.01% |
| Cash & Other Securities | 0.58% |

---

[9] The Western Asset Inflation Indexed Plus Bond Fund has seven different share classes, each class having its own ticker symbol. WAFSX is the ticker symbol for that fund's "Class IS" shares. The share classes feature different sales charges, annual distribution or service fees, and exchange privileges, but otherwise are identical. All classes share in the same underlying portfolio of assets overseen by the same portfolio managers. All share classes pay the same investment advisory fees.

241.   As of February 28, 2018 WAFSX's portfolio consisted of securities of credit quality reflected below:

**Image 7. WAFSX Credit Quality**



| Credit Quality | |
| --- | --- |
| AAA | 93.88% |
| A | 0.82% |
| BBB | 4.30% |
| BB | 0.43% |
| Not Rated | 0.58% |

242.   As of February 28, 2018 the effective duration of WAFSX's portfolio was 7.68 years.

243.   WAFSX's portfolio turnover rate for the year ended December 31, 2017 was 43%, and has averaged 52% for the past five years.

244.   As of December 31, 2017 the top ten holdings in WAFSX's portfolio by value were:

**Table 11. WAFSX Top 10 Holdings**

| Security | Portfolio weight |
| --- | --- |
| US TIPS, 0.125%, 04/15/2020 | 11.08% |
| US TIPS, 0.125%, 04/15/2019 | 9.55% |
| US TIPS, 1.375%, 02/15/2044 | 9.20% |
| US TIPS, 1.75%, 01/15/2028 | 8.18% |
| US TIPS, 0.125%, 07/15/2022 | 7.96% |
| US TIPS, 0.125%, 01/15/2023 | 7.76% |
| US TIPS, 3.875%, 04/15/2029 | 6.64% |
| US TIPS, 0.625%, 01/15/2026 | 5.98% |
| US TIPS, 2.5%, 01/15/2029 | 5.20% |
| US TIPS, 0.125%, 04/15/2022 | 4.49% |
| TOTAL | 76.04% |

245.   As of December 31, 2017 WAFSX had $443.3 million of total assets, $0.6 million of total liabilities, and $442.7 million of net assets.

246.   The following table shows the total investment return for WAFSX over the last five years, as reflected in WAFSX's SEC filings:

**Table 12. WAFSX Total Return 2013-2017**

|  | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| Total return (%) | 3.44 | 2.13 | -2.72 | 2.53 | -8.52 | -0.63 |

247.   WAFSX's officers include Jane Trust (President and CEO), Richard F. Sennett (Principal Financial Officer and Treasurer), and Todd F. Kuehl (Chief Compliance Officer).

### A.   Investment Advisory Services

248.   WAFSX's primary investment adviser is LMPFA. WAFSX's investment sub-advisers are WAMCO, WA Japan, WA London, and WA Singapore.

249.   WAFSX's portfolio managers are S. Kenneth Leech and Frederick Marki. WAFSX's SEC filings state that, "At Western Asset . . . we utilize a fixed-income team approach, with decisions derived from interaction among various investment management sector specialists. The sector teams are comprised of Western Asset's senior portfolio management personnel, research analysts and an in-house economist." The analysts and economist are not identified in WAFSX's public filings.

250.   For the year ended December 31, 2017 WAFSX accrued $853,754 in investment management fees payable to LMPFA.

251.   From WAFSX's inception in or about 2001 through the present, the substantive terms of WAFSX's investment advisory arrangements have remained largely unchanged. The only significant changes being the addition of WA Japan, WA London, and WA Singapore as sub-advisers, and the replacement of LMFA by LMPFA as primary adviser in 2009.

252.   WAFSX's original Investment Management Agreement was executed by Western Asset Funds, Inc. and LMFA on or about December 31, 2001 (in the form attached as **Exhibit 12**, the "WAFSX Advisory Agreement"). Under this agreement, LMFA's primary responsibility was to, "regularly provide [WAFSX] with investment

research, advice, management and supervision and . . . furnish a continuous investment program for [WAFSX] consistent with [WAFSX]'s investment objectives, policies and restrictions." *See* WAFSX Advisory Agreement, Ex. 12 at §3(a).

253.   The WAFSX Advisory Agreement and the WIA Advisory Agreement use nearly identical language in their respective sections 3(a) to describe the investment advisory services to be performed, as shown in the redline comparison attached as **Exhibit 13**.

254.   The WAFSX Advisory Agreement also provides, "Other than as herein specifically indicated, the Manager shall not be responsible for the expenses of the Corporation or any series of the Corporation, including the Fund," and sets forth a long list of expenses that the adviser is not responsible for. *See* WAFSX Advisory Agreement, Ex. 12 at §5(b).

255.   The WAFSX Advisory Agreement provided that in exchange for its services, WAFSX "shall pay the Manager, as promptly as possible after the last day of each month, a fee, computed daily at an annual rate of 0.20% of the average daily net assets of the Fund." *See* WAFSX Advisory Agreement, Ex. 12 at §7. The WAFSX Advisory Agreement did not indicate what portion, if any, of the 0.20% fee was attributable to services other than investment advisory services.

256.   Also on or about December 31, 2001, a sub-advisory agreement, titled Advisory Agreement, was executed by LMFA and WAMCO (in the form attached as **Exhibit 14**, the "WAFSX Sub-Advisory Agreement"). Under this agreement WAMCO's primary responsibility was to, "regularly provide the Fund with investment research, advice, management and supervision and . . . furnish a continuous investment program for the Fund consistent with the Fund's investment objectives, policies, and restrictions as stated in the Fund's current Prospectus and Statement of Additional Information" *See* WAFSX Sub-Advisory Agreement, Ex. 14 at §3(a).

257.  The WAFSX Sub-Advisory Agreement and the WAFSX Advisory Agreement use nearly identical language in their respective sections 3(a) to describe the investment advisory services to be performed.

258.  No substantive revisions to the 2001 versions of the WAFSX Advisory Agreement or the WAFSX Sub-Advisory Agreement appear to have been made as of the date of this Complaint.

**B.**     **Administrative and Other Services**

259.  LMPFA serves as WAFSX's administrator in addition to providing investment advisory services.

260.  Legg Mason Investor Services, LLC serves as WAFSX's distributor.

261.  BNY Mellon Investment Servicing (US) Inc. serves as WAFSX's transfer agent.

262.  State Street Bank and Trust Company serves as WAFSX's custodian.

263.  WAFSX's independent registered public accounting firm is PricewaterhouseCoopers LLP.

264.  The total expense ratio, including investment advisory, administrative, and all other services, for WAFSX's Class IS shares is 0.26% of net assets. Class IS is the "institutional" share class of WAFSX, and is available for purchase by certain retirement plans, institutional investors, and other investors authorized by Legg Mason. Class IS accounts for a substantial majority of WAFSX's total assets, with the other six share classes accounting for lesser amounts.

**C.**     **Investment Advisory Services for WAFSX and the Funds are Similar**

265.  The investment advisory services provided by Western Asset to WAFSX are very similar to the investment advisory services provided by Defendants to WIW and WIA. In fact, WIW's proxy statement filed April 6, 2018, under the heading "Information Regarding Similar Funds," admits that WAFSX "may have a similar investment objective and principal investment strategy" as WIW.

266.   Both WAFSX and the Funds are part of the Western Asset fund complex. WAFSX and the Funds share certain senior officers including Jane Trust, Richard F. Sennett, and Todd F. Kuehl.

267.   Both WAFSX and the Funds share the same investment adviser or sub-advisers in WAMCO, WA London, WA Singapore, and WA Japan. S. Kenneth Leech and Frederick Marki serve as portfolio managers for both WAFSX and the Funds.

268.   WAFSX and the Funds also share several other service providers in addition to having investment advice provided by the Western Asset Defendants, including LMPFA serving as administrator.

269.   WAFSX and the Funds have similar investment objectives. WAFSX and the Funds have investment policies requiring 70-80% of total assets to be invested in inflation-linked securities. WAFSX and the Funds measure their results against similar benchmark indexes.

270.   In practice, WAFSX and the Funds invest roughly 75-95% of their assets in U.S. TIPs, with most of the remainder of their portfolios consisting of emerging markets debt, high yield corporate debt, mortgage backed securities, and investment grade corporate debt.

271.   The portfolios of WAFSX and the Funds have similar effective duration of roughly 7 years. WAFSX and the Funds are invested roughly 80-90% in debt of AAA quality, with the next largest classification consisting of BBB quality debt. WAFSX and the Funds have similar levels of turnover.

272.   Six of WAFSX's top ten securities owned by portfolio weight are also among WIW's top ten securities owned by portfolio weight. Seven of WAFSX's top ten securities owned by portfolio weight are also among WIA's top ten securities owned by portfolio weight.

273.   The following chart displays the total return for $10,000 invested in each of WAFSX, WIW and WIA from January 1, 2005 to December 31, 2017.

**Image 8. Comparison of the Funds and WAFSX Total Return 2005-2017**



274.   The high degree of correlation visible in the above chart is confirmed by a numerical correlation analysis. Over the period January 1, 2005 to December 31, 2017 the annual returns of WAFSX and WIA have a correlation coefficient of 0.76, and the annual returns of WAFSX and WIW have a correlation coefficient of 0.82.

275.   Furthermore, as shown in **Exhibit 13**, the contractual language in the WAFSX Advisory Agreement that sets forth the investment advisory services to be performed is nearly identical to the language in the WIA Advisory Agreement that sets forth the investment advisory services to be performed.

276.   Because of the extremely high degree of similarity between the investment agreements, policies and portfolios of WAFSX and the Funds, it follows that their investment advisers provide comparable services. This conclusion is reinforced by the fact that they share the same investment advisers in the Western Asset Defendants, and even share individual portfolio managers. This conclusion is further reinforced by WIW's admission that WAFSX "may have a similar investment objective and principal investment strategy" as WIW.

62

# XI. COMPARABLE SERVICE: WESTERN ASSET PRIVATE CLIENTS

## A.    US TIPS Full Discretion Service

277.   Western Asset offers private clients investment advisory services that it calls "US TIPS Full Discretion." Western Asset began offering this service on or about August 1, 2003.

278.   The stated investment objective of this service is, "Exceed the benchmark return by an average of 100 basis points annually over the course of a market cycle while approximating benchmark risk." The benchmark is the Bloomberg Barclays U.S. TIPS Index (Series-L). The index consists of inflation-protection securities issued by the U.S. Treasury. To be included in the index, securities must have at least one year to final maturity.

279.   Western Asset describes the investment style of this service as follows:

> Construct a well-diversified, higher-yielding inflation-protected portfolio with a bias towards Treasury Inflation-Protected Securities (TIPS). Exposure to the diversifying sectors (which include credit, global inflation-linked securities and mortgage-backed securities) may be derived through derivative and forward transactions. This strategy allows for opportunistic investments in high-yield, emerging markets, non-dollar securities, commodities and bank loans.

280.   As of December 31, 2017 the US TIPS Full Discretion portfolio was comprised of the following asset classes:

**Image 9. Western Asset US TIPS Full Discretion Portfolio Concentration**



| Portfolio Concentration | |
| --- | --- |
| Inflation-Linked | 94.00% |
| Investment Grade Credit | 4.30% |
| High-Yield Credit | 0.60% |
| Emerging Markets | 0.80% |
| Cash & Cash Equivalent | 0.80% |

281.   As of December 31, 2017 the US TIPS Full Discretion portfolio had an average credit quality of AAA, and an effective duration of 7.70 years.

282.   According to Western Asset's website, Western Asset provides its US TIPS Full Discretion services for $2.6 billion worth of invested assets as of December 31, 2017.[10] According to a "Performance Disclosure" dated December 31, 2017 also available on Western Asset's website, in 2017 Western Asset's "US TIPS Full Discretion Composite" included 6 accounts and a total market value of $1.0 billion in managed assets. As such, it appears that the $2.6 billion figure listed on the website may be the sum of the assets in the separate accounts and the $1.6 billion of assets managed by WIW and WIA.

283.   The following table shows the total investment return for the US TIPS Full Discretion service, as reflected in the above described Performance Disclosure.

Table 13. Western Asset US TIPS Full Discretion Total Return 2013-2017

|  | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| US TIPS Full Discretion total return (%) | 3.83 | 2.54 | -2.46 | 3.03 | -8.39 | -0.29 |

284.   According to the performance disclosure, the above data relates to WAMCO, WA London, WA Singapore, WA Tokyo, and certain other affiliates.

285.   Because US TIPS Full Discretion is a service offered to private clients, only limited information about it is publicly available. For example, it is not publicly disclosed what particular securities make up its holdings, what its portfolio turnover rate is, or who its portfolio managers are.

286.   Western Asset offers the US TIPS Full Discretion Service for annual fees equal to 0.30% of the first $100 million invested by a client, and 0.15% of all amounts over $100 million.

---

[10] *Available at* http://www.westernasset.com/us/en/products/999abf.cfm

## B.   Investment Advisory Services for Western Asset Private Clients and the Funds are Similar

287.   The services provided by Western Asset to its private clients in the US TIPS Full Discretion service are very similar to the investment advisory services provided by Defendants to WIW and WIA. In fact, the annual reports for both WIW and WIA admit that for both Funds, "the management fee paid . . . was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies" in an apparent reference to the US TIPS Full Discretion service.

288.   Investment advisory services for the Funds and for the US TIPS Full Discretion service are provided by WAMCO, WA London, WA Singapore, and WA Japan.

289.   The US TIPS Full Discretion service and the Funds have similar investment styles and policies. The US TIPS Full Discretion service and the Funds measure their results against similar benchmark indexes.

290.   In practice, the US TIPS Full Discretion service and the Funds invest roughly 75-95% of their assets in U.S. TIPs, with most of the remainder of their portfolios consisting of emerging markets debt, high yield corporate debt, and investment grade corporate debt.

291.   The portfolios of the US TIPS Full Discretion service and the Funds have similar effective duration of roughly 7 years. The US TIPS Full Discretion service and the Funds are invested primarily in debt of AAA quality.

292.   The following table displays the total return for each of the US TIPS Full Discretion Portfolio, WIW and WIA for the last five years.

**Table 14. Comparison of Total Returns 2013-2017**

| | 2017 | 2016 | 2015 | 2014 | 2013 | Avg. |
|---|---|---|---|---|---|---|
| WIW total return, based on NAV (%) | 6.99 | 4.69 | -3.42 | 1.09 | -8.74 | 0.12 |
| WIA total return, based on NAV (%) | 6.77 | 4.28 | -3.00 | 3.68 | -8.29 | 0.69 |
| US TIPS Full Discretion total return (%) | 3.83 | 2.54 | -2.46 | 3.03 | -8.39 | -0.29 |

65

293.   These total returns are highly correlated. For the 2013-2017 period, the annual returns for the US TIPS Full Discretion service and WIA have a correlation coefficient of 0.99, and the annual returns of the US TIPS Full Discretion service and WIW have a correlation coefficient of 0.95.

294.   Because of the extremely high degree of similarity between the investment policies and portfolios of the US TIPS Full Discretion service and the Funds, it follows that their investment advisers provide comparable services. This conclusion is reinforced by the fact that they share the same investment advisers in the Western Asset Defendants. This conclusion is further reinforced by the Funds' admissions that "the management fee paid . . . was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies" in an apparent reference to the US TIPS Full Discretion service.

## XII. WIW'S EXCESS FEE CLAIM AGAINST SI

### A.      Nature and Quality of Services Performed by SI

295.   SI is the primary investment adviser for WIW, and SI obtains related sub-advisory services from the Western Asset Defendants. However, it appears likely that SI has in fact delegated all responsibility for investment advice to Western Asset, despite SI retaining a substantial portion of investment advisory fees, equal to more than $3 million per year.

296.   Each of WIW's four individual portfolio managers are employees of Western Asset, and have no affiliation with SI apart from their work with the Funds. Apart from WIW's payment of advisory fees to SI, there is no indication in any of WIW's public disclosures that SI or Guggenheim play any role whatsoever in the provision of investment advisory services to WIW.

297.   Furthermore, the WIW Advisory Agreement with SI as primary adviser (at least in the agreement's 2003 iteration reproduced in **Exhibit 3**, which is believed to be substantially similar to the current version) and the WIW Sub-Advisory

Agreement with WAMCO as sub-adviser (at least in the agreement's 2003 iteration reproduced in **Exhibit 4**, which is believed to be substantially similar to the current version), use nearly identical language to describe the investment advisory services to be performed, as shown in the redline comparison attached as **Exhibit 5**.

298. The almost identical language contained in these two agreements regarding the advisory services to be performed, combined with the fact that WIW's portfolio managers are Western Asset personnel and do not work for SI, creates a strong inference that SI in fact performs no or very minimal investment advisory services for WIW despite retaining a substantial portion of investment advisory fees.

299. Although the WIW Advisory Agreement calls for SI to perform certain routine administrative services in addition to providing investment advice, such additional services are hardly sufficient to justify SI's retention of annual fees equal to 0.33% of WIW's total assets, or over $3 million per year.

300. As shown in **Exhibit 15**, a comparison of the WIW Advisory Agreement's list of administrative services to be performed by SI (*See* WIW Advisory Agreement, Ex. 3 at §3(b) and EXHIBIT A) to the list of administrative services to be performed by LMPFA under the WIW Administrative Services Agreement (s*ee* WIW Administrative Services Agreement, Ex. 9, at §3(a), SCHEDULE A), reveals that most of the services purportedly to be performed by SI are duplicative of those already performed by LMPFA.

301. Those few administrative services to be performed by SI that are not already performed by LMPFA are either performed by other service providers (*e.g.*, "Oversee the maintenance by the Trust's custodian and transfer agent and dividend disbursing agent of certain books and records"), or are purely ministerial in nature and of little value (*e.g.*, "Establish and maintain a toll-free number for sales support and marketing requests on an ongoing basis").

302.   Therefore, it appears that most or all of SI's duties under the WIW Advisory Agreement are in fact performed by WAMCO as sub-adviser to WIW, by LMPFA as administrator to WIW, or by other service providers.

303.   Furthermore, that SI performs effectively no services for WIW while retaining hefty fees is practically admitted in WIW's proxy statement filed April 6, 2018.

304.   According to that preliminary proxy statement, LMPFA, which already provides administrative services to WIW for annual fees of 0.04% of total assets, will continue to perform such services and from on or about April 27, 2018 will assume SI's administrative duties in exchange for an increase in its annual fees of only 0.01%, up to a total of 0.05% of total assets. If SI in fact performed substantial administrative services these would not be assumed by LMPFA for such a negligible increase in fees.

305.   The proxy statement also indicates that when WIW's new advisory agreements take effect, SI and the Guggenheim complex will no longer play any role in WIW's operations, but will be replaced by WAMCO and its Western Asset affiliates. WAMCO will assume all advisory duties for annual fees of 0.35% of total assets, down from WIW's current advisory expense of 0.60% of total assets.

306.   Although SI will be entirely removed from WIW's management, according to the proxy statement, "the manner in which the Fund's assets are managed, Western Asset's portfolio management team for the Fund, and the Fund's investment strategies will not change as a result of restructuring the management arrangements for the Fund," and "there will not be any diminution in the nature, quality and extent of services provided to the Fund." Similarly, "[t]he Proposed Advisory Agreement is substantially similar to the Current Advisory Agreement, except that the Fund will pay a lower investment advisory fee rate." In other words, "portfolio management services to the Fund would remain unchanged."

68

307.   Also in the proxy statement is what seems to be a direct admission that SI delegated all responsibility for providing investment advice, "With respect to the performance of the Fund, the Board considered that, where Security Investors has delegated responsibility for the management of the Fund's portfolio to Western Asset and the Western Asset Affiliates, Western Asset and the Western Asset Affiliates would continue to manage the portfolios."

308.   Because the investment advisory services provided to WIW will not change with the elimination of SI, it follows that SI did not provide any advisory services.

309.   Although SI was also supposed to perform certain administrative services for WIW, it appears that other service providers were already performing those services. In any event all of SI's administrative services are being assumed by LMPFA for an increase in its fees of only 0.01% of total assets per year, showing that any administrative services performed by SI are of little value.

310.   Therefore, it strongly appears that SI obtained millions of dollars in payments from WIW each year for performing little or no work.

**B.**   **Comparative Fee Structures**

311.   WIW pays SI annual fees equal to 0.60% of WIW's total assets. SI pays WAMCO annual fees of 0.27% of WIW's total assets, while retaining fees equal to 0.33% of WIW's total assets.

312.   For the year ended November 30, 2017 WIW accrued $6,489,372 in management fees payable to SI. Of this amount, $2,920,217 was payable to WAMCO as sub-adviser, leaving $3,569,155 for SI to retain.

313.   In comparison, when a service provider performs little to no work, it should receive little to no compensation. The amount of $3,569,155 for providing a handful of minor administrative services is unreasonable, and could not be the product of arm's-length bargaining.

69

### C.    WIW's Profitability to SI

314.   Because SI performs little or no work for WIW, SI likely incurs little or no related expense. Therefore, the more than $3 million SI receives in payment each year is likely to be almost all profit to SI.

315.   Upon information and belief, discovery will show that SI's profit levels from its relationship with WIW are so excessive as to be incompatible with SI's fiduciary duties to WIW.

### D.    Economies of Scale Realized by SI

316.   Due to the large scale of the Guggenheim fund complex, which includes dozens of funds and hundreds of billions of dollars under management, SI's already low costs from providing little or no work to WIW are further decreased.

317.   For example, one of the few non-duplicative tasks assigned to SI under the WIW Advisory Agreement is to maintain a public website with information about WIW. Because the Guggenheim complex already maintains a website with information about all its other funds, it requires little additional effort or expense for SI to provide a page on this website for WIW.

318.   The benefits of such economies of scale are entirely captured by SI. The high fees SI charges to WIW appear completely untethered to SI's costs of providing minimal services.

### E.    Fall-Out Financial Benefits to Guggenheim

319.   SI and its affiliates in the Guggenheim complex derive substantial benefits from their relationship with WIW, in addition to SI's excessive investment advisory fees (such additional benefits are often referred to as "fall-out" benefits in excessive fee cases and literature). Because the Funds are jointly managed by the Defendants as a single enterprise, fall-out benefits received from either Fund should be considered in connection with WIW's excess fee analysis.

320.   First among the fall-out benefits obtained by SI and Guggenheim are fees for providing additional services to the Funds. To the extent that any portion of the advisory fees paid by WIW to SI is determined to be attributable to services other than investment advice (*e.g.*, certain administrative services purportedly performed by SI under the terms of the WIW Advisory Agreement), then all such fees represent fall-out benefits.

321.   In addition, SI and GFDI have received substantial fees equal to 0.15% of WIA's total assets per year for supposedly performing administrative work for WIA as its "servicing agent." GFDI served as servicing agent through February 1, 2018, when it was replaced in this role by SI.

322.   In its year ended November 30, 2017 WIA paid GFDI a servicing agent fee of $793,318. This fee is excessive for the routine administrative services performed by GFDI. Furthermore, many of the services purportedly performed by GFDI and/or SI under the WIA Servicing Agreement are needlessly duplicative of services already performed by LMPFA under the WIA Administrative Services Agreement. *Compare* WIA Servicing Agreement at §2 *with* WIA Administrative Services Agreement at §3(b) and SCHEDULE A.

323.   WIA's servicing fee of 0.15% of total assets (equivalent to 0.21% of net assets) substantially exceeds the cost of similar services for other funds. For example, GFDI also acts as distributor for the Guggenheim Ultra Short Duration ETF ("GSY"), which pays only a total of 0.06% of net assets for all "other" expenses apart from investment advice.

324.   Even worse, GFDI appears to have retained fees from WIA in excess of those to which it was entitled, and refused to fully refund these fees when confronted by WIA (after Plaintiff's threat of legal action finally spurred WIA's Trustees to review WIA's fee arrangements). As stated in WIA's most recent annual report:

Management recently informed the Servicing Agent that the Servicing Agent may have received payments in excess of a previously agreed up-on cap on its compensation. The Servicing Agent informed the Fund that the Servicing Agent believes that it has not received any payments in ex-cess of a cap. To settle this matter, the Servicing Agent and the Fund have agreed that the Servicing Agent will contribute to the Fund $350,000 of the potential overage and retain the remaining amount of ap-proximately $700,000 as consideration for services rendered which the Board of Trustees believes the Servicing Agent earned based on services rendered to the Fund.

325.   Second, SI and its Guggenheim affiliates gain advertising and cross-promotional benefits from their association with WIW. For the Guggenheim fund complex, the breadth of its fund offerings is a main point emphasized in its advertising. By offering a wide variety of funds promoted as part of a unified, branded fund complex, Guggenheim hopes to encourage investor loyalty and to sell additional products to investors. For example, if a WIW shareholder visits Guggenheim's website to obtain information about WIW, she will be presented with information about other Guggenheim investment products.

**F.   Independence and Care of WIW's Board of Trustees**

326.   WIW's Board of Trustees until recently consisted of Michael Larson, Ronald A. Nyberg, Ronald E. Toupin, Jr., and Jane Trust. Following WIW's receipt of Plaintiff's demand letter, Ms. Trust resigned from the Board on December 19, 2017. None of the Trustees has acted with sufficient independence or care to protect WIW's shareholders' interests.

**1.   The Trustees' Inattention to WIW's Affairs**

327.   The Trustees of WIW have demonstrated a high degree of inattention to WIW's affairs at all times until Plaintiff's recent threat of legal action spurred them to take some (albeit insufficient) steps to correct longstanding problems with WIW.

328.   First, such inattention is evidenced by the Trustees' failure over many years from 2003 to 2017 to even attempt to reduce WIW's excessive fee payments to Defendants.

329.   Board minutes reveal that in 2016 WIW's Trustees approved the hiring of independent consultant Barrington Partners to review the fees charged by WIW's custodian bank, however it appears that no such consultant was ever hired to scrutinize the advisory fees charged by Defendants.

330.   Although WIW's annual reports dutifully describe the process by which the Trustees approve WIW's advisory agreements each year, this process appears to be a mere formality leading to the annual rubber-stamping of Defendants' excessive fees.

331.   In fact, WIW even delegated to SI and LMPFA the responsibility to calculate and oversee the fees charged to WIW by SI, LMPFA and their affiliates. *See* WIW Advisory Agreement, Ex. 3 at §3(b) and EXHIBIT A (Listing SI's duties as including "Review the appropriateness of and arrange for payment of the Trust's expenses," and "Oversee and review calculations of fees paid to the Trust's service providers"); WIW Administrative Services Agreement, Ex. 9 at §3(b) and SCHEDULE A §§(c)-(e) (listing similar duties, such as "Oversee and review calculations of fees paid to the administrator, the investment adviser, the custodian, the shareholder servicing agent, the transfer agent and any other entity providing authorized services to the Fund").

332.   These practices represent negligent oversight of WIW's investment advisers and their fees by WIW's Trustees.

333.   Second, each of the Trustees is likely incapable of devoting sufficient time to WIW's business in order to adequately protect WIW's interests, in light of the substantial competing demands on the Trustees' time.

334.   As discussed below, Mr. Larson is the Business Manager of Cascade Investments, L.L.C. ("Cascade"). Cascade is a vehicle for the investment of Bill Gates's fortune and is by far WIW's largest shareholder. Mr. Larson is also the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of

dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust. Mr. Larson also serves as a board member for at least four other publicly traded companies (Republic Services, Inc., Autonation, Inc., Fomento Economico Mexicano, SAB, and Grupo Televisa, S.A.B.).

335.   Ronald A. Nyberg is a partner in the law firm of Momkus McCluskey Roberts, and oversees 97 Western Asset or Guggenheim affiliated investment funds. He also serves as a director for PPM Funds and for the Edward-Elmhurst Healthcare System.

336.   Ronald E. Toupin Jr. works as a portfolio consultant and oversees 94 Western Asset or Guggenheim affiliated investment funds. He also serves as a director for the Bennett Group of Funds.

337.   Jane Trust is Senior Managing Director of Legg Mason & Co., LLC, an affiliate of Western Management, and the President and CEO of Legg Mason Partners Fund Advisor LLC, in addition to overseeing 150 Legg Mason or Western Asset affiliated investment funds.

338.   Third, the Trustees' inattention to WIW's affairs is also demonstrated by the overdue remedial actions only taken after Plaintiff sent his demand letter of November 27, 2017.

339.   As discussed above, the Trustees took no actions to correct various lingering problems with WIW over the course of many years, until forced to do so by Plaintiff's threat of legal action. In contrast, the Trustees did not hesitate to take other actions to protect themselves (*e.g.*, secretly and unilaterally amending WIW's bylaws to add a forum selection provision in 2015) or to enrich the Defendants and their affiliates (*e.g.*, nearly doubling administrative fees in 2012).

340.   The Trustees' overdue corrective actions included, *inter alia*: (i) the resignation of conflicted Trustee Jane Trust, (ii) WIW's public SEC filing of amended bylaws more than two years after they should have been disclosed to shareholders, and

(iii) WIW's renegotiation of fees to somewhat less excessive levels to take effect on or about April 27, 2018.

341.   Fourth, the Trustees' inattention to WIW is further demonstrated by their allowing its shares to trade at a large, persistent discount to NAV over many years, to the detriment of WIW's shareholders, while taking no corrective action.

342.   Over the last several years WIW's shares have generally traded at a discount to NAV of over 10%, among the largest discounts of all closed-end bond funds. Under WIW's Agreement and Declaration of Trust, WIW's assets are to be held in trust by the Trustees for the benefit of WIW's shareholders. However, the Trustees continue to allow a large discount that harms shareholders by preventing them from realizing the full value of WIW's assets.

343.   Notably, WIW's investment advisory and other fees are calculated based on total assets, not based on the market value of its shares. As such the interests of WIW's investment advisers, and the Trustees who appear to operate in the interests of the advisers, are not aligned with those of shareholders. A WIW shareholder selling shares must do so at an approximately 10% discount to NAV, however this large, persistent discount causes no commensurate reduction in WIW's fees. If fees paid by WIW, as reflected throughout this Complaint, were to be expressed as a percentage of WIW's market value instead of WIW's total assets, those fees would appear even greater in percentage terms.

344.   As discussed above, there are clear solutions to the discount problem, and other closed-end funds with comparable discounts and investment strategies have recently adopted such solutions by converting to open-end structures (*e.g.*, ACG which converted in April 2016, or FTT which converted in October 2015). There is no serious impediment to WIW's conversion to an open-end structure or offering to redeem shares, because of the high liquidity of WIW's investment assets.

345.   Although Plaintiff has pushed for the discount problem to be corrected for over two years, the Trustees have failed to meaningfully address the issue. Prompted by Plaintiff, the Fund announced in March 2016 that the Trustees may approve share repurchases, however there is no definite timeline or capital committed to repurchases and no repurchases have been made to date.

346.   If the Trustees had been paying sufficient attention to WIW's affairs then the discount problem would have been corrected long ago and the other problems discussed above, not the least of which is WIW's excessive advisory fee payments, would have been corrected years earlier without necessitating a threat of legal action from Plaintiff to spur the Trustees into action.

## 2.   The Independence of Trustees Nyberg, Trust, and Toupin

347.   Notwithstanding the Trustees' severe time constraints, Trustees Nyberg and Toupin each receive at least $35,000 annually from WIW for serving as Trustees. They each receive a total of over $400,000 annually from WIW and the other Western Asset or Guggenheim affiliated funds. The substantial amount of these payments calls into question whether Trustees Nyberg and Toupin are more loyal to WIW's shareholders or to the management companies in control of the fund complexes that so richly reward them.

348.   Similarly, Trustee Jane Trust is a high level executive at Legg Mason, presumably receiving compensation from Legg Mason commensurate with the seniority of her position. As discussed above, Western Asset is owned by Legg Mason. Ms. Trust's likely substantial compensation from Legg Mason calls into question whether she is more loyal to WIW's shareholders or to the Legg Mason/Western Asset fund complex.

349.   These allegations regarding the high levels of compensation received by Trustees Nyberg, Toupin and Trust from the Western Asset and Guggenheim fund complexes are reinforced by the Trustees' track record of ignoring problems at WIW,

and allowing the Defendants to profit at WIW shareholders' expense by charging excessive advisory fees.

### 3. Mr. Larson's Conflicts of Interest Involving Cascade

350. Mr. Larson's conflicted actions appearing to favor the interests of Cascade over those of WIW shareholders show that he has generally not acted with sufficient care or loyalty in his duties as a WIW Trustee. As discussed above, Cascade Investments, L.L.C. is a vehicle for the investment of Bill Gates's fortune.

351. Mr. Larson is the Business Manager for Cascade, which owns approximately $150 million worth of WIW shares. Cascade is by far WIW's largest shareholder currently holding 22.1% of all WIW shares. As a Trustee for WIW with fiduciary duties Mr. Larson must not favor his own interests, or those of his employer Cascade, over the interests of WIW or its shareholders.

352. The interests of WIW shareholders would have best been served at all times by the Trustees taking prompt action to reduce WIW's excessive fees and the discount at which WIW shares trade.

353. Mr. Larson controls Cascade. Given his status as a Trustee and his control over WIW's largest shareholder, Mr. Larson at all times had tremendous power to fix WIW's excessive fees and discount to NAV. However, no such steps were taken until 2018 after Plaintiff threatened legal action. Even then only insufficient corrective measures were introduced that allowed WIW's excessive fees and discount to persist indefinitely.

354. Cascade, under Mr. Larson's direction, has substantially increased its ownership of WIW over the last decade while the shares have traded at a steep discount. Cascade owned 6.7% of WIW shares as of March 2007, 14.1% of WIW shares as of March 2012, and currently owns 22.1% of WIW shares.

355. If WIW had purchased and retired these shares instead of allowing Cascade to purchase the shares, substantial benefits would have accrued to all WIW

shareholders (*i.e.*, an immediate risk-free return for WIW equal to the aggregate discount on the purchased shares, or approximately $14 million). However, because Mr. Larson caused WIW to forego this opportunity and instead caused Cascade to make these purchases, the benefits that rightfully belonged to WIW and its shareholders have accrued and will accrue to Cascade and Mr. Larson.

356.   Likewise, if Larson and Cascade had foregone Cascade's share purchases this could have benefitted shareholders even in the absence of any repurchases by WIW. Because of WIW's large discount to NAV and highly liquid portfolio, absent Cascade's 22% stake in WIW it is likely that an activist investor would have accumulated a large position and sought reforms to benefit all shareholders, such as fee reductions or conversion to an open-end structure. Because Cascade now has a 22% stake, it can effectively block and deter activist investors.

357.   Cascade's substantial purchases of shares in a closed-end fund for which Cascade's Business Manager is the Chairman are highly unusual. Based on information and belief, in percentage terms these (and Cascade's similar purchases of WIA shares) are among the largest purchases of shares in any closed-end fund by one of the fund's trustees (or affiliates of such a trustee) in recent history, and perhaps since the enactment of the Investment Company Act of 1940. There is no indication in WIW's public filings that Cascade's large purchases were reviewed or approved by independent counsel or independent financial consultants for compliance with Mr. Larson's fiduciary duties to WIW shareholders.

358.   Mr. Larson and WIW's shareholders have conflicting interests with respect to Cascade's purchases and WIW's fee payments. As discussed above, WIW's excessive fees are a substantial contributing factor to WIW's wide and persistent discount to NAV. It has been in Mr. Larson's interest to allow such high fees and discount to continue, so that Cascade can purchase WIW shares at a large discount to

their intrinsic value. It is in the interest of WIW's shareholders to see WIW's fees and discount reduced as quickly as possible.

359.   As discussed above, at any given time the discount could be reduced or eliminated through fee reductions and share repurchases or conversion to an open-end structure. Because a large majority of WIW's assets are highly liquid Treasury securities there is no serious impediment to taking these steps. Because Mr. Larson is Chairman of WIW and Business Manager of WIW's largest shareholder, the discount can be eliminated largely at a time of his choosing. Nevertheless, he has allowed WIW's large discount and excessive fees to continue for years while Cascade has accumulated a very large amount of WIW shares. If and when WIW takes the appropriate steps to eliminate the discount to NAV, Cascade will reap a huge benefit.

360.   If WIW had repurchased and retired the shares instead bought by Cascade, this would have reduced WIW's total assets and therefore reduced the Defendants' fees. That provided a powerful incentive for Mr. Larson and WIW's other Trustees, who appear to be more loyal to the Defendants and the Western Asset and Guggenheim fund complexes than they are to WIW's shareholders, not to make such repurchases.

### 4.   Mr. Larson's Conflicts of Interest Involving Western Asset

361.   Significant aspects of material relationships between (i) Mr. Larson, Bill Gates, and other persons affiliated with them, and (ii) Western Asset remain undisclosed to WIW shareholders. Such relationships appear to have compromised Mr. Larson's judgment and independence which should have been exercised in favor of WIW's shareholders.

362.   As discussed above, Mr. Larson is the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of dollars of investments.

363.   WIW, at Plaintiff's urging, recently began disclosing that Western Asset has provided advice with respect to perhaps billions of dollars of Bill Gates's fortune

for the last two decades. However, this disclosure consists of only a vague footnote in WIW's proxy statements, and is nowhere near an adequate explanation of the relationships involved and the potential conflicts of interest for WIW's purportedly independent Chairman, Mr. Larson. The footnote reads:

> Mr. Larson is the chief investment officer for William H. Gates III and in that capacity oversees the investments of Mr. Gates and the investments of the Bill and Melinda Gates Foundation Trust. Since 1997, Western Asset has provided discretionary investment advice with respect to one or more separate investment portfolios for Mr. Gates and the Bill and Melinda Gates Foundation Trust. Since the beginning of the last two completed fiscal years/periods of the Fund, at no time did the value of those investment portfolios exceed 0.5% of Western Asset's total assets under management. No changes to these arrangements are currently contemplated.

364.   Gates's relationship with Western Asset is a source of potential conflicts for Mr. Larson because it places him in a position to potentially obtain preferred treatment for Gates from Western Asset by allowing Western Asset to profit at Fund shareholders' expense.

365.   Based on the high fees paid by WIW and the lower fees charged by Western Asset to private clients for similar services, it appears likely that Mr. Larson has obtained more favorable fees for Bill Gates's other investments with Western Asset than he has for WIW. As such, at the very least it appears likely that Mr. Larson does business with the Western Asset Defendants using a certain level of care and independence on behalf of Bill Gates, and using a lesser level of care and independence on behalf of WIW's shareholders.

366.   Another potential conflict of interest is presented by the close, long-standing personal relationship between Mr. Larson and Steve Walsh, former Western Asset Chief Investment Officer.

367.   Mr. Walsh was one of only a handful of portfolio managers responsible for WIW from its inception through 2013, and served as Chief Investment Officer of

Western Asset during 2008-2013. As reported by THE WALL STREET JOURNAL, but nowhere disclosed by WIW, Messrs. Larson and Walsh have known each other for decades, and Mr. Walsh was one of only about 40 guests to attend a dinner party thrown by Bill Gates at his mansion to honor Mr. Larson in 2014. *See* Anupreeta Das and Craig Karmin, *This Man's Job: Make Bill Gates Richer*, THE WALL STREET JOURNAL (Sept. 19, 2014).  This close personal relationship creates the risk that Larson may act in the interests of Walsh and Western Asset rather than in the interests of WIW's shareholders.

368.   Given WIW's generally poor management by the Trustees and the numerous entanglements between WIW's purportedly independent Chairman and the Western Asset fund complex, Mr. Larson's loyalty as a WIW Trustee must be called into question.

## 5.   Conflicts of Interest of the Trustees' "Independent" Counsel

369.   The law firm of Paul Hastings LLP provides legal representation to WIW's purportedly independent Trustees in connection with their duties as independent Trustees for WIW. As reflected in WIW's board minutes, each year the Trustees consider Paul Hastings' conflicts of interest, and each year the Trustees decide that Paul Hastings should nonetheless continue to serve as "independent" counsel.

370.   For example, minutes of a February 21, 2017 joint meeting of the Funds' Boards of Trustees provide:

> RESOLVED, that, having obtained and reviewed information provided by Paul Hastings LLP to the [Independent Trustees] . . . with respect to any representation by Paul Hastings of Security Investors, LLC, Western Asset Management Company, Western Asset Management Company Pte. Ltd. (in Singapore), Western Asset Management Company Limited (in London), Western Asset Management Company Ltd (in Tokyo), Legg Mason Partners Fund Advisor, LLC or any of their control persons . . . the Independent Trustees hereby determine that any such representation is or was sufficiently limited that it is unlikely to adversely affect the

professional judgment of Paul Hastings in providing legal representation to the Independent Trustees.

371.   It appears that Paul Hastings performs substantial amounts of work for affiliates of Guggenheim and SI, for which it likely receives substantial compensation.

372.   Biographies for seven different lawyers (including four partners) on Paul Hastings' website prominently list Guggenheim affiliates as clients in several different transactions. Those lawyers are Jason C. Ewart (represented Guggenheim Partners), Luke McDougall (advised Guggenheim), Steve Tredennick (represented Guggenheim Investments), Richard Kitchen (advised Guggenheim), Bianca Lee (represented Guggenheim Securities LLC), Chris Dickerson (assisted Guggenheim), and John Paul G. Igoe (represented a portfolio company of Guggenheim).

373.   Other publicly available information indicates yet further connections between Guggenheim and Paul Hastings. For example, articles published on the legal news website Law360 indicate the Paul Hastings partners Ted E. Smith (represented Guggenheim Commercial Real Estate Finance) and Rick Kirkbride (worked with Guggenheim Partners) also performed work for Guggenheim affiliates. *See* Beth Winegarner, *Hospitality MVP: Paul Hastings' Rick Kirkbride*, Law360 (Nov. 12, 2015); Andrew McIntyre, *DLA Piper, Paul Hastings Guide Oxford's $150M Financing*, Law360 (Dec. 17, 2014).

374.   While the full extent of Paul Hastings' conflicts are not known to Plaintiff, the limited publicly available information indicates that Paul Hastings receives substantially more business from the Guggenheim complex than it is likely to receive from WIW's independent Trustees. This calls into question where the true loyalties of Paul Hastings lie, and why the "Independent Trustees" never decided to retain truly independent counsel.

375.   These allegations are all the more significant in light of Paul Hastings' involvement in the independent Trustees' approval of WIW's advisory fees. As stated in WIW's annual report under the heading "Board approval of management and

subadvisory agreements," "In their deliberations with respect to these matters, the Independent Trustees were advised by their independent counsel, who is independent . . . of the Managers. The Independent Trustees weighed each of the foregoing matters in light of the advice given to them by their independent counsel as to the law applicable to the review of investment advisory contracts."

### XIII.  WIW'S EXCESS FEE CLAIM AGAINST WESTERN ASSET

A. <u>**Nature and Quality of Services Performed by Western Asset**</u>

376.   The Western Asset Defendants provide investment sub-advisory services to WIW. SI is the primary investment adviser for WIW. WAMCO, WA Japan, WA London, and WA Singapore are sub-advisers to WIW.

377.   Although WIW's investment policies as set forth in WIW's public SEC filings and quoted above are somewhat verbose, the policies that the Western Asset Defendants in fact implement are straightforward. WIW invests approximately 80% of its assets in TIPs. The remaining 20% of WIW's assets are invested in riskier assets in an attempt to generate additional income. WIW borrows money to invest (in an amount equal to approximately 25% of WIW's total assets), which may generate additional net income and certainly generates additional fees.

378.   U.S. Treasury securities, and TIPs in particular, are safe, liquid investments, making a portfolio primarily comprised of such securities easy to manage. Ordinarily an investment adviser for a fixed income portfolio must research a multitude of different issuers (whether corporations or governments) to determine which issuers are likely to be able to repay their obligations in full and on time. However, U.S. Treasury securities are viewed as among the safest investments available because they are issued by the U.S. federal government. Defendants' job of selecting securities for inclusion in WIW's portfolio is made much simpler because the portfolio consists at all times of approximately 80% TIPs.

379.   Defendants' job is further simplified by WIW's closed-end structure. Unlike an open-end fund or ETF, a closed-end fund does not have to plan for constant creation and redemption of shares as fund investors buy and sell. Therefore, it is simpler for a closed-end fund's adviser to maintain the desired balance of investments for the fund, and advisory costs should be proportionately lower.

380.   Defendants appear to devote only a small amount of labor to the investment advisory services provided to WIW. Four individuals serve as co-portfolio managers, each of whom is responsible for dozens or hundreds of other funds and investment accounts totaling tens or hundreds of billions of dollars. As such, these individuals likely do not devote significant time to WIW.

381.   The following table shows WIW's portfolio managers, the number of investment funds and accounts for which they each have day-to-day management responsibilities, the total assets contained in those funds and accounts, and other responsibilities as reflected by their job titles:

**Table 15. WIW Portfolio Managers' Other Responsibilities**

| Manager | Accounts Managed | Assets Managed | Titles |
|---|---|---|---|
| S. Kenneth Leech | 961 | $438 billion | Chief Investment Officer of Western Asset |
| Michael C. Buchanan | 363 | $166 billion | Deputy Chief Investment Officer of Western Asset |
| Frederick Marki | 46 | $19 billion | Portfolio manager at Western Asset |
| Chia-Liang Lian | 219 | $89 billion | Co-Head of Emerging Markets Debt, portfolio manager and research analyst at Western Asset |

382.   Given these significant other responsibilities, it appears likely that WIW's four portfolio managers cannot devote much time or thought to WIW's mere $1 billion of total assets.

383.   Although WIW's public disclosures indicate that various other Western Asset employees are involved in providing investment advice to WIW, nowhere in WIW's public disclosures are such individuals or the services they purportedly perform identified.

384.   The quality of Defendants' investment advisory services for WIW has been mediocre at best. As noted in WIW's annual report for the year ended November 30, 2016, "the performance of the Fund was lower than its peer average performance for the one-, three-, five- and ten-year periods ended August 31, 2016."

385.   As shown in Table 4 (at paragraph 153), during the 2013-2017 period WIW produced a meager total return each year averaging 0.12% (based on NAV) or 0.74% (based on market price).

**B.     Comparative Fee Structures**

386.   WIW pays SI annual fees equal to 0.60% of WIW's total assets. SI pays WAMCO annual fees of 0.27% of WIW's total assets. This same basic arrangement has been in place from WIW's inception in or about 2003 through the beginning of 2018. Since 2008, WAMCO has passed on portions of its 0.27% fee to WA Japan, WA London, and WA Singapore, in proportion to the amounts of WIW's total assets managed by them.

387.   For the year ended November 30, 2017 WIW accrued $2,920,217 in fees payable to WAMCO as investment sub-adviser.

388.   WIW has announced, following receipt of Plaintiff's demand letter threatening legal action regarding WIW's excessive fees, that its total advisory fees will be reduced to 0.35% of total assets beginning on or about April 27, 2018. However, because WAMCO will receive the entire investment advisory fee under the new arrangements, this in fact represents a substantial, unjustified increase in WAMCO's fees of 8 basis points for providing the same services as before.

389.   WIW's current and proposed investment advisory fees are plainly excessive in relation to fees charged for comparable services by Western Asset when those fees are subject to at least some degree of competition and market forces.

1

2

### 1. **Western Assets' Fees from WIW Substantially Exceed its Fees for Comparable Services**

390.   As discussed above, WIW's closed-end structure makes little sense in light of WIW's investment policies centered on investing in TIPs. Similar considerations led what were perhaps the most comparable closed-end funds, FTT and ACG, to convert to open-end structures in 2015 and 2016. Furthermore, WIW's investment policies have evolved idiosyncratically over the years (in what appear to be attempts to justify high fees, such as increasing investments in risky and exotic assets, *see supra* paragraphs 123-125). As such, there are no perfectly comparable funds to WIW in terms of structure and investment policies. Nonetheless, WAFSX and the Western Asset private client US TIPS Full Discretion service are sufficiently similar to provide a reasonable and informative basis for comparison.

391.   As demonstrated above, the investment advisory services provided by the Western Asset Defendants to WAFSX are substantially similar to the services they provide to WIW.

392.   For example, like WIW, WAFSX invests primarily in TIPs. Also like WIW, WAFSX's sub-advisers are WAMCO, WA Japan, WA London, and WA Singapore. Like WIW, WAFSX's portfolio managers include S. Kenneth Leech and Frederick Marki. In fact, WIW's preliminary proxy statement filed March 23, 2018 admits that WAFSX "may have a similar investment objective and principal investment strategy" as WIW.

393.   Unlike WIW, WAFSX pays total investment advisory fees of only 0.20% of net assets annually.

394.   Also as demonstrated above, the investment advisory services provided by the Western Asset Defendants to private clients in the US TIPS Full Discretion service are substantially similar to the services they provide to WIW.

395.   For example, investment advisory services for WIW and for the US TIPS Full Discretion service are provided by WAMCO, WA London, WA Singapore, and

WA Japan. Both WIW and the US TIPS Full Discretion service have similar portfolios and highly correlated returns. WIW and the US TIPS Full Discretion service have similar investment styles and policies. As admitted in WIW's most recent annual report "the management fee paid by SI to Western Asset was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies," in an apparent reference to the US TIPS Full Discretion service.

396.    However, unlike WIW, Western Asset advertises its US TIPS Full Discretion service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million.

397.    The following table summarizes the Funds' current and recently proposed fees, as well as the above described fee comparisons:

**Table 16. Summary of WIW-Western Asset Fee Comparisons**

| Fund or Service | Annual Advisory Fees |
|---|---|
| *WIW's Current Fees* | |
| WIW sub-advisory fee paid to WAMCO | 0.27% of total assets (approx. 0.37% of net assets) |
| | |
| *WIW's Fees Effective April 27, 2018* | |
| WIW advisory fee paid to WAMCO | 0.35% of total assets (approx. 0.48% of net assets) |
| | |
| *Comparable Services Provided by Western Asset* | |
| Western Asset Inflation Indexed Plus Bond Fund (WAFSX) | 0.20% of net assets |
| Western Asset Private Client US TIPS Full Discretion Service | 0.30% of assets up to $100 million 0.15% of assets over $100 million |

398.    In light of these comparisons, WIW's investment advisory fees paid to the Western Asset Defendants of 0.27% of total assets are plainly excessive, and the contemplated fees of 0.35% of total assets are even more excessive. The fees Western Asset charges for comparable services are 0.20% of net assets or less when those fees are subject to at least some degree of competitive pressure.

## 2.   WIW's Closed-End Structure Enables Excessive Fees

399.   WIW's closed-end structure has enabled it to maintain supra-competitive expenses. An open-end fund or ETF with excessive fees is subject to some degree of market discipline as investors who dislike the high fees can redeem their shares, thereby decreasing the fund's assets (the base on which fees are calculated). However, because WIW is a closed-end fund, no amount of investor displeasure will reduce the amount of assets under its control.

400.   When WIW's investors vote with their feet and sell shares, the only result is a declining share price and a large discount to NAV. This is precisely what has occurred. Over the last several years WIW's shares have almost always traded at a discount of over 10%, among the highest discounts of any closed-end bond fund.

401.   As demonstrated above, WAFSX, for which investment advisory services are comparable to those provided to WIW, pays far lower advisory fees than WIW. Because WAFSX is an open-end fund, if it paid advisory fees at the excessive level paid by WIW, it would likely suffer substantial outflows that would decrease WAFSX's assets and its advisers' total fees.

402.   Similarly, private clients considering the Western Asset US TIPS Full Discretion service may be willing to take their business to other advisers to obtain arm's-length rates, thereby forcing Western Asset to offer competitive pricing for separate account customers. Although the advisory services provided by Western Asset to such private clients are very similar to the services provided to WIW, the fees charged to WIW are much higher.

## 3.   Fees Based on Total Assets Including Leverage are Excessive

403.   An additional problem with WIW's fee structure is that its fees are calculated based on total assets rather than net assets. It is generally standard practice in the investment fund industry to charge fees based on net assets. However, it is common for closed-end funds like WIW to borrow money and then charge fees based on total assets (increased by the borrowed funds).

404.   This practice is disfavored by objective industry participants and observers. According to an article published by Fidelity (one of the largest and lowest-fee fund complexes in the United States) in conjunction with Morningstar (a leading source of fund industry information for investors), charging advisory fees based on assets attributable to leverage "is not considered a best practice" because "[d]oing so results in higher management fees" that are not justified. *See Closed-end fund expenses*, https://www.fidelity.com/learning-center/investment-products/closed-end-funds/expenses (last visited Mar. 26, 2018). "Investment management is a highly scalable business, meaning higher assets under management do not correlate highly with additional costs," and therefore "[t]he argument that it would cost more to manage a . . . leveraged portfolio versus a . . . unleveraged fund does not hold water." *Id.*

405.   As of November 30, 2017, WIW had $1.077 billion in total assets and $292 million in leverage outstanding. As such WIW had approximately $785 million of net assets, and leverage represented roughly 37% of WIW's net assets. This amount of leverage has been typical for WIW over the last few years.

406.   WIW's total advisory fees of 0.60% of total assets are even more facially excessive when translated to the more fair base of net assets. Applying the 0.60% advisory fee to WIW's total assets is equivalent to applying a fee of 0.82% to WIW's net assets, due to WIW's leverage equal to 37% of net assets.[11]

407.   As admitted in WIW's most recent annual report, "when measured as a percentage of net assets (net of leverage), . . . the advisory fee paid by [WIW] to SI was higher than the average of the fees paid by the funds in its peer group and that the total expenses for [WIW] were higher than the average of the funds in its peer group."

---

[11]  137% * 0.60% = 0.822%
   0.82% * $785 million = $6.44 million
   0.60% * $1.077 billion = $6.46 million (discrepancy due to rounding)

408.   Furthermore, WIW's leverage serves little purpose other than to generate higher fees. The combination of high advisory fees and the interest expense that comes with leverage consumes a substantial portion of the small investment return attributable to WIW's use of leverage.

409.   Adding WIW's weighted average rate for interest expense of 1.08% to WIW's 0.60% of total assets investment advisory fee produces, before administrative and other costs, a combined expense of 1.68% applicable to borrowed funds, as compared to current yields for intermediate-term Treasury securities of approximately 2.70%. Unsurprisingly given WIW's high expenses and low-yielding investments, annual total returns for WIW over the last five years average 0.12% based on NAV, and 0.74% based on market price (*see* Table 4 at paragraph 153).

410.   Because roughly 80% of WIW's total assets are invested in low-yielding TIPs, the high advisory fees and leverage costs consume a very large portion of WIW's meager investment returns.

411.   Like WIW' s total advisory fees, WIW's current sub-advisory fees payable to WAMCO of 0.27% of total assets are even more facially excessive when translated to the more fair base of net assets. Applying the 0.27% advisory fee to WIW's total assets is equivalent to applying a fee of 0.37% to WIW's net assets, due to WIW's leverage equal to 37% of net assets.[12]

412.   Similarly, WIW's new advisory fees payable to WAMCO to take effect on or about April 27, 2018, equal to 0.35% of total assets are even more facially excessive when translated to the more fair base of net assets. Applying the 0.35%

---

[12] 137% * 0.27% = 0.3699%
   0.37% * $785 million = $2.90 million
   0.27% * $1.077 billion = $2.91 million (discrepancy due to rounding)

90

advisory fee to WIW's total assets is equivalent to applying a fee of 0.48% to WIW's net assets, due to WIW's leverage equal to 37% of net assets.[13]

413.   Again, as demonstrated above the Western Asset Defendants provide comparable services to WAFSX for only 0.20% of net assets.

## C.   WIW's Profitability to Western Asset

414.   Average profit margins for investment advisory services in the fund industry are exceptionally high, due to the industry's structural conflicts of interest discussed above. The Western Asset Defendants' profit margins from providing investment advisory services to WIW are likely even higher than the already excessive average profit margins in the industry.

415.   Precise data on the profitability of providing investment advice to registered investment companies is not publicly disclosed, likely in part because investment managers do not want to draw attention to their excessive profits.

416.   However, the available information indicates that average profit margins for such services are approximately 40%. For example, recent research by an industry group found average profit margins for advisory services to fixed income funds to be 45%. *See* Mutual Fund Directors Forum, *Beyond Expense Benchmarking: Economies of Scale, Mutual Fund Profitability, Breakpoints and Director Oversight* (June 1, 2016) at 12. A report published by the United States General Accounting Office found average profit margins of 36% for asset management companies in 1998. United States General Accounting Office, *Mutual Fund Fees* (June 2000) at 45 (hereinafter "GAO Report"). Anecdotally, Vanguard mutual funds CEO Tim Buckley has stated, "This whole industry is built on 40% [profit] margins." Simon Duke, *Interview: Never*

---

[13] 137% * 0.35% = 0.4795%

0.48% * $785 million = $3.77 million

0.35% * $1.077 billion = $3.77 million

*mind the stock picking, look at the fees, says Vanguard Boss Tim Buckley*, The Times (Feb. 11, 2018).

417.   This approximate 40% average profit margin on fund investment advisory services compares to historical average profit margins of approximately 8% for the companies making up the S&P 500. *See, e.g.*, Edward Yardeni and Joe Abbott, *Stock Market Briefing: S&P 500 Sectors & Industries Profit Margins*, Yardeni Research, Inc. (Mar. 26, 2018). Put differently, companies providing investment advice to a captive mutual fund obtain on average roughly five times the profit levels prevailing among large, public U.S. companies.

418.   However, the Western Asset Defendants likely obtain even greater profit levels from WIW. As discussed above, the advisory fees charged to WIW are substantially higher than the fees that these Defendants and their affiliates charge to WAFSX and private clients for comparable services.

419.   Based on information and belief a reasonable opportunity for discovery will show that the Defendants' profit margins obtained from WIW are substantially in excess of already high industry averages, and completely disproportionate to the costs of performing the services rendered.

### D.   Economies of Scale Realized by Western Asset

420.   The existence of economies of scale in investment management has been confirmed by the SEC and the Governmental Accounting Office, both of whom conducted in-depth studies of investment adviser fees and concluded that economies of scale exist in the provision of investment advisory services. *See* SEC Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000), at 30-31; GAO Report at 9. These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale that are not passed on to investment company shareholders. *See e.g.*, John P. Freeman &

Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001).

421.   According to a recent paper published by economist Burton Malkiel, "[t]here should be substantial economies of scale in asset management . . . The due diligence required for the investment manager is no different for a large mutual fund than it is for a small one." This paper found that "[a]cademic research has documented substantial economies of scale in mutual fund administration," however, "the scale economies in asset management appear to have been entirely captured by the asset managers" rather than reducing fees for the benefit of investors. Burton G. Malkiel, *Asset Management Fees and the Growth of Finance*, 27 JOURNAL OF ECONOMIC PERSPECTIVES 97, 98-99 (2013).

422.   In addition to the academic research Malkiel cites for his conclusions, these conclusions are also supported by common sense. In order to provide investment advice to a fund, a firm will incur a set amount of fixed costs including compensation for investment analysts, and various sources of overhead costs such as office space. Once these have been incurred, the marginal cost of providing investment advice to a fund is likely to decrease rapidly as additional assets are added to the fund's portfolio.

423.   For example, the cost of advising a fund on how to construct a $200 million investment portfolio is likely far less than twice the cost of advising a fund on how to construct a $100 million investment portfolio. This is all the more true in the context of a closed-end Fund like WIW with an investment portfolio consisting primarily of TIPs, which does not require as much research or planning as open-end funds with more complex investments.

424.   Likewise, Malkiel's conclusion that such economies of scale have been entirely captured by asset managers also makes sense as a matter of simple logic. As a general matter, fees in the investment advisory industry are calculated as a percentage of invested assets, thereby providing ever increasing fees to managers as compared to

sharply declining marginal costs (though some investment advisory agreements provide for "breakpoints" or decreases in fees once certain asset thresholds are reached).

425.    In the case of WIW, economies of scale are entirely captured by the Defendants and are not passed on to WIW's shareholders. WIW's investment advisory agreements provide for an annual fee of 0.60% of total assets, of which 0.27% is captured by the Western Asset Defendants, with no breakpoints.

426.    In contrast, when subjected to the threat of competition, Western Asset charges substantially lower fees with a breakpoint for nearly identical services. As discussed above Western Asset advertises its US TIPS Full Discretion separate account advisory service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million. As admitted in WIW's most recent annual report "the management fee paid by SI to Western Asset was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies."

427.    As of November 30, 2017 WIW had $785 million in net assets, and $1.077 billion in total assets, both of which are far in excess of the $100 million breakpoint level provided for Western Asset's private clients. Yet Defendants provide no reduction of WIW's excessive fees.

428.    Furthermore, economies of scale are even greater when viewing WIW and WIA together. As demonstrated above, the Funds have very similar investment policies and receive similar services from the Western Asset Defendants. As of November 30, 2017 the Funds had a combined $1.17 billion in net assets and $1.61 billion in total assets. Again, no breakpoints are provided to reduce the Funds' excessive fees.

### E.    Fall-Out Financial Benefits to Western Asset

429.    The Western Asset Defendants and their affiliates in the Western Asset complex derive substantial benefits from their relationship with WIW, in addition to

WAMCO's excessive investment advisory fees. Because the Funds are jointly managed by the Defendants as a single enterprise, fall-out benefits received from either Fund should be considered in connection with WIW's excess fee analysis.

430.   First among the fall-out benefits obtained by Western Asset are fees for providing additional services to the Funds. LMPFA, an affiliate of the Western Asset Defendants, provides certain administrative and accounting functions for WIW. WIW pays LMPFA fees at an annual rate of 0.04% of WIW's total assets, subject to an annual minimum fee of $225,000. In its year ended November 30, 2017 WIW paid LMPFA $432,625.

431.   LMPFA similarly obtains additional fall-out benefits from WIA. LMPFA provides certain administrative and accounting functions for WIA. WIA pays LMPFA fees at an annual rate of 0.04% of WIA's total assets, subject to an annual minimum fee of $225,000. In its year ended November 30, 2017 WIA paid LMPFA $225,200.

432.   Second, the Western Asset Defendants derive fall-out benefits from their relationship with the Funds in the form of cost savings for the Western Asset Defendants' related services to other customers. As discussed above, Western Asset advises another fund (WAFSX) and private clients that employ investment strategies that are highly similar to the Funds. Western Asset is able to utilize any work performed for the Funds in order to reduce its costs in providing similar services to other clients, and thereby retain greater profits from services performed for other clients.

433.   Third, the Western Asset Defendants gain advertising and cross-promotional benefits from their association with the Funds. For the Western Asset fund complex, the breadth of its fund offerings is a main point emphasized in its advertising. By offering a wide variety of funds promoted as part of a unified, branded fund complex, Western Asset hopes to encourage investor loyalty and to sell additional products to investors. For example, if a WIW shareholder visits Western

Asset's website to obtain information about WIW, she will be presented with information about other Western Asset investment products.

### F.   Independence and Care of WIW's Board of Trustees

434.   Plaintiff incorporates by reference the allegations regarding the WIW Trustees' lack of care and independence as set forth above in paragraphs 326 to 375.

## XIV. WIA'S EXCESS FEE CLAIM AGAINST WESTERN ASSET

### A.   Nature and Quality of Services Performed by Western Asset

435.   Plaintiff incorporates by reference the general allegations set forth above in paragraphs 376–385 regarding this factor in the context of WIW, and further makes the following allegations specific to WIA.

436.   The Western Asset Defendants provide investment advisory services to WIA. WAMCO is the primary investment adviser for WIA. WA Japan, WA London, and WA Singapore are sub-advisers to WAMCO.

437.   Although WIA's investment policies as set forth in WIA's public SEC filings and quoted above are somewhat verbose, the policies that Western Asset in fact implements are straightforward. WIA invests approximately 80% of its assets in U.S. TIPs. The remaining 20% of WIA's assets are invested in riskier assets in an attempt to generate additional income. WIA borrows money to invest (in an amount equal to approximately 25% of WIA's total assets), which may generate additional net income and certainly generates additional fees.

438.   As discussed above, the Western Asset Defendants' job of selecting securities for inclusion in WIA's portfolio is made simpler because the portfolio consists at all times of approximately 80% TIPs. The Western Asset Defendants' job is further simplified by WIA's closed-end structure.

439.   The Western Asset Defendants appear to devote only a small amount of labor to the investment advisory services provided to WIA. The same four individuals (S. Kenneth Leech, Michael C. Buchanan, Frederick Marki, and Chia-Liang Lian)

who serve as co-portfolio managers for WIW also serve as co-portfolio managers for WIA. As discussed above and as reflected in Table 15 (at paragraph 381), each of these individuals is responsible for dozens or hundreds of other funds and investment accounts totaling tens or hundreds of billions of dollars. As such, it appears likely that WIA's four portfolio managers cannot devote much time or thought to WIA's mere $500 million of total assets.

440.   Although WIA's public disclosures indicate that various other Western Asset employees are involved in providing investment advice to WIA, nowhere in WIA's public disclosures are such individuals or the services they purportedly perform identified.

441.   The quality of the Western Asset Defendants' investment advisory services for WIA has been mediocre at best. As noted in WIA's annual report for the year ended November 30, 2016, "the performance of the Fund was lower than its peer average performance for the one-, three-, five- and ten-year periods ended August 31, 2016."

442.   As shown in Table 8 (at paragraph 196), during the 2013-2017 period WIA produced a meager total return each year averaging 0.69% (based on NAV) or 1.17% (based on market price).

**B.   Comparative Fee Structures**

443.   Plaintiff incorporates by reference the general allegations set forth above in paragraphs 386–413 regarding this factor in the context of WIW, and further makes the following allegations specific to WIA.

444.   WIA pays WAMCO annual fees equal to 0.40% of WIA's total assets. This same basic arrangement has been in place from WIA's inception in or about 2003 through the beginning of 2018. Since 2008, WAMCO has paid WA Japan, WA London, and WA Singapore some undisclosed portion of these fees.

445.   For the year ended November 30, 2017 WIA accrued $2,115,515 in advisory fees payable to WAMCO.

446.   WIA has announced, following receipt of Plaintiff's demand letter threatening legal action regarding WIA's excessive fees, that its advisory fees will be reduced to 0.35% of total assets beginning on or about April 27, 2018. This is a tacit concession that WIA's current fees are excessive and unreasonable. Despite the modest reduction, the fee of 0.35% of total assets remains excessive.

447.   WIA's current and proposed investment advisory fees are plainly excessive in relation to fees charged for comparable services by Western Asset when those fees are subject to at least some degree of competition and market forces.

### 1. Western Assets' Fees from WIA Substantially Exceed its Fees for Comparable Services

448.   As discussed above in relation to WIW, the most comparable closed-end funds, FTT and ACG, converted to open end structres in 2015 and 2016. WIA's investment policies have evolved idiosyncratically over the years (in what appear to be attempts to justify high fees, such as increasing investments in risky and exotic assets, *see supra* paragraphs 123-125). As such, there are no perfectly comparable funds to WIA in terms of structure and investment policies. Nonetheless, WIW, WAFSX, and the Western Asset private client US TIPS Full Discretion service are sufficiently similar to provide a reasonable and informative basis for comparison.

449.   As demonstrated above, the investment advisory services provided by the Western Asset Defendants to WIW are substantially similar to the services they provide to WIA.

450.   For example, both WIW and WIA are closed-end funds created by Western Asset and Claymore Group in or about 2003. WIW and WIA share the same Trustees and officers. WIW and WIA have very similar portfolios and highly correlated returns. Both WIW and WIA obtain investment advisory or sub-advisory services from WAMCO, WA Japan, WA London, and WA Singapore. Like WIW,

WIA's portfolio managers are S. Kenneth Leech, Michael C. Buchanan, Frederick Marki, and Chia-Liang Lian.

451.    Also as discussed above, while SI is at least on paper the primary investment adviser to WIW, it appears to have delegated all investment advisory duties to the Western Asset Defendants. However, WIW pays only 0.27% of total assets for Western Asset's services, whereas WIA pays 0.40% of total assets for nearly identical services (or 0.35% from on or about April 27, 2018).

452.    Also as demonstrated above, the investment advisory services provided by the Western Asset Defendants to WAFSX are substantially similar to the services they provide to WIA.

453.    For example, like WIA, WAFSX invests primarily in TIPs. Also like WIA, WAFSX's sub-advisers are WAMCO, WA Japan, WA London, and WA Singapore. Like WIA, WAFSX's portfolio managers include S. Kenneth Leech and Frederick Marki. WIW's preliminary proxy statement filed March 23, 2018 admits that WAFSX "may have a similar investment objective and principal investment strategy" as WIW, which logically means that WAFSX also has a similar investment objective and principal investment strategy as WIA.

454.    However, unlike WIA, WAFSX pays total investment advisory fees of only 0.20% of net assets annually.

455.    Also as demonstrated above, the investment advisory services provided by the Western Asset Defendants to private clients in the US TIPS Full Discretion service are substantially similar to the services they provide to WIA.

456.    For example, investment advisory services for WIA and for the US TIPS Full Discretion service are provided by WAMCO, WA London, WA Singapore, and WA Japan. Both WIA and the US TIPS Full Discretion service have similar portfolios and highly correlated returns. WIA and the US TIPS Full Discretion service have similar investment styles and policies. As admitted in WIA's most recent annual

report, "the management fee paid by [WIA] was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies," in an apparent reference to the US TIPS Full Discretion service.

457.   Unlike WIA, Western Asset advertises its US TIPS Full Discretion service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million.

458.   The following table summarizes WIA's current and recently proposed fees, as well as the above described fee comparisons:

**Table 17. Summary of WIA-Western Asset Fee Comparisons**

| Fund or Service | Annual Advisory Fees |
|---|---|
| *WIA's Current Fees* | |
| WIA advisory fee paid to WAMCO | 0.40% of total assets (approx. 0.55% of net assets) |
| | |
| *WIA's Fees Effective April 27, 2018* | |
| WIA advisory fee paid to WAMCO | 0.35% of total assets (approx. 0.48% of net assets) |
| | |
| *Comparable Services Provided by Western Asset* | |
| WIW's current sub-advisory fee paid to WAMCO | 0.27% of total assets (approx. 0.37% of net assets) |
| Western Asset Inflation Indexed Plus Bond Fund (WAFSX) | 0.20% of net assets |
| Western Asset Private Client US TIPS Full Discretion Service | 0.30% of assets up to $100 million 0.15% of assets over $100 million |

459.   In light of these comparisons, WIA's current investment advisory fees paid to the Western Asset Defendants of 0.40% of total assets are plainly excessive, as are the contemplated fees of 0.35% of total assets. The fees Western Asset charges for comparable services are 0.20% of net assets or less when those fees are subject to at least some degree of competitive pressure.

### 2.   WIA's Closed-End Structure Enables Excessive Fees

460.   As discussed above in relation to WIW, WIA's closed end structure has enabled it to maintain supra-competitive expenses because WIA's managers need not fear redemptions and declining assets.

100

461.   As in the case of WIW, over the last several years WIA's shares have almost always traded at a discount of over 10%, among the highest discounts of any closed-end bond fund.

### 3.   Fees Based on Total Assets Including Leverage are Excessive

462.   An additional problem with WIA's fee structure is that, like WIW's, its fees are calculated based on total assets rather than net assets.

463.   As of November 30, 2017, WIA had $529 million in total assets and $146 million in leverage outstanding. As such WIA had $383 million of net assets, and leverage represented roughly 38% of WIA's net assets. This amount of leverage has been typical for WIA over the last few years.

464.   WIA's current advisory fees of 0.40% of total assets are in fact even more facially excessive when translated to the more fair base of net assets. Applying the 0.40% advisory fee to WIA's total assets is equivalent to applying a fee of 0.55% to WIA's net assets, due to WIA's leverage equal to 38% of net assets.[14]

465.   As with WIW, WIA's leverage serves little purpose other than to generate higher fees. Adding WIA's weighted average rate for interest expense of 1.07% to WIA's 0.40% of total assets investment advisory fee produces, before administrative and other costs, a combined expense of 1.47% applicable to borrowed funds, as compared to current yields for intermediate-term Treasury securities of approximately 2.70%. Unsurprisingly given WIA's high expenses and low-yielding investments, annual total returns for WIA over the last five years average 0.69% based on NAV, and 1.17% based on market price (*see* Table 8 at paragraph 196).

---

[14] 138% * 0.40% = 0.552%

  0.55% * $383 million = $2.11 million

  0.40% * $529 million = $2.11 million

466.   Because roughly 80% of WIA's total assets are invested in low-yielding TIPs, the high advisory fees and leverage costs consume a very large portion of WIA's meager investment returns.

467.   Like WIA's current fees, WIA's new advisory fees to take effect on or about April 27, 2018 are even more facially excessive when translated to the more fair base of net assets. Applying the 0.35% advisory fee to WIA's total assets is equivalent to applying a fee of 0.48% to WIA's net assets, due to WIA's leverage equal to 38% of net assets.[15]

468.   In comparison, as demonstrated above the Western Asset Defendants provide comparable services to WAFSX for only 0.20% of net assets.

## C.   WIA's Profitability to Western Asset

469.   Plaintiff incorporates by reference the general allegations set forth above in paragraphs 414–419 regarding this factor in the context of WIW, and further makes the following allegations specific to WIA.

470.   As discussed above in relation to WIW, average profit margins for investment advisory services in the fund industry are exceptionally high, due to the industry's structural conflicts of interest and weak competition. However, the Western Asset Defendants likely obtain even greater profit levels from WIA. As discussed above, the advisory fees charged to WIA are substantially higher than the fees that these Defendants and their affiliates charge to WAFSX and private clients for comparable services.

471.   Based on information and belief a reasonable opportunity for discovery will show that the Western Asset Defendants' profit margins obtained from WIA are

---

[15] 138% * 0.35% = 0.483%

0.48% * $383 million = $1.84 million

0.35% * $529 million = $1.85 million (discrepancy due to rounding)

substantially in excess of already high industry averages, and completely disproportionate to the services rendered.

**D.**  **Economies of Scale Realized by Western Asset**

472.   Plaintiff incorporates by reference the general allegations set forth above in paragraphs 420–428 regarding this factor in the context of WIW, and further makes the following allegations specific to WIA.

473.   In the case of WIA, economies of scale are entirely captured by the Western Asset Defendants and are not passed on to shareholders. WIA's investment advisory agreements provide for an annual fee of 0.40% (or 0.35% under the proposed new fees) of total assets with no breakpoints.

474.   In contrast, when subjected to the threat of competition, Western Asset charges substantially lower fees with a breakpoint for nearly identical services. As discussed above Western Asset advertises its US TIPS Full Discretion separate account advisory service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million. As admitted in WIA's most recent annual report, "the management fee paid by [WIA] was higher than the average of the fees paid by clients of Western Asset for accounts with similar investment strategies."

475.   As of November 30, 2017 WIA had $383 million in net assets, and $529 million in total assets, both of which are far in excess of the $100 million breakpoint level provided for Western Asset's private clients. Yet Defendants provide no reduction of WIA's excessive fees.

476.   Furthermore, economies of scale are even greater when viewing WIW and WIA together. The Funds have very similar investment policies and receive similar services from the Western Asset Defendants. As of November 30, 2017 the Funds had a combined $1.17 billion in net assets and $1.61 billion in total assets. Again, no breakpoints are provided to reduce the Funds' excessive fees.

### E.   Fall-Out Financial Benefits to Western Asset

477.   Plaintiff incorporates by reference the allegations regarding fall-out benefits to Western Asset as set forth above in paragraphs 429-433 regarding this factor in the context of WIW.

### F.   Independence and Care of WIA's Board of Trustees

478.   Plaintiff incorporates by reference the general allegations set forth above in paragraphs 326–375 regarding this factor in the context of WIW. Plaintiff further makes the following allegations specific to WIA.

479.   WIA's Board of Trustees is identical to WIW's Board of Trustees. Until recently it consisted of Michael Larson, Ronald A. Nyberg, Ronald E. Toupin, Jr., and Jane Trust. Following WIA's receipt of Plaintiff's demand letter, Ms. Trust resigned from the Board on December 19, 2017. None of the Trustees has acted with sufficient independence or care to protect WIA's shareholders' interests.

#### 1.   The Trustees' Inattention to WIA's Affairs

480.   As discussed above in the context of WIW, the inattention of WIA's Trustees is first and foremost evidenced by the Trustees' failure over many years from 2003 to 2017 to even attempt to reduce WIA's excessive fee payments.

481.   Board minutes reveal that in 2016 WIA's Trustees approved the hiring of independent consultant Barrington Partners to review the fees charged by WIA's custodian bank, however it appears that no such consultant was ever hired to scrutinize the advisory fees charged by the Western Asset Defendants.

482.   Although WIA's annual reports dutifully describe the process by which the Trustees approve WIA's advisory agreements each year, this process appears to be a mere formality leading to the annual rubber-stamping of the Western Asset Defendants' excessive fees.

483.   In fact, WIA even delegated to LMPFA the responsibility to calculate and oversee the fees charged to WIA by WAMCO, LMPFA and their affiliates. *See*

WIA Administrative Services Agreement at §3(b) and SCHEDULE A §§(c)-(e) (listing duties of the administrator such as "Oversee and review calculations of fees paid to the administrator, the investment adviser, the custodian, the shareholder servicing agent, the transfer agent and any other entity providing authorized services to the Fund").

484.   These practices represent negligent oversight of WIA's investment advisers and their fees by WIA's Trustees.

485.   Second, each of the Trustees is likely incapable of devoting sufficient time to WIA's business in order to adequately protect WIA's interests, in light of the substantial competing demands on the Trustees' time, as described above in the context of WIW.

486.   Third, the Trustees' inattention to WIA's affairs is also demonstrated by the overdue remedial actions only taken after Plaintiff sent his demand letter of November 27, 2017.

487.   As discussed above, the Trustees took no actions to correct various lingering problems with WIA over the course of many years, until forced to do so by Plaintiff's threat of legal action. In contrast, the Trustees did not hesitate to take other actions to protect themselves (*e.g.*, secretly and unilaterally amending WIA's bylaws to add a forum selection provision in 2015) or to enrich the Defendants and their affiliates (*e.g.*, more than doubling administrative fees in 2012).

488.   The Trustees' overdue corrective actions included, *inter alia*: (i) the resignation of conflicted Trustee Jane Trust, (ii) WIA's public SEC filing of amended bylaws more than two years after they should have been disclosed to shareholders, (iii) WIA's determination that it had overpaid GFDI for its services by more than $1 million, and (iv) WIA's renegotiation of fees to somewhat less excessive levels to take effect on or about April 27, 2018.

489.   Fourth, the Trustees' inattention to WIA is further demonstrated by their allowing its shares to trade at a large, persistent discount to NAV over many years, to the detriment of WIA's shareholders, while taking no corrective action.

490.   Over the last several years WIA's shares have generally traded at a discount to NAV of over 10%, among the largest discounts of all closed-end bond funds. Under WIA's Agreement and Declaration of Trust, WIA's assets are to be held in trust by the Trustees for the benefit of WIA's shareholders. However, the Trustees continue to allow a large discount that harms shareholders by preventing them from realizing the full value of WIA's assets.

491.   Notably, WIA's investment advisory and other fees are calculated based on total assets, not based on the market value of its shares. As such the interests of WIA's investment advisers, and the Trustees who appear to operate in the interests of the advisers, are not aligned with those of shareholders. A WIA shareholder selling shares must do so at an approximately 10% discount to NAV, however this large, persistent discount causes no commensurate reduction in WIA's fees. If fees paid by WIA, as reflected throughout this Complaint, were to be expressed as a percentage of WIA's market value instead of WIA's total assets, those fees would appear even greater in percentage terms.

492.   If the Trustees had been paying sufficient attention to WIA's affairs, the discount problem would have been corrected long ago, and the other problems discussed above would have been corrected years earlier without necessitating a threat of legal action from Plaintiff to spur the Trustees into action.

## 2.   The Independence of Trustees Nyberg, Trust and Toupin

493.   Notwithstanding the Trustees' severe time constraints, Trustees Nyberg and Toupin each receive at least $35,000 annually from WIA for serving as Trustees. They each receive a total of over $400,000 annually from WIA and the other Western Asset or Guggenheim affiliated funds. The substantial amount of these payments calls

into question whether Trustees Nyberg and Toupin are more loyal to WIA's shareholders or to the management companies in control of the fund complexes that so richly reward them.

494.   Similarly, Trustee Jane Trust is a high level executive at Legg Mason, presumably receiving compensation from Legg Mason commensurate with the seniority of her position. As discussed above, Western Asset is owned by Legg Mason. Ms. Trust's likely substantial compensation from Legg Mason calls into question whether she is more loyal to WIA's shareholders or to the Legg Mason/Western Asset fund complex.

495.   These allegations regarding the high levels of compensation received by Trustees Nyberg, Toupin and Trust from the Western Asset and Guggenheim fund complexes are reinforced by the Trustees' track record of ignoring problems at WIA, and allowing the Defendants to profit at WIA shareholders' expense by charging excessive advisory fees.

### 3.   Mr. Larson's Conflicts of Interest Involving Cascade

496.   As discussed above in the context of WIW, Mr. Larson's conflicted actions appearing to favor the interests of Cascade over those of WIA shareholders show that he has generally not acted with sufficient care or loyalty in his duties as a WIA Trustee.

497.   Cascade owns approximately $80 million worth of WIA shares. Cascade is by far WIA's largest shareholder currently holding 23.8% of all WIA shares. As a Trustee with fiduciary duties Mr. Larson must not favor his own interests, or those of his employer Cascade, over the interests of WIA or its shareholders.

498.   The interests of WIA shareholders would have best been served at all times by the Trustees taking prompt action to reduce WIA's excessive fees and the discount at which WIA shares trade. Given his status as a Trustee and his control over WIA's largest shareholder, Mr. Larson at all times had tremendous power to fix

WIA's excessive fees and discount to NAV. However, no such steps were taken until 2018 after Plaintiff threatened legal action. Even then only insufficient corrective measures were introduced that allowed WIA's excessive fees and discount to persist indefinitely.

499.   Cascade, under Mr. Larson's direction, has substantially increased its ownership of WIA over the last decade while the shares have traded at a steep discount. Cascade owned 7.8% of WIA shares as of March 2007, 15.5% of WIA shares as of March 2012, and currently owns 23.8% of WIA shares.

500.   If WIA had purchased and retired these shares instead of allowing Cascade to purchase the shares, substantial benefits would have accrued to all WIA shareholders (*i.e.*, an immediate risk-free return for WIA equal to the aggregate discount on the purchased shares, or approximately $7 million). However, because Mr. Larson caused WIA to forego this opportunity and instead caused Cascade to make these purchases, the benefits that rightfully belonged to WIA and its shareholders have accrued and will accrue to Cascade and Mr. Larson.

501.   Likewise, if Larson and Cascade had foregone Cascade's share purchases this could have benefitted shareholders even in the absence of any repurchases by WIA. Because of WIA's large discount to NAV and highly liquid portfolio, absent Cascade's 23% stake in WIA it is likely that an activist investor would have accumulated a large position and sought reforms to benefit all shareholders, such as fee reductions or conversion to an open-end structure. Because Cascade has a 23% stake, it can effectively block and deter activist investors.

502.   Cascade's substantial purchases of shares in a closed-end fund for which Cascade's Business Manager is the Chairman are highly unusual. Based on information and belief, in percentage terms these (and Cascade's similar purchases of WIW shares) are among the largest purchases of shares in any closed-end fund by one of the fund's trustees (or affiliates of such a trustee) in recent history, and perhaps

since the enactment of the Investment Company Act of 1940. There is no indication in WIA's public filings that Cascade's large purchases were reviewed or approved by independent counsel or independent financial consultants for compliance with Mr. Larson's fiduciary duties to WIA shareholders.

503. If WIA had repurchased and retired the shares instead bought by Cascade, this would have reduced WIA's total assets and therefore reduced the Defendants' fees. That provided a powerful incentive for Mr. Larson and WIA's other Trustees, who appear to be more loyal to the Defendants and the Western Asset and Guggenheim fund complexes than they are to WIA's shareholders, not to make such repurchases.

### 4. Mr. Larson's Conflicts of Interest Involving Western Asset

504. As discussed above, significant aspects of material relationships between (i) Mr. Larson, Bill Gates, and other persons affiliated with them, and (ii) Western Asset remain undisclosed to WIA shareholders. Such relationships appear to have compromised Mr. Larson's judgment and independence which should have been exercised in favor of WIA's shareholders.

505. WIA, at Plaintiff's urging, recently began disclosing that Western Asset has provided advice with respect to perhaps billions of dollars of Bill Gates's fortune for the last two decades. However, this disclosure consists of only a vague footnote in WIA's proxy statement, and is nowhere near an adequate explanation of the relationships involved and the potential conflicts of interest for WIA's purportedly independent Chairman, Mr. Larson. The footnote reads:

> Mr. Larson is the chief investment officer for William H. Gates III and in that capacity oversees the investments of Mr. Gates and the investments of the Bill and Melinda Gates Foundation Trust. Since 1997, Western Asset has provided discretionary investment advice with respect to one or more separate investment portfolios for Mr. Gates and the Bill and Melinda Gates Foundation Trust. Since the beginning of the last two completed fiscal years/periods of the Fund, at no time did the value of

those investment portfolios exceed 0.5% of Western Asset's total assets under management. No changes to these arrangements are currently contemplated.

506.   Gates's relationship with Western Asset is a source of potential conflicts for Mr. Larson because it places him in a position to potentially obtain preferred treatment for Gates from Western Asset by allowing Western Asset to profit at Fund shareholders' expense.

507.   Based on the high fees paid by WIA and the lower fees charged by Western Asset to private clients for similar services, it appears likely that Mr. Larson has obtained more favorable fees for Bill Gates's other investments with Western Asset than he has for WIA.

508.   Likewise, additional questions about Mr. Larson's loyalty to WIA shareholders are raised by the long-standing personal relationship between Mr. Larson and Steve Walsh, former Western Asset Chief Investment Officer and WIA portfolio manager. Their close relationship creates the risk that Larson may act in the interests of Walsh and Western Asset rather than in the interests of WIA's shareholders.

509.   Given WIA's generally poor management by the Trustees and the numerous entanglements between WIA's purportedly independent Chairman and the Western Asset fund complex, Mr. Larson's loyalty as a WIA Trustee must be called into question.

### 5. **Conflicts of Interest of the Trustees' "Independent" Counsel**

510.   The law firm of Paul Hastings LLP provides legal representation to WIA's purportedly independent Trustees in connection with their duties as independent Trustees for WIA. As reflected in WIA's board minutes, each year the Trustees consider Paul Hastings' conflicts of interest, and each year the Trustees decide that Paul Hastings should nonetheless continue to serve as "independent" counsel.

511.   For example, minutes of a February 21, 2017 joint meeting of the Funds' Boards of Trustees provide:

> RESOLVED, that, having obtained and reviewed information provided by Paul Hastings LLP to the [Independent Trustees] . . . with respect to any representation by Paul Hastings of Security Investors, LLC, Western Asset Management Company, Western Asset Management Company Pte. Ltd. (in Singapore), Western Asset Management Company Limited (in London), Western Asset Management Company Ltd (in Tokyo), Legg Mason Partners Fund Advisor, LLC or any of their control persons . . . the Independent Trustees hereby determine that any such representation is or was sufficiently limited that it is unlikely to adversely affect the professional judgment of Paul Hastings in providing legal representation to the Independent Trustees.

512.   As discussed above in the context of WIW, it appears that Paul Hastings performs substantial amounts of work for affiliates of Guggenheim, for which it likely receives substantial compensation. This calls into question where the true loyalties of Paul Hastings lie, and why the "Independent Trustees" never decided to retain truly independent counsel.

513.   These allegations are all the more significant in light of Paul Hastings' involvement in the independent Trustees' approval of WIA's advisory fees. As stated in WIA's annual report under the heading "Board approval of management and subadvisory agreements," "In their deliberations with respect to these matters, the Independent Trustees were advised by their independent counsel, who is independent . . . of the Advisers. The Independent Trustees weighed each of the foregoing matters in light of the advice given to them by their independent counsel as to the law applicable to the review of investment advisory contracts."

## XV. EXCESSIVE FEES HARM THE FUNDS

514.   Investment advisory fees are paid to Defendants out of the Funds' assets. Each dollar in fees paid by the Funds directly reduces the value of the Funds' investment portfolio.

515.   Additionally, the payment of excessive investment advisory fees to Defendants harms the Funds on an ongoing basis because the Funds lose investment returns and profits that they could have earned on the amounts paid out as fees to Defendants.

516.   The Funds have sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendants.

517.   During the Funds' most recently completed fiscal years, ended November 30, 2017, WIW paid Defendants $6,489,372 in investment advisory fees and WIA paid Defendants $2,115,515 in investment advisory fees.

518.   Relevant fee comparisons indicate that WIW should have paid at most approximately $1,564,825 (calculating fees based on 0.20% of year-end net assets), meaning that it paid the Defendants more than 4 times as much as it should have. Similarly, last year WIA should have paid at most approximately $763,224, meaning that it paid the Defendants more than twice as much as it should have.

519.   Based on these fee comparisons, in the year ended November 30, 2017 WIW paid at least $4,924,547 in excess fees to the Defendants, and WIA paid at least $1,352,291 in excess fees to the Defendants.

520.   The Funds have announced new fee arrangements to take effect on or about April 27, 2018. The proposed fee arrangements remain excessive and will continue to damage the Funds on an ongoing basis.

## COUNT I

### For Violation of Section 36(b)
### (On Behalf of WIW Against SI)

521.   Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth herein.

522.   Plaintiff asserts this count, on behalf of and for the benefit of WIW, against Defendant SI.

112

523.   Defendant SI is the primary investment adviser to WIW, which directly pays investment advisory fees to SI.

524.   Under Section 36(b), SI owes a fiduciary duty to WIW with respect to its receipt of investment advisory fees and other compensation from WIW.

525.   SI breached its fiduciary duties under Section 36(b) by charging investment advisory fees that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by SI and could not have been the product of arm's-length bargaining.

526.   In charging and receiving such excessive fees and failing to put the interests of WIW and its shareholders ahead of its own interests, SI has breached its statutory fiduciary duties to WIW and its shareholders.

527.   As a direct, proximate, and foreseeable result of SI's breach of its fiduciary duties under Section 36(b), WIW has sustained millions of dollars in damages.

528.   Pursuant to Section 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of WIW, the actual damages resulting from SI's breaches of its fiduciary duties, including the excessive investment advisory fees paid by WIW to SI and investment returns that would have accrued to WIW had those fees remained in the portfolio and available for investment.

529.   Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the applicable investment advisory agreements and restitution of all excessive investment advisory fees paid by WIW pursuant to those agreements.

530.   WIW has announced that SI will be removed as investment adviser on or about April 27, 2018. If and to the extent that SI may continue to act as investment adviser, it is expected that SI will continue to breach its fiduciary duties under Section 36(b) and will continue to cause ongoing damages to WIW.

## COUNT II

### For Violation of Section 36(b)
### (On Behalf of WIW Against the Western Asset Defendants)

531.   Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth herein.

532.   Plaintiff asserts this count, on behalf of and for the benefit of WIW, against Defendants WAMCO, WA Japan, WA London, and WA Singapore.

533.   Defendants WAMCO, WA Japan, WA London, and WA Singapore are investment sub-advisers to WIW, and receive payment from WIW indirectly via SI.

534.   Under Section 36(b), each Western Asset Defendant owes a fiduciary duty to WIW with respect to its receipt of investment advisory fees and other compensation from WIW.

535.   The Western Asset Defendants breached their fiduciary duties under Section 36(b) by charging investment advisory fees that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by the Western Asset Defendants and could not have been the product of arm's-length bargaining.

536.   In charging and receiving such excessive fees and failing to put the interests of WIW and its shareholders ahead of their own interests, the Western Asset Defendants have breached their statutory fiduciary duties to WIW and its shareholders.

537.   As a direct, proximate, and foreseeable result of the Western Asset Defendants' breach of their fiduciary duties under Section 36(b), WIW has sustained millions of dollars in damages.

538.   Pursuant to Section 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of WIW, the actual damages resulting from the Western Asset Defendants' breaches of their fiduciary duties, including the excessive investment advisory fees paid to the Western Asset Defendants and investment returns that would have accrued to WIW had those fees remained in the portfolio and available for investment.

539.   Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the applicable investment advisory agreements and restitution of all excessive investment advisory fees paid by WIW pursuant to those agreements.

540.   WIW has announced that new advisory fee arrangements will take effect on or about April 27, 2018. Under the revised fee arrangements, although overall fee levels will decrease due to the elimination of SI and its fees, the Western Asset Defendants' fee levels from WIW will in fact increase for performing the same services as before. Therefore, it is expected that the Western Asset Defendants will continue to breach their fiduciary duties under Section 36(b) and will continue to cause ongoing damages to WIW.

## COUNT III

### For Violation of Section 36(b)
### (On Behalf of WIA Against the Western Asset Defendants)

541.   Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth herein.

542.   Plaintiff asserts this count, on behalf of and for the benefit of WIA, against Defendants WAMCO, WA Japan, WA London, and WA Singapore.

543.   Defendant WAMCO is the primary investment adviser to WIA, which directly pays investment advisory fees to WAMCO. Defendants WA Japan, WA London, and WA Singapore are investment sub-advisers to WIA, and receive payment from WIA indirectly via WAMCO.

544.   Under Section 36(b), each Western Asset Defendant owes a fiduciary duty to WIA with respect to its receipt of investment advisory fees and other compensation from WIA.

545.   The Western Asset Defendants breached their fiduciary duties under Section 36(b) by charging investment advisory fees that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by the

Western Asset Defendants and could not have been the product of arm's-length bargaining.

546.   In charging and receiving such excessive fees and failing to put the interests of WIA and its shareholders ahead of their own interests, the Western Asset Defendants have breached their statutory fiduciary duties to WIA and its shareholders.

547.   As a direct, proximate, and foreseeable result of the Western Asset Defendants' breach of their fiduciary duties under Section 36(b), WIA has sustained millions of dollars in damages.

548.   Pursuant to Section 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of WIA, the actual damages resulting from the Western Asset Defendants' breaches of their fiduciary duties, including the excessive investment advisory fees paid by WIA to the Western Asset Defendants and investment returns that would have accrued to WIA had those fees remained in the portfolio and available for investment.

549.   Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff seeks rescission of the applicable investment advisory agreements and restitution of all excessive investment advisory fees paid by WIA pursuant to those agreements.

550.   WIA has announced that new advisory fee arrangements will take effect on or about April 27, 2018. Under the revised fee arrangements the Western Asset Defendants' fee levels from WIA will decrease only slightly and will remain excessive. Therefore, it is expected that the Western Asset Defendants will continue to breach their fiduciary duties under Section 36(b) and will continue to cause ongoing damages to WIA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment on behalf of the Funds as follows:

a. Declaring that Defendants have violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from the Funds;

b. Permanently enjoining Defendants from further violations of Section 36(b);

c. Awarding compensatory damages against Defendants, including repayment to the Funds of all unlawful and excessive investment advisory fees paid to Defendants by the Funds from one year prior to the commencement of this action through the date of final judgment after trial, lost investment returns on those amounts, and interest thereon;

d. Rescinding the applicable investment advisory agreements pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to the Funds of the excessive investment advisory fees paid to Defendants by the Funds from one year prior to the commencement of this action through the date of final judgment after trial, lost investment returns on those amounts, and interest thereon;

e. Awarding Plaintiff reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

f. Awarding such other and further relief as this Court may deem just and proper.

Dated: April 26, 2018

GLANCY PRONGAY & MURRAY LLP

By: */s/ Kevin F. Ruf*
Kevin F. Ruf (SBN 136901)
kruf@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160

Brian P. Murray (*pro hac vice forthcoming*)
bmurray@glancylaw.com
Garth A. Spencer (*pro hac vice forthcoming*)
gspencer@glancylaw.com
230 Park Avenue, Suite 530
New York, New York 10169
Telephone:   (212) 682-5340
Facsimile:   (212) 884-0988

*Attorneys for Plaintiff*

## **Exhibit List**

Exhibit 1 –   Shareholder Demand Letter to WIW Trustees

Exhibit 2 –   Shareholder Demand Letter to WIA Trustees

Exhibit 3 –   WIW Advisory Agreement

Exhibit 4 –   WIW Sub-Advisory Agreement

Exhibit 5 –   Comparison of WIW Sub-Advisory Agreement Section 3(a) to WIW
             Advisory Agreement Section 3(a)

Exhibit 6 –   WIW New Advisory Agreement

Exhibit 7 –   Comparison of WIW New Advisory Agreement Section 3(a) to WIW
             Advisory Agreement Section 3(a)

Exhibit 8 –   WIW New Sub-Advisory Agreement

Exhibit 9 –   WIW Administrative Services Agreement

Exhibit 10 – WIA Advisory Agreement

Exhibit 11 – Comparison of WIA Advisory Agreement Section 3(a) to WIW
             Advisory Agreement Section 3(a)

Exhibit 12 – WAFSX Advisory Agreement

Exhibit 13 – Comparison of WAFSX Advisory Agreement Section 3(a) to WIA
             Advisory Agreement Section 3(a)

Exhibit 14 – WAFSX Sub-Advisory Agreement

Exhibit 15 – Comparison of WIW Advisory Agreement Exhibit A to WIW
             Administrative Services Agreement Schedule A

# Exhibit 1



GPM | Glancy
Prongay
& Murray LLP

The Helmsley Building
230 Park Avenue
Suite 530
New York, New York 10169
Phone: (212) 682-5340
Fax: (212) 884-0988

November 27, 2017

**VIA FEDERAL EXPRESS**

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund
c/o Western Asset Management Company
385 East Colorado Blvd.
Pasadena, CA 91101

ATTN: Board of Trustees
c/o Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund
Security Investors, LLC
227 West Monroe Street
Chicago, Illinois 60606

RE:   ***Shareholder Demand to Remedy Breaches of Fiduciary Duties***

To the Secretary and the Trustees:

This firm represents Howard Winston, a holder of shares of the Western Asset/Claymore Inflation-Linked Opportunities & Income Fund (the "Fund"). As of November 19, 2017 Mr. Winston owned 200 shares. I write on behalf of Mr. Winston pursuant to the Fund's Agreement and Declaration of Trust, Article III, Section 5 (heading "Derivative Claims") to demand that the Fund take action to remedy breaches of fiduciary duties by its Trustees: Michael Larson, Ronald A. Nyberg, Ronald E. Toupin, Jr., and Jane Trust. Such actions should include a lawsuit by the Fund against the Trustees. The fiduciary breaches concern a number of interrelated corporate governance failures and conflicts of interest that have enriched the Trustees and their affiliates while damaging the Fund and costing its shareholders millions of dollars.

Before outlining Mr. Winston's specific concerns, I preface this letter by noting that he has repeatedly, over more than two years, attempted to resolve these issues without recourse to lawyers or the threat of legal action. In October 2015 Mr. Winston raised his concerns privately by writing the Fund's Chairman, Mr. Larson. Because Mr. Larson did not reply and the Trustees continued to disregard Mr. Winston's concerns, Mr. Winston published an article in the hopes of convincing the Trustees to act in the interests of all shareholders. Mr. Winston has also raised his concerns with the Fund's Chief Compliance Officer Todd F. Kuehl and with William Korver, a director at Guggenheim Investments, which is an affiliate of the Fund's investment adviser.

In light of the Trustees' continuing failure to serve the Fund's interests, Mr. Winston has come to believe that it is necessary for him to make this demand and to threaten legal action in order to protect his and his fellow shareholders' rights. Nonetheless, Mr. Winston still hopes that

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 2 of 9

his concerns will be addressed without the need for litigation and is willing to discuss, through his attorneys, a mutually agreeable resolution of his concerns.

The Trustees' breaches of their fiduciary duties to the Fund and its shareholders include, without limitation:

(1) *Fund Shares' Market Discount to NAV*

The Trustees have failed to take meaningful steps to reduce the exceptionally large and persistent discount between the Fund's per share net asset value ("NAV") and the market trading price for its shares.

(2) *Excessive Fees*

The Trustees have approved excessive fees for the Fund's service providers including Security Investors, LLC (the "Investment Adviser," and together with its affiliates, "Guggenheim").

(3) *Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset*

The Trustees have failed to fully and timely disclose, or to protect the Fund from, the conflicts of interest arising from relationships between (i) Mr. Larson and his affiliates including Bill Gates, and (ii) the Western Asset Management Company and its affiliates (together "Western Asset"). In addition to his role as the Fund's purportedly independent Chairman, Mr. Larson is the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust.

(4) *Mr. Larson Favors Cascade at the Fund's Expense*

The Trustees have allowed Mr. Larson and Cascade Investment, L.L.C. ("Cascade") to profit by usurping the Fund's opportunities to repurchase its discounted shares, and have failed to properly address Mr. Larson's conflict of interest arising from his roles as both the Fund's Chairman and Cascade's Business Manager. Cascade is a vehicle for the investment of Bill Gates's fortune and is by far the Fund's largest shareholder.

(5) *Trustees' Lack of Attention to the Fund*

The Trustees have failed to dedicate sufficient time or attention to the Fund's affairs in order to adequately fulfill their duties as Trustees, and have failed to protect the Fund from the harm resulting from their inadequate oversight.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 3 of 9

Mr. Winston demands that the Fund take action to obtain full compensation from the Trustees and other responsible parties for damages suffered by the Fund and its shareholders as a result of these breaches of fiduciary duty.

Mr. Winston demands that the Fund take specific actions to remedy the Trustees' breaches of fiduciary duty, including but not limited to the following:

(1) *Fund Shares' Market Discount to NAV*

The Fund should substantially reduce or eliminate the discount to NAV at which the Fund's shares trade. This may be accomplished by: (i) converting the Fund to an open-end or ETF structure; (ii) instituting a tender offer that allows shareholders to redeem their shares at NAV and that provides for conversion to an open-end or ETF structure if a sufficient percentage of non-conflicted shares (excluding, *inter alia*, the shares owned by Cascade) are tendered; or (iii) any other reasonably effective means.

(2) *Excessive Fees*

The Fund should negotiate substantially reduced fees with its service providers including the Investment Adviser and other Guggenheim and Western Asset affiliates. The Fund should obtain refunds from such service providers of excessive fees paid in past periods and/or should obtain compensation from the Trustees for the excessive fee payments made with their approval.

(3) *Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset*

The Fund should fully and promptly disclose the nature and extent of all material relationships between Mr. Larson, his affiliates, and Western Asset, and the resulting conflicts of interest. Such relationships include the business relationships between (i) Bill Gates or the Bill and Melinda Gates Foundation Trust, and (ii) Western Asset. Such relationships also include the close, long-standing personal relationship between Mr. Larson and Steve Walsh, former Western Asset Chief Investment Officer. To the extent that Western Asset has given more favorable treatment to Mr. Larson and his affiliates than it has given to the Fund (*e.g.*, in the form of reduced fees on advisory services relating to Bill Gates's other investments), the Fund should recover the full value of such preferential treatment from Mr. Larson and his affiliates.

(4) *Mr. Larson Favors Cascade at the Fund's Expense*

The Fund should fully and promptly disclose the conflicts of interest arising from Mr. Larson's role as the Fund's Chairman and his role as the Business Manager of Cascade. This includes the conflict between (i) Mr. Larson's duty to the Fund's shareholders to promptly reduce the discount between NAV and trading price, and (ii) his desire to

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 4 of 9

enable Cascade to purchase Fund shares at a high discount to NAV. In order to prevent Mr. Larson and Cascade from profiting by usurping the Fund's opportunities, and to make the Fund whole, Cascade should be compelled to sell its Fund shares to the Fund at the lesser of (i) current trading price, (ii) current NAV, or (iii) Cascade's purchase price, in each case less the costs associated with such redemptions.

(5) *Trustees' Lack of Attention to the Fund*

The Fund should require the Trustees to devote sufficient time to their duties by: (i) requiring Trustees to resign outside directorships or business roles, and (ii) requiring Trustees to resign from their roles as trustees or directors for dozens of other funds affiliated with Western Asset and Guggenheim. Alternatively the Fund should take actions to replace inattentive Trustees with individuals who will be vigilant and truly independent. The Fund should disclose the amount of time actually devoted to the Fund's business by each Trustee. The Fund should seek compensation from the Trustees for the harm caused by their inadequate oversight, including but not limited to the amounts of excessive fees paid by the Fund to Western Asset and Guggenheim, and to the Trustees themselves.

In addition to the above described remedial actions, Mr. Winston further demands that the Fund commence a civil court action against the Trustees for their breaches of fiduciary duties in violation of the common law of Massachusetts.

The essential facts relied upon by Mr. Winston to support the allegations made in this demand letter are, in summary form and without limitation:

(1) *Fund Shares' Market Discount to NAV*

The Fund's shares currently trade at a discount to NAV of over 11%, among the largest discounts of all closed-end bond funds (and much larger than the negligible discounts, or premiums, for comparable ETFs)[1]. The Fund's shares have traded at similar or worse discounts for most of the prior five years, also far worse than average discounts for comparable funds. Under the Fund's Agreement and Declaration of Trust, the Fund's assets are to be held in trust by the Trustees for the benefit of the Fund's shareholders. However, the Trustees continue to allow a large discount that harms shareholders by preventing them from realizing the full value of the Fund's assets.

There is no serious impediment to the Fund's conversion or offering to redeem shares, because of the high liquidity of the Fund's investment assets. There are clear solutions to

---

[1] For example, during the third quarter of 2017 the Guggenheim Ultra Short Duration ETF traded between a greatest premium of 0.03% of NAV, and at a greatest discount of 0.03% of NAV.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 5 of 9

the discount problem as discussed above, and other closed-end funds with comparable discounts and investment strategies have recently adopted such solutions by converting to open-end structures (*e.g.*, the AllianceBernstein Income Fund, Inc. which converted in April 2016, or the Federated Enhanced Treasury Income Fund which converted in October 2015).

Although Mr. Winston has pushed for the discount problem to be corrected for over two years, the Trustees have failed to meaningfully address the issue. Prompted by Mr. Winston, the Fund recently announced that the Trustees may approve share repurchases, however there is no definite timeline or capital committed to repurchases and no repurchases have been made to date.

(2) *Excessive Fees*

The Fund pays the Investment Adviser an annual fee of 0.60% of total assets, or approximately $6 million per year. These fees are unreasonable and excessive for several reasons and should not have been approved by the Trustees. The excessive portion of the fees amounts to at least $3 million dollars each year, and serves to unjustly enrich the Investment Adviser, Western Asset, and their affiliates, at the expense of the Fund and its shareholders.

Calculating the fees based on total assets rather than the industry standard of net assets results in an effective fee of 0.82% of net assets due to the Fund's 36% leverage.[2] Because roughly 80% of the Fund's total assets are invested in low-yielding Treasury Inflation-Protected Securities, the high management fees consume a substantial portion of the Fund's small investment return. The Fund's leverage serves little purpose other than to generate higher fees, as the combination of high management fees and interest expense consumes an even greater portion of the small investment return attributable to the Fund's use of leverage.[3]

Comparable funds pay far lower expenses. For example, the Guggenheim Ultra Short Duration ETF pays its Guggenheim-affiliated investment adviser an annual fee of 0.20% of net assets. Western Asset also provides comparable services at far lower rates when subjected to competitive pressures. For example, the Western Asset Inflation Indexed Plus Bond Fund pays a Western Asset affiliate management fees of only 0.20% of net assets.

---

[2] According to Guggenheim's website, the Fund currently has $1,064,110,007 in total assets and $280,341,250 in leverage. Leverage therefore represents approximately 36% of net assets. Applying the 0.60% advisory fee to total assets is equivalent to applying a fee of (0.60% * 1.36 = 0.816%) to net assets.

[3] Adding the Fund's weighted average rate for interest expense of 0.65% to the Fund's 0.60% investment advisory fee produces, before administrative and other costs, a combined fee of 1.25% applicable to borrowed funds. Many of the Fund's investments produce returns below 1.25%.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 6 of 9

As another example, Western Asset advertises its "US TIPS Full Discretion" separate account advisory service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million. This service appears to be nearly identical to the investment advice provided to the Fund, but at less than half the cost. The reason for the price disparity is that (unlike the Fund's Trustees) the separate account customers for Western Asset's service are likely willing to take their business to other advisers to obtain arm's-length rates, thereby forcing Western Asset to offer competitive pricing for separate account customers. Despite the Fund holding $775 million in net assets, the Investment Adviser provides no breakpoints (fee reductions for economies of scale) such as that provided to Western Asset's separate account customers once their assets exceed $100 million.

Furthermore, the Investment Adviser delegates investment management to Western Asset for a (similarly excessive) fee of 0.27% of total Fund assets, making it unclear what, if anything, the Investment Adviser is doing to earn the remaining 0.33% fee. Based on the Fund's literature, it appears that the Western Asset sub-advisers provide all of the Fund's investment management advice.

The excessive investment advisory fees are even more difficult to justify in light of the limited attention the Fund receives from its portfolio managers and the poor results obtained. Four individuals serve as co-portfolio managers, each of whom is responsible for dozens or hundreds of other funds and investment accounts with tens or hundreds of billions of dollars under management. As such, they likely do not devote significant time to the Fund. As stated in the Fund's most recent annual report, "the performance of the Fund was lower than its peer average performance for the one-, three-, five- and ten-year periods ended August 31, 2016."

Finally, although average investment fund fees have declined substantially since 2004 (the Fund's inception), the Trustees have apparently made no effort whatsoever to renegotiate the excessive fees paid by the Fund to the Investment Adviser.

(3) *Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset*

Significant aspects of material relationships between Mr. Larson, Bill Gates, and other persons affiliated with them and Western Asset remain undisclosed to Fund shareholders.

The Fund, at Mr. Winston's urging, recently began disclosing that Western Asset has provided advice with respect to perhaps billions of dollars of Bill Gates's fortune for the last two decades. However, this disclosure consists of only a vague footnote in the Fund's proxy statement, and is nowhere near an adequate explanation of the relationships involved and the resulting conflicts of interest for the Fund's purportedly independent Chairman. In order for the Fund and its shareholders to accurately assess the risks posed

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 7 of 9

by Mr. Larson's conflicts of interest, they are entitled to much more information, such as the precise investment amounts managed and the corresponding fee arrangements. Based on the high fees paid by the Fund, it appears likely that Mr. Larson has negotiated more favorable fees for Bill Gates's other investments with Western Asset than he has for the Fund.

The Fund and its shareholders are also entitled to information regarding the close personal relationship between Messrs. Larson and Walsh, and how this relationship affects Mr. Larson's judgment in business dealings between the Fund and Western Asset. Mr. Walsh was one of only a handful of portfolio managers responsible for the Fund from its inception through 2013, and served as Chief Investment Officer of Western Asset during 2008-2013. As reported by THE WALL STREET JOURNAL, but nowhere disclosed by the Fund, Messrs. Larson and Walsh have known each other for decades, and Mr. Walsh was one of only about 40 guests to attend a dinner party thrown by Bill Gates at his mansion to honor Mr. Larson in 2014.

(4) *Mr. Larson Favors Cascade at the Fund's Expense*

Mr. Larson is the Business Manager for Cascade, which owns approximately $150 million worth of Fund shares. As a Trustee with fiduciary duties Mr. Larson must not favor his own interests, or those of his employer Cascade, over the interests of the Fund or its shareholders.

The interests of Fund shareholders would best be served by the Trustees taking immediate action to reduce the discount at which Fund shares trade. Mr. Larson, as Business Manager of Cascade, has an interest in allowing Cascade to purchase Fund shares at a steep discount to NAV in order to profit from the eventual reduction of the discount (at a time largely of Mr. Larson's own choosing through his powers as one of four Trustees and through Cascade's position as the Fund's largest shareholder). Cascade, under Mr. Larson's direction, has substantially increased its ownership of the Fund over the last decade while the shares have traded at a steep discount. Cascade owned 6.7% of Fund shares as of March 2007, 14.1% of Fund shares as of March 2012, and 22.1% of Fund shares as of March 2017.

If the Fund had purchased and retired these shares instead of allowing Cascade to purchase the shares, substantial benefits would have accrued to all shareholders (*i.e.*, an immediate risk-free return for the Fund equal to the aggregate discount on the purchased shares, or approximately $14 million). However, because Mr. Larson caused the Fund to forego this opportunity and caused Cascade to make these purchases, the benefits that rightfully belonged to the Fund and its shareholders have accrued and will accrue to Cascade and Mr. Larson.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 8 of 9

### (5) *Trustees' Lack of Attention to the Fund*

Each of the Trustees is likely incapable of devoting sufficient time to the Fund's business in order to adequately protect the Fund's interests, in light of the substantial competing demands on the Trustees' time. Such inattention is evidenced by the Trustees' failure over many years to attempt to reduce the Fund's discount to NAV, or to attempt to reduce the Fund's excessive fee payments.

As discussed above, Mr. Larson is the Business Manager of Cascade and is the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust. Mr. Larson also serves as a board member for at least four other publicly traded companies. Ronald A. Nyberg is a partner in the law firm of Momkus McCluskey Roberts, and oversees 100 Western Asset and Guggenheim affiliated investment funds. Ronald E. Toupin Jr. works as a portfolio consultant and oversees 97 Western Asset and Guggenheim affiliated investment funds. Jane Trust is Managing Director of Legg Mason & Co., LLC, an affiliate of Western Management, and the President and CEO of Legg Mason Partners Fund Advisor LLC, in addition to overseeing 150 affiliated investment funds.

Notwithstanding the Trustees' severe time constraints, Messrs. Larson, Nyberg and Toupin each receive at least $35,000 annually from the Fund for serving as Trustees. Mr. Larson receives a total of roughly $70,000 annually from the Fund and its affiliated funds, whereas Messrs. Nyberg and Toupin each receive over $400,000 annually from the Fund and its affiliated funds.

If, within 45 days of receipt of this letter, the Fund and the Trustees do not agree to take sufficient actions to obtain compensation and to rectify the breaches of fiduciary duty described above, Mr. Winston intends to prosecute a shareholder derivative action on behalf of the Fund seeking money damages, injunctive relief barring further breaches of fiduciary duty, and such other relief as may be appropriate.

In addition to the proposed court action against the Trustees, Mr. Winston hereby informs you that if his concerns about excessive fees are not promptly addressed he also intends to bring a lawsuit against the Investment Adviser (and/or the Fund's Western Asset sub-advisers) for receipt of excessive fees from the Fund in violation of § 36(b) of the Investment Company Act of 1940. Mr. Winston may bring such a lawsuit at any time and is not constrained by the demand requirement or the waiting period for derivative actions set forth in the Fund's Agreement and Declaration of Trust (see *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)). Nonetheless, Mr. Winston hopes that the excessive fees will be addressed without the need for litigation and is willing to discuss, through his attorneys, a mutually agreeable resolution of these concerns.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Opportunities & Income Fund

Page 9 of 9

Thank you for your prompt attention to these matters. Please address any communications directly to me at the address listed in the letterhead, or at bmurray@glancylaw.com. I look forward to working with you to jointly advance the interests of all the Fund's shareholders.

Very truly yours,

Brian Murray

# Exhibit 2



GPM | Glancy
       Prongay
       & Murray LLP

The Helmsley Building
230 Park Avenue
Suite 530
New York, New York 10169
Phone: (212) 682-5340
Fax: (212) 884-0988

November 27, 2017

**VIA FEDERAL EXPRESS**

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund
c/o Western Asset Management Company
385 East Colorado Blvd.
Pasadena, CA 91101

ATTN: Board of Trustees
c/o Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund
Guggenheim Funds Distributors, LLC
227 West Monroe Street
Chicago, Illinois 60606

      **RE:**    *Shareholder Demand to Remedy Breaches of Fiduciary Duties*

To the Secretary and the Trustees:

      This firm represents Howard Winston, a holder of shares of the Western Asset/Claymore Inflation-Linked Securities & Income Fund (the "Fund"). As of November 19, 2017 Mr. Winston owned 4,096 shares. I write on behalf of Mr. Winston pursuant to the Fund's Agreement and Declaration of Trust, Article III, Section 5 (heading "Derivative Claims") to demand that the Fund take action to remedy breaches of fiduciary duties by its Trustees: Michael Larson, Ronald A. Nyberg, Ronald E. Toupin, Jr., and Jane Trust. Such actions should include a lawsuit by the Fund against the Trustees. The fiduciary breaches concern a number of interrelated corporate governance failures and conflicts of interest that have enriched the Trustees and their affiliates while damaging the Fund and costing its shareholders millions of dollars.

      Before outlining Mr. Winston's specific concerns, I preface this letter by noting that he has repeatedly, over more than two years, attempted to resolve these issues without recourse to lawyers or the threat of legal action. In October 2015 Mr. Winston raised his concerns privately by writing the Fund's Chairman, Mr. Larson. Because Mr. Larson did not reply and the Trustees continued to disregard Mr. Winston's concerns, Mr. Winston published an article in the hopes of convincing the Trustees to act in the interests of all shareholders. Mr. Winston has also raised his concerns with the Fund's Chief Compliance Officer Todd F. Kuehl and with William Korver, a director at Guggenheim Investments, which is an affiliate of the Fund's servicing agent.

      In light of the Trustees' continuing failure to serve the Fund's interests, Mr. Winston has come to believe that it is necessary for him to make this demand and to threaten legal action in order to protect his and his fellow shareholders' rights. Nonetheless, Mr. Winston still hopes that



Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 2 of 9

his concerns will be addressed without the need for litigation and is willing to discuss, through his attorneys, a mutually agreeable resolution of his concerns.

The Trustees' breaches of their fiduciary duties to the Fund and its shareholders include, without limitation:

(1) *Fund Shares' Market Discount to NAV*

The Trustees have failed to take meaningful steps to reduce the exceptionally large and persistent discount between the Fund's per share net asset value ("NAV") and the market trading price for its shares.

(2) *Excessive Fees*

The Trustees have approved excessive fees for the Fund's service providers including Western Asset Management Company (the "Investment Adviser," and together with its affiliates, "Western Asset") and Guggenheim Funds Distributors, LLC (the "Servicing Agent",[1] and together with its affiliates, "Guggenheim").

(3) *Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset*

The Trustees have failed to fully and timely disclose, or to protect the Fund from, the conflicts of interest arising from relationships between (i) Mr. Larson and his affiliates including Bill Gates, and (ii) Western Asset. In addition to his role as the Fund's purportedly independent Chairman, Mr. Larson is the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust.

(4) *Mr. Larson Favors Cascade at the Fund's Expense*

The Trustees have allowed Mr. Larson and Cascade Investment, L.L.C. ("Cascade") to profit by usurping the Fund's opportunities to repurchase its discounted shares, and have failed to properly address Mr. Larson's conflict of interest arising from his roles as both the Fund's Chairman and Cascade's Business Manager. Cascade is a vehicle for the investment of Bill Gates's fortune and is by far the Fund's largest shareholder.

---

[1] The Fund's literature at times mistakenly refers to the Servicing Agent as, "Guggenheim Funds Distributors, Inc."

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 3 of 9

### (5) *Trustees' Lack of Attention to the Fund*

The Trustees have failed to dedicate sufficient time or attention to the Fund's affairs in order to adequately fulfill their duties as Trustees, and have failed to protect the Fund from the harm resulting from their inadequate oversight.

Mr. Winston demands that the Fund take action to obtain full compensation from the Trustees and other responsible parties for damages suffered by the Fund and its shareholders as a result of these breaches of fiduciary duty.

Mr. Winston demands that the Fund take specific actions to remedy the Trustees' breaches of fiduciary duty, including but not limited to the following:

### (1) *Fund Shares' Market Discount to NAV*

The Fund should substantially reduce or eliminate the discount to NAV at which the Fund's shares trade. This may be accomplished by: (i) converting the Fund to an open-end or ETF structure; (ii) instituting a tender offer that allows shareholders to redeem their shares at NAV and that provides for conversion to an open-end or ETF structure if a sufficient percentage of non-conflicted shares (excluding, *inter alia*, the shares owned by Cascade) are tendered; or (iii) any other reasonably effective means.

### (2) *Excessive Fees*

The Fund should negotiate substantially reduced fees with its service providers including the Investment Adviser, the Servicing Agent, and other Guggenheim and Western Asset affiliates. The Fund should obtain refunds from such service providers of excessive fees paid in past periods and/or should obtain compensation from the Trustees for the excessive fee payments made with their approval.

### (3) *Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset*

The Fund should fully and promptly disclose the nature and extent of all material relationships between Mr. Larson, his affiliates, and Western Asset, and the resulting conflicts of interest. Such relationships include the business relationships between (i) Bill Gates or the Bill and Melinda Gates Foundation Trust, and (ii) Western Asset. Such relationships also include the close, long-standing personal relationship between Mr. Larson and Steve Walsh, former Western Asset Chief Investment Officer. To the extent that Western Asset has given more favorable treatment to Mr. Larson and his affiliates than it has given to the Fund (*e.g.*, in the form of reduced fees on advisory services relating to Bill Gates's other investments), the Fund should recover the full value of such preferential treatment from Mr. Larson and his affiliates.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 4 of 9

### (4) *Mr. Larson Favors Cascade at the Fund's Expense*

The Fund should fully and promptly disclose the conflicts of interest arising from Mr. Larson's role as the Fund's Chairman and his role as the Business Manager of Cascade. This includes the conflict between (i) Mr. Larson's duty to the Fund's shareholders to promptly reduce the discount between NAV and trading price, and (ii) his desire to enable Cascade to purchase Fund shares at a high discount to NAV. In order to prevent Mr. Larson and Cascade from profiting by usurping the Fund's opportunities, and to make the Fund whole, Cascade should be compelled to sell its Fund shares to the Fund at the lesser of (i) current trading price, (ii) current NAV, or (iii) Cascade's purchase price, in each case less the costs associated with such redemptions.

### (5) *Trustees' Lack of Attention to the Fund*

The Fund should require the Trustees to devote sufficient time to their duties by: (i) requiring Trustees to resign outside directorships or business roles, and (ii) requiring Trustees to resign from their roles as trustees or directors for dozens of other funds affiliated with Western Asset and Guggenheim. Alternatively the Fund should take actions to replace inattentive Trustees with individuals who will be vigilant and truly independent. The Fund should disclose the amount of time actually devoted to the Fund's business by each Trustee. The Fund should seek compensation from the Trustees for the harm caused by their inadequate oversight, including, but not limited to the amounts of excessive fees paid by the Fund to Western Asset and Guggenheim, and to the Trustees themselves.

In addition to the above described remedial actions, Mr. Winston further demands that the Fund commence a civil court action against the Trustees for their breaches of fiduciary duties in violation of the common law of Massachusetts.

The essential facts relied upon by Mr. Winston to support the allegations made in this demand letter are, in summary form and without limitation:

### (1) *Fund Shares' Market Discount to NAV*

The Fund's shares currently trade at a discount to NAV of over 11%, among the largest discounts of all closed-end bond funds (and much larger than the negligible discounts, or premiums, for comparable ETFs)[2]. The Fund's shares have traded at similar or worse discounts for most of the prior five years, also far worse than average discounts for comparable funds. Under the Fund's Agreement and Declaration of Trust, the Fund's

---

[2] For example, during the third quarter of 2017 the Guggenheim Ultra Short Duration ETF traded between a greatest premium of 0.03% of NAV, and at a greatest discount of 0.03% of NAV.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 5 of 9

assets are to be held in trust by the Trustees for the benefit of the Fund's shareholders. However, the Trustees continue to allow a large discount that harms shareholders by preventing them from realizing the full value of the Fund's assets.

There is no serious impediment to the Fund's conversion or offering to redeem shares, because of the high liquidity of the Fund's investment assets. There are clear solutions to the discount problem as discussed above, and other closed-end funds with comparable discounts and investment strategies have recently adopted such solutions by converting to open-end structures (*e.g.*, the AllianceBernstein Income Fund, Inc. which converted in April 2016, or the Federated Enhanced Treasury Income Fund which converted in October 2015).

Although Mr. Winston has pushed for the discount problem to be corrected for over two years, the Trustees have failed to meaningfully address the issue. Prompted by Mr. Winston, the Fund recently announced that the Trustees may approve share repurchases, however there is no definite timeline or capital committed to repurchases, and no repurchases have been made to date.

(2) *Excessive Fees*

The Fund pays the Investment Adviser an annual fee of 0.40% of total assets, or approximately $2 million per year. These fees are unreasonable and excessive for several reasons and should not have been approved by the Trustees. The excessive portion of the fees amounts to at least $1 million dollars each year, and serves to unjustly enrich the Investment Adviser and its Western Asset affiliates, at the expense of the Fund and its shareholders.

Calculating the fees based on total assets rather than the industry standard of net assets results in an effective fee of 0.55% of net assets due to the Fund's 38% leverage.[3] Because roughly 80% of the Fund's total assets are invested in low-yielding Treasury Inflation-Protected Securities, the high management fees consume a substantial portion of the Fund's small investment return. The Fund's leverage serves little purpose other than to generate higher fees, as the combination of high management fees and interest expense consumes an even greater portion of the small investment return attributable to the Fund's use of leverage.[4]

---

[3] According to Guggenheim's website, the Fund currently has $527,481,683 in total assets and $145,288,200 in leverage. Leverage therefore represents approximately 38% of net assets. Applying the 0.40% advisory fee to total assets is equivalent to applying a fee of (0.40% * 1.38 = 0.552%) to net assets.

[4] Adding the Fund's weighted average rate for interest expense of 0.59% to the Fund's 0.40% investment advisory fee produces, before administrative and other costs, a combined fee of 0.99% applicable to borrowed funds. Many of the Fund's investments produce returns below 0.99%.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 6 of 9

Comparable funds pay far lower expenses. For example, the Guggenheim Ultra Short Duration ETF pays its Guggenheim-affiliated investment adviser an annual fee of 0.20% of net assets. Western Asset also provides comparable services at far lower rates when subjected to competitive pressures. For example, the Western Asset Inflation Indexed Plus Bond Fund pays a Western Asset affiliate management fees of only 0.20% of net assets.

As another example, Western Asset advertises its "US TIPS Full Discretion" separate account advisory service for a fee of 0.30% of assets up to $100 million and 0.15% of assets over $100 million. This service appears to be nearly identical to the investment advice provided to the Fund, but at less than half the cost. The reason for the price disparity is that (unlike the Fund's Trustees) the separate account customers for Western Asset's service are likely willing to take their business to other advisers to obtain arm's-length rates, thereby forcing Western Asset to offer competitive pricing for separate account customers. Despite the Fund holding $381 million in net assets, the Investment Adviser provides no breakpoints (fee reductions for economies of scale) such as that provided to Western Asset's separate account customers once their assets exceed $100 million.

The excessive investment advisory fees are even more difficult to justify in light of the limited attention the Fund receives from its portfolio managers and the poor results obtained. Four individuals serve as co-portfolio managers, each of whom is responsible for dozens or hundreds of other funds and investment accounts with tens or hundreds of billions of dollars under management. As such, they likely do not devote significant time to the Fund. As stated in the Fund's most recent annual report, "the performance of the Fund was lower than its peer average performance for the one-, three-, five- and ten-year periods ended August 31, 2016."

Finally, although average investment fund fees have declined substantially since 2003 (the Fund's inception), the Trustees have apparently made no effort whatsoever to renegotiate the excessive fees paid by the Fund to the Investment Adviser.

Similarly to the excessive investment advisory fees, the Fund pays excessive servicing fees. The Fund's servicing fee of 0.15% of total assets (0.21% of net assets) substantially exceeds the cost of similar services for comparable funds. For example, the Servicing Agent also acts as Distributor for the Guggenheim Ultra Short Duration ETF, which pays only 0.06% of net assets for "other" expenses apart from investment advice. The excessive servicing fees amount to hundreds of thousands of dollars each year, and serve to unjustly enrich the Servicing Agent and its Guggenheim affiliates, at the expense of the Fund and its shareholders.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 7 of 9

### (3) _Inadequately Disclosed Conflicts of Interest Involving Mr. Larson and Western Asset_

Significant aspects of material relationships between Mr. Larson, Bill Gates, and other persons affiliated with them and Western Asset remain undisclosed to Fund shareholders.

The Fund, at Mr. Winston's urging, recently began disclosing that Western Asset has provided advice with respect to perhaps billions of dollars of Bill Gates's fortune for the last two decades. However, this disclosure consists of only a vague footnote in the Fund's proxy statement, and is nowhere near an adequate explanation of the relationships involved and the resulting conflicts of interest for the Fund's purportedly independent Chairman. In order for the Fund and its shareholders to accurately assess the risks posed by Mr. Larson's conflicts of interest, they are entitled to much more information, such as the precise investment amounts managed and the corresponding fee arrangements. Based on the high fees paid by the Fund, it appears likely that Mr. Larson has negotiated more favorable fees for Bill Gates's other investments with Western Asset than he has for the Fund.

The Fund and its shareholders are also entitled to information regarding the close personal relationship between Messrs. Larson and Walsh, and how this relationship affects Mr. Larson's judgment in business dealings between the Fund and Western Asset. Mr. Walsh was one of only a handful of portfolio managers responsible for the Fund from its inception through 2013, and served as Chief Investment Officer of Western Asset during 2008-2013. As reported by THE WALL STREET JOURNAL, but nowhere disclosed by the Fund, Messrs. Larson and Walsh have known each other for decades, and Mr. Walsh was one of only about 40 guests to attend a dinner party thrown by Bill Gates at his mansion to honor Mr. Larson in 2014.

### (4) _Mr. Larson Favors Cascade at the Fund's Expense_

Mr. Larson is the Business Manager for Cascade, which owns approximately $75 million worth of Fund shares. As a Trustee with fiduciary duties Mr. Larson must not favor his own interests, or those of his employer Cascade, over the interests of the Fund or its shareholders.

The interests of Fund shareholders would best be served by the Trustees taking immediate action to reduce the discount at which Fund shares trade. Mr. Larson, as Business Manager of Cascade, has an interest in allowing Cascade to purchase Fund shares at a steep discount to NAV in order to profit from the eventual reduction of the discount (at a time largely of Mr. Larson's own choosing through his powers as one of four Trustees and through Cascade's position as the Fund's largest shareholder). Cascade, under Mr. Larson's direction, has substantially increased its ownership of the Fund over the last decade while the shares have traded at a steep discount. Cascade owned 7.8% of

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 8 of 9

Fund shares as of March 2007, 15.5% of Fund shares as of March 2012, and 23.8% of Fund shares as of March 2017.

If the Fund had purchased and retired these shares instead of allowing Cascade to purchase the shares, substantial benefits would have accrued to all shareholders (*i.e.*, an immediate risk-free return for the Fund equal to the aggregate discount on the purchased shares, or approximately $7 million). However, because Mr. Larson caused the Fund to forego this opportunity and caused Cascade to make these purchases, the benefits that rightfully belonged to the Fund and its shareholders have accrued and will accrue to Cascade and Mr. Larson.

(5) *Trustees' Lack of Attention to the Fund*

Each of the Trustees is likely incapable of devoting sufficient time to the Fund's business in order to adequately protect the Fund's interests, in light of the substantial competing demands on the Trustees' time. Such inattention is evidenced by the Trustees' failure over many years to attempt to reduce the Fund's discount to NAV, or to attempt to reduce the Fund's excessive fee payments.

As discussed above, Mr. Larson is the Business Manager of Cascade and is the Chief Investment Officer for Bill Gates, with ultimate responsibility for tens of billions of dollars of investments, including the endowment of the Bill & Melinda Gates Foundation Trust. Mr. Larson also serves as a board member for at least four other publicly traded companies. Ronald A. Nyberg is a partner in the law firm of Momkus McCluskey Roberts, and oversees 100 Western Asset and Guggenheim affiliated investment funds. Ronald E. Toupin Jr. works as a portfolio consultant and oversees 97 Western Asset and Guggenheim affiliated investment funds. Jane Trust is Managing Director of Legg Mason & Co., LLC, an affiliate of Western Management, and the President and CEO of Legg Mason Partners Fund Advisor LLC, in addition to overseeing 150 affiliated investment funds.

Notwithstanding the Trustees' severe time constraints, Messrs. Larson, Nyberg and Toupin each receive at least $35,000 annually from the Fund for serving as Trustees. Mr. Larson receives a total of roughly $70,000 annually from the Fund and its affiliated funds, whereas Messrs. Nyberg and Toupin each receive over $400,000 annually from the Fund and its affiliated funds.

If, within 45 days of receipt of this letter, the Fund and the Trustees do not agree to take sufficient actions to obtain compensation and to rectify the breaches of fiduciary duty described above, Mr. Winston intends to prosecute a shareholder derivative action on behalf of the Fund seeking money damages, injunctive relief barring further breaches of fiduciary duty, and such other relief as may be appropriate.

Mark E. Mathiasen, Secretary
Western Asset/Claymore Inflation-Linked Securities & Income Fund

Page 9 of 9

     In addition to the proposed court action against the Trustees, Mr. Winston hereby informs you that if his concerns about excessive fees are not promptly addressed he also intends to bring a lawsuit against the Investment Adviser (and/or the Fund's Western Asset sub-advisers) for receipt of excessive fees from the Fund in violation of § 36(b) of the Investment Company Act of 1940. Mr. Winston may bring such a lawsuit at any time and is not constrained by the demand requirement or the waiting period for derivative actions set forth in the Fund's Agreement and Declaration of Trust (*see Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)). Nonetheless, Mr. Winston hopes that the excessive fees will be addressed without the need for litigation and is willing to discuss, through his attorneys, a mutually agreeable resolution of these concerns.

     Thank you for your prompt attention to these matters. Please address any communications directly to me at the address listed in the letterhead, or at bmurray@glancylaw.com. I look forward to working with you to jointly advance the interests of all the Fund's shareholders.

Very truly yours,

Brian Murray

# Exhibit 3

**WIW Advisory Agreement**

*Available at*   https://www.sec.gov/Archives/edgar/data/1267902/000104746904005444/
a2127885zex-99_g1.txt

NOTE: Minor formatting changes have been made here to the version available online

INVESTMENT ADVISORY AGREEMENT

This INVESTMENT ADVISORY AGREEMENT, made this ___ day of _____, by and
between Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund 2, a
Massachusetts business trust (the "Trust"), and Claymore Advisors, LLC, a Delaware limited
liability company (the "Advisor").

WHEREAS, the Trust is registered as a closed-end management investment company under
the Investment Company Act of 1940, as amended ("1940 Act"); and

WHEREAS, the Trust wishes to retain the Advisor to provide certain investment advisory,
management, administrative and shareholder services; and

WHEREAS, the Advisor is willing to furnish such services on the terms and conditions
hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein
contained, it is agreed as follows:

1. The Trust hereby appoints Claymore Advisors, LLC as Advisor of the Trust for the period
and on the terms set forth in this Agreement. The Advisor accepts such appointment and agrees
to render the services herein set forth, for the compensation herein provided.

2. The Trust shall at all times keep the Advisor fully informed with regard to the securities
and other property owned by it, its funds available, or to become available, for investment, and
generally as to the condition of its affairs. It shall furnish the Advisor with such other documents
and information with regard to its affairs as the Advisor may from time to time reasonably
request.

3. (a) Subject to the supervision of the Trust's Board of Trustees (the "Trustees"), the Advisor
shall regularly provide the Trust with investment research, advice, management and supervision
and shall furnish a continuous investment program for the Trust consistent with the Trust's
investment objectives, policies and restrictions. The Advisor shall determine from time to time
what securities or other property will be purchased, retained or sold by the Trust, and shall
implement those decisions, all subject to the provisions of the Trust's Agreement and Declaration
of Trust and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and
Exchange Commission, and other applicable federal and state law, as well as the investment
objectives, policies and restrictions of the Trust, as each of the foregoing may be amended from

Exhibit 3 – Page 1

time to time. The Advisor will place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, the Advisor shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, the Advisor, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine, the Advisor shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay, on behalf of the Trust, a broker that provides brokerage and research services to the Advisor or any affiliated person of the Advisor an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the Advisor determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the Advisor's overall responsibilities with respect to the Trust and to other clients of the Advisor and any affiliated person of the Advisor as to which the Advisor or any affiliated person of the Advisor exercises investment discretion. The Advisor shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall perform such other functions of management and supervision, as may be directed by the Trustees.

(b) In addition to the services to be provided by the Advisor pursuant to Paragraph 3(a) of this Agreement, the Advisor shall, subject to the supervision of the Trustees, provide the services set forth in EXHIBIT A attached hereto. In all matters pertaining to the performance of the services set forth in EXHIBIT A, the Advisor will act in conformity with the Trust's Agreement and Declaration of Trust, By-Laws and registration statements, each as amended from time to time, and with the directions of the Trustees and the Trust's executive officers; and will conform to and comply with the requirements of the 1940 Act and the rules and regulations thereunder and all other applicable federal or state laws and regulations. Notwithstanding any other provision of this Agreement, the Advisor shall be responsible for any expense it incurs in connection with its duties under this Paragraph 3(b).

(c) The Trust hereby agrees with the Advisor and with any investment manager appointed pursuant to Paragraph 4 below (an "Investment Manager") that any entity or person associated with the Advisor or Investment Manager (or with any affiliated person of the Advisor or Investment Manager) that is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Trust which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Trust hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

Exhibit 3 – Page 2

4. The Advisor may enter into a contract ("Investment Management Agreement") with one or more investment managers in which the Advisor delegates to such investment manager or investment managers any or all of its duties specified in Paragraph 3 hereunder. Such Investment Management Agreement must meet all requirements of the 1940 Act and the rules and regulations thereunder.

5. (a) The Advisor, at its expense, shall supply the Board of Trustees and officers of the Trust with statistical information and reports reasonably requested by them and reasonably available to the Advisor and shall furnish the Trust with office facilities, including space, furniture and equipment and all personnel reasonably necessary for the operation of the Trust. The Advisor shall oversee the maintenance of all books and records with respect to the Trust's portfolio transactions and the keeping of the Trust's books of account in accordance with all applicable federal and state laws and regulations and shall perform such other administrative, bookkeeping or clerical duties as may be agreed upon by the parties. In compliance with the requirements of Rule 31a-3 under the 1940 Act, the Advisor hereby agrees that any records which it maintains for the Trust are the property of the Trust, and further agrees to surrender promptly to the Trust or its agents any of such records upon the Trust's request. The Advisor further agrees to arrange for the preservation of the records required to be maintained by Rule 31a-1 under the 1940 Act for the periods prescribed by Rule 31a-2 under the 1940 Act. The Advisor shall authorize and permit any of its directors, officers and employees, who may be elected as Trustees or officers of the Trust, to serve in the capacities in which they are elected. The Advisor may enter into a contract with one or more other parties in which the Advisor delegates to such party or parties any or all of the duties specified in this Paragraph 5(a).

(b) Other than as herein specifically indicated, the Advisor shall not be responsible for the expenses of the Trust. Specifically (but without limitation), the Advisor will not be responsible for any of the following expenses of the Trust, which expenses shall be borne by the Trust: advisory fees; distribution fees; interest; taxes; governmental fees; fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; the cost (including brokerage commissions or charges, if any) of securities or other property purchased or sold by the Trust and any losses in connection therewith; fees of custodians, transfer agents, registrars, administrators or other agents; legal expenses; expenses of preparing share certificates; expenses relating to the redemption or repurchase of the Trust's shares; expenses of registering and qualifying shares of the Trust for sale under applicable federal and state law; expenses of preparing, setting in print, printing and distributing prospectuses, reports, notices and dividends to Trust shareholders; costs of stationery; costs of shareholders' and other meetings of the Trust; Trustees' fees; audit fees; travel expenses of officers, Trustees and employees of the Trust, if any; and the Trust's pro rata portion of premiums on any fidelity bond and other insurance covering the Trust and/or its officers and Trustees.

6. No Trustee, officer or employee of the Trust shall receive from the Trust any salary or other compensation as such Trustee, officer or employee while he or she is at the same time a director, officer, or employee of the Advisor or any affiliated company of the Advisor. This

Exhibit 3 – Page 3

Paragraph 6 shall not apply to Trustees, executive committee members, consultants and other persons who are not regular members of the Advisor's or any affiliated company's staff.

7. As compensation for the services performed and expenses assumed by the Advisor, including the services of any consultants, investment managers or other parties retained by the Advisor, the Trust shall pay the Advisor an annual fee, payable on a monthly basis, at the annual rate of 0.60% of the Trust's average weekly assets. "Average Weekly Assets" means the average weekly value of the total assets of the Trust (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage). For purposes of calculating Average Weekly Assets, neither the liquidation preference of any preferred shares of beneficial interest outstanding nor any liabilities associated with any instruments or transactions used to leverage the Trust's portfolio (whether or not such instruments or transactions are "covered" within the meaning of the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) is considered a liability. In addition, with respect to reverse repurchase or dollar roll transactions ("Repurchase Transactions") entered into by the Trust, Average Weekly Assets includes (a) any proceeds from the sale of an asset (the "Underlying Asset") of the Trust to a counterparty in a Repurchase Transaction and (b) the value of such Underlying Asset as of the relevant measuring date. The first payment of the fee shall be made as promptly as possible at the end of the month succeeding the effective date of this Agreement. For any period less than a month during which this Agreement is in effect, the fee shall be prorated according to the proportion which such period bears to a full month of 28, 29, 30 or 31 days, as the case may be. For purposes of this Agreement and except as otherwise provided herein, the Average Weekly Assets of the Trust shall be calculated pursuant to procedures adopted by the Trustees of the Trust for calculating the value of the Trust's assets or delegating such calculations to third parties. In the event that the expenses of the Trust exceed any expense limitation which the Advisor may, by written notice to the Trust, voluntarily declare to be effective with respect to the Trust, subject to such terms and conditions as the Advisor may prescribe in such notice, the compensation due the Advisor shall be reduced, and, if necessary, the Advisor shall bear the Trust's expenses to the extent required by such expense limitation.

8. In the absence of willful misfeasance, bad faith or gross negligence on the part of the Advisor, or reckless disregard of its obligations and duties hereunder, the Advisor shall not be subject to any liability to the Trust or to any shareholder of the Trust, for any act or omission in the course of, or connected with, rendering services hereunder.

9. Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of the Advisor who may also be a Trustee, officer, or employee of the Trust to engage in any other business or to devote his or her time and attention to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, or limit or restrict the right of the Advisor to engage in any other business or to render services of any kind, including investment advisory and management services, to any other trust, firm, individual or association.

10. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to

Exhibit 3 – Page 4

them by Section 2(a) of the 1940 Act, subject to such exemptions as may be granted, issued or adopted by the Securities and Exchange Commission or its staff by any rule, regulation, or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

11. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Paragraph 12 below) until terminated as follows:

(a) Either party hereto may at any time terminate this Agreement by sixty days' written notice delivered or mailed by registered mail, postage prepaid, to the other party, or

(b) If (i) the Trustees or the shareholders of the Trust by the vote of a majority of the outstanding voting securities of the Trust, and (ii) a majority of the Trustees who are not interested persons of the Trust or of the Advisor, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; PROVIDED, HOWEVER, that if the continuance of this Agreement is submitted to the shareholders of the Trust for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, the Advisor may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder.

Action by the Trust under paragraph (a) of this Paragraph 11 may be taken either (i) by vote of a majority of the Trustees, or (ii) by the vote of a majority of the outstanding voting securities of the Trust.

12. Except as otherwise provided herein, this Agreement shall terminate automatically in the event of its assignment by the Advisor and shall not be assignable by the Trust without the consent of the Advisor. Any termination of this Agreement pursuant to Paragraph 11 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Trust (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff), and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Trustees who are not interested persons of the Trust or of the Advisor.

13. The Advisor hereby grants to the Trust the nonexclusive right and license to use the mark "Claymore" (the "Licensed Mark") in the Trust's name and in connection with the formation, issuance, marketing, promotion and operations of, or disclosure related to, the Trust.

Exhibit 3 – Page 5

The Advisor agrees that it shall receive no compensation for any such use by the Trust. The Advisor hereby warrants and represents that it has filed applications and/or owns rights in the Licensed Mark sufficient to grant this license. No right, title or interest in the Licensed Mark, except the right to use the Licensed Mark as provided in this Agreement, is or will be transferred to the Trust by this Agreement. Should this Agreement be terminated, the Trust agrees that it will take reasonably necessary steps to change its name to a name not including the word "Claymore."

14. The Advisor agrees on behalf of itself and its employees to treat confidentially and as proprietary information of the Trust all records and other information relative to the Trust, any Investment Manager appointed pursuant to Paragraph 4 hereof, and all prior, current or potential shareholders of the Trust and not to use such records and information for any purpose other than the performance of its duties hereunder. The Advisor also agrees that, without the prior written consent of the Trust, it will not disclose personal information of any shareholders of the Trust ("Personal Shareholder Information") or any other confidential information, including to its affiliates, unless it is required by law to disclose the information to the recipient of such information. The Advisor further agrees, represents and warrants that (a) only those employees of the Advisor who need to do so in carrying out their job responsibilities may access Personal Shareholder Information; (b) it maintains physical, electronic and procedural safeguards that comply with federal standards to protect confidentiality; and (c) it may use Personal Shareholder Information only for the purposes set forth in this Agreement. Upon termination of this Agreement, all confidential information shall be promptly returned unless otherwise agreed to by the parties, although copies may be retained.

15. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

16. A copy of the Trust's Agreement and Declaration of Trust is on file with the Secretary of The Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Trust by an officer of the Trust as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any of the Trustees, officers or shareholders of the Trust individually but are binding only upon the assets and property of the Trust.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized.

Attest:                WESTERN ASSET/CLAYMORE U.S. TREASURY
INFLATION PROTECTED SECURITIES FUND 2

By:               By:

Exhibit 3 – Page 6

----------------              ---------------------------------

Attest:              CLAYMORE ADVISORS, LLC

By:              By:
    ----------------         ---------------------------------

## EXHIBIT A

- Reply to requests for information concerning the Trust from shareholders or prospective shareholders, brokers or the public;

- Aid in the secondary market support of the Trust through regular written and oral communications with the Trust's New York Stock Exchange specialist, the closed-end fund analyst community and various information providers specializing in the dissemination of closed end fund information;

- Prepare (or oversee the preparation) for review and approval by officers of the Trust financial information for the Trust's reports to be sent to the Trust's shareholders, and arrange for the printing and dissemination of such reports to shareholders;

- Prepare (or oversee the preparation) for review by an officer of the Trust all reports required to be filed with the Securities and Exchange Commission, including reports on Forms N-SAR and N-CSR, and in the filing of such completed forms with the Securities and Exchange Commission;

- Assist in the dissemination to shareholders of the Trust's proxy materials and assist in the filing of such materials with the Trust's regulators, and oversee the tabulation of proxies by the Trust's transfer agent;

- Determine the amounts available for distribution as dividends and distributions to be paid by the Trust to its shareholders; prepare and arrange for the printing of dividend notices to shareholders; and assist in the preparation of materials relevant to the Trust's Dividend Reinvestment Plan;

- Establish and maintain a toll-free number for sales support and marketing requests on an ongoing basis;

- Develop and maintain, as agreed by the Trust, a website for the Trust which will provide daily and weekly updates, daily net asset value and price information, monthly distribution notifications and such other information reasonably requested by the Trust, as well as hyperlinks to the websites of the Advisor and any Investment Manager appointed pursuant to Paragraph 4 above, for added information;

Exhibit 3 – Page 7

- Make the Trust and any Investment Manager aware of trading strategies that might be used for the Trust and communicate to the investment community any changes made to the Trust's trading strategies;

- Assist, as agreed by the Trust, in the provision of materials regarding the Trust to the investment community and current and prospective investors;

- Assist in the review of materials made available to shareholders and prospective investors to assure compliance with applicable laws, rules and regulations;

- Oversee, as agreed by the Trust, the dissemination of the Trust's net asset value, market price and discount;

- Host analyst meetings as appropriate;

- Provide persons to serve as officers and trustees of the Trust, as the Trust may request;

- Maintain ongoing contact with brokers in branch offices whose clients hold Trust shares or whose clients may have an interest in acquiring Trust shares, including providing, among other things, progress reports on the Trust, dividend announcements and performance updates;

- Assist in the drafting of press releases to the public;

- Make such reports and recommendations to the Trustees as the Trustees reasonably request or deem appropriate;

- Oversee, in consultation with, and as agreed by, any Investment Manager, matters relating to the conduct and administration of meetings of the Trustees, meetings, communication with respect to such meetings and, if requested, the hosting of such meetings (including arranging any off-site meetings);

- Oversee the maintenance by the Trust's custodian and transfer agent and dividend disbursing agent of certain books and records of the Trust as required under Rule 31a-1(b)(4) of the 1940 Act and maintain  (or oversee maintenance by the Trust's administrator or such other persons as approved by the Trustees) such other books and records required by law or for the proper operation of the Trust;

- Oversee the preparation and filing of the Trust's federal, state and local income tax returns and any other required tax returns;

- Review the appropriateness of and arrange for payment of the Trust's expenses;

- Prepare (or oversee the preparation of) such information and reports as may be required by any stock exchange or exchanges on which the Trust's shares are listed;

Exhibit 3 – Page 8

-   Oversee and review calculations of fees paid to the Trust's service providers;

-   Oversee the Trust's portfolio and perform necessary calculations as required under Section 18 of the 1940 Act;

-   Consult with the Trust's officers, independent accountants, legal counsel, custodian, administrator or other accounting agent, transfer agent and dividend disbursing agent in establishing the accounting policies of the Trust and monitor financial and shareholder accounting services;

-   Review implementation of any share purchase programs authorized by the Trustees;

-   Prepare such information and reports as may be required by any banks from which the Trust borrows funds;

-   Provide such assistance to the custodian and the Trust's counsel and auditors as generally may be required to properly carry on the business and operations of the Trust; and

-   Provide such other services as the parties may mutually agree from time to time.

Exhibit 3 – Page 9

# Exhibit 4

**WIW Sub-Advisory Agreement**

*Available at*    https://www.sec.gov/Archives/edgar/data/1267902/000104746904005444/
a2127885zex-99_g2.txt

NOTE: Minor formatting changes have been made here to the version available online

INVESTMENT MANAGEMENT AGREEMENT

This INVESTMENT MANAGEMENT AGREEMENT made this ___ day of _____, by and between Claymore Advisors, LLC (the "Advisor"), a Delaware limited liability company, and Western Asset Management Company ("WAM"), a California corporation, each of which is registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

WHEREAS, the Advisor is the adviser of Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund 2 (the "Trust"), a closed-end, management investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act"); and

WHEREAS, the Advisor wishes to retain WAM to provide certain investment advisory services in connection with the Advisor's management of the Trust; and

WHEREAS, WAM is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1.  APPOINTMENT. The Advisor hereby appoints WAM as investment manager for the Trust for the period and on the terms set forth in this Agreement. WAM accepts such appointment and agrees to furnish the services herein set forth for the compensation herein provided.

2.  DELIVERY OF DOCUMENTS. The Advisor has furnished WAM with copies of each of the following:

(a) The Trust's Agreement and Declaration of Trust and all amendments thereto (such Declaration of Trust, as presently in effect and as it shall from time to time be amended, is herein called the "Declaration");

(b) The Trust's By-Laws and all amendments thereto (such By-Laws, as presently in effect and as they shall from time to time be amended, are herein called the "By-Laws");

(c) Resolutions of the Trust's Board of Trustees (the "Trustees") authorizing the appointment of the Advisor as the adviser and WAM as investment manager and approving the Investment

Exhibit 4 – Page 1

Advisory Agreement between the Advisor and the Trust with respect to the Trust dated February __, 2004 (the "Advisory Agreement") and this Agreement;

(d) The Trust's most recently filed Amendment to its Registration Statement on Form N-2 under the Securities Act of 1933, as amended, and the 1940 Act, including all exhibits thereto, relating to common shares of beneficial interest of the Trust, no par value;

(e) The Trust's most recent prospectus (such prospectus, as presently in effect, and all amendments and supplements thereto are herein called the "Prospectus"); and

(f) The Trust's most recent statement of additional information (such statement of additional information, as presently in effect, and all amendments and supplements thereto are herein called the "Statement of Additional Information").

The Advisor will furnish WAM from time to time with copies of all amendments of or supplements to the foregoing.

3.   INVESTMENT ADVISORY SERVICES. (a) Subject to the supervision of the Trustees and the Advisor, WAM shall as requested by the Advisor regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust consistent with the Trust's investment objectives, policies, and restrictions as stated in the Trust's current Prospectus and Statement of Additional Information. WAM shall as requested by the Advisor determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the Trust's Declaration and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies, and restrictions of the Trust, as each of the foregoing may be amended from time to time. WAM will as requested by the Advisor place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, WAM shall seek to obtain for the Trust the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, WAM, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into consideration market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine and communicate to WAM in writing, WAM shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay a broker that provides brokerage and research services to WAM or any affiliated person of WAM an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if WAM determines in good faith that such amount of

Exhibit 4 – Page 2

commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or WAM's overall responsibilities with respect to the Trust and to other clients of WAM and any affiliated person of WAM as to which WAM or any affiliated person of WAM exercises investment discretion. WAM shall also perform such other functions of management and supervision as may be requested by the Advisor and agreed to by WAM.

(b) WAM will as requested by the Advisor oversee the maintenance of all "books and records with respect to the investment transactions of the Trust that it implements in accordance with all applicable federal and state laws and regulations, and will furnish the Trustees with such periodic and special reports as the Trustees or the Advisor reasonably may request.

(c) The Trust hereby agrees that any entity or person associated with WAM (or with any affiliated person of WAM) which is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Trust which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Trust hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4.   SERVICES NOT EXCLUSIVE. WAM's services hereunder are not deemed to be exclusive, and WAM shall be free to render similar services to others. It is understood that persons employed by WAM to assist in the performance of its duties hereunder might not devote their full time to such service. Nothing herein contained shall be deemed to limit or restrict the right of WAM or any affiliate of WAM to engage in and devote time and attention to other businesses or to render services of whatever kind or nature.

5.   BOOKS AND RECORDS. In compliance with the requirements of Rule 31a-3 under the 1940 Act, WAM hereby agrees that all books and records which it maintains for the Trust are property of the Trust and further agrees to surrender promptly to the Trust or its agents any of such records upon the Trust's request. WAM further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act any such records required to be maintained by Rule 31a-1 under the 1940 Act.

6.   EXPENSES. During the term of this Agreement, WAM will pay all expenses incurred by it in connection with its activities under this Agreement other than the cost of securities and other property (including brokerage commissions, if any) purchased for the Trust.

7.   COMPENSATION. For the services which WAM will render to the Advisor and the Trust under this Agreement, the Advisor shall pay WAM an annual fee, payable on a monthly basis, at the annual rate of 0.27% of the Trust's average weekly assets. "Average Weekly Assets" means the average weekly value of the total assets of the Trust (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage). For purposes of calculating Average Weekly Assets, neither the liquidation preference of any preferred shares of beneficial interest outstanding nor any liabilities associated with any instruments or transactions to leverage the Trust's portfolio (whether or not such instruments or transactions are "covered" within the meaning of the 1940 Act and the rules and regulations thereunder, giving

Exhibit 4 – Page 3

effect to any interpretations of the Securities and Exchange Commission and its staff) is considered a liability. In addition, with respect to reverse repurchase or dollar roll transactions ("Repurchase Transactions") entered into by the Trust, Average Weekly Assets includes (a) any proceeds from the sale of an asset (the "Underlying Asset") of the Trust to a counterparty in a Repurchase Transaction and (b) the value of such Underlying Asset as of the relevant measuring date. Fees due to WAM hereunder shall be paid promptly to WAM by the Advisor following its receipt of fees from the Trust. For any period less than a month during which this Agreement is in effect, the fee shall be prorated according to the proportion which such period bears to a full month of 28, 29, 30 or 31 days, as the case may be. For purposes of this Agreement and except as otherwise provided herein, the Average Weekly Assets of the Trust shall be calculated pursuant to procedures adopted by the Trustees of the Trust for calculating the value of the Trust's assets or delegating such calculations to third parties.

8.   LIMITATION OF LIABILITY. In the absence of willful misfeasance, bad faith or gross negligence on the part of WAM, or reckless disregard of its obligations and duties hereunder, WAM shall not be subject to any liability to the Advisor, the Trust or any shareholder of the Trust, for any act or omission in the course of, or connected with, rendering services hereunder.

9.   DEFINITIONS. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such exemptions as may be granted, issued or adopted by the Securities and Exchange Commission or its staff by any rule, regulation, or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

10.   TERM. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Section 12) until terminated as follows:

a.   The Trust may at any time terminate this Agreement by 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Advisor and WAM, or

b.   If (i) the Trustees or the shareholders of the Trust by vote of a majority of the outstanding voting securities of the Trust, and (ii) a majority of the Trustees who are not interested persons of the Trust, the Advisor or WAM, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; PROVIDED, HOWEVER, that if the continuance of this Agreement is submitted to the shareholders of the Trust for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, WAM may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder, or

Exhibit 4 – Page 4

    c.  WAM may at any time terminate this Agreement by 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Advisor.

    Action by the Trust under paragraph (a) of this Section 10 may be take either (i) by vote of a majority of the Trustees, or (ii) by the vote of a majority of the outstanding voting securities of the Trust.

    11.  FURTHER ACTIONS. Each party agrees to perform such further acts and execute such further documents as are necessary to effectuate the purposes hereof.

    12.  NO ASSIGNMENT; AMENDMENTS. This Agreement shall terminate automatically in the event of its assignment or in the event that the Advisory Agreement shall have terminated for any reason. Any termination of this Agreement pursuant to Section 10 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Trust (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Trustees who are not interested persons of the Trust, the Advisor or WAM.

    13.  NON-EXCLUSIVE RIGHT. WAM hereby grants to the Trust the nonexclusive right and license to use the mark "Western" (the "Licensed Mark") in the Trust's name and in connection with the formation, issuance, marketing, promotion and operations of, or disclosure related to, the Trust. WAM agrees that it shall receive no compensation for any such use by the Trust. WAM hereby warrants and represents that it has filed applications and/or owns rights in the Licensed Mark sufficient to grant this license. No right, title, or interest in the Licensed Mark, except the right to use the Licensed Mark as provided in this Agreement, is or will be transferred to the Trust by this Agreement. Should this Agreement be terminated, the Trust agrees that it will take reasonably necessary steps to change its name to a name not including the word "Claymore."

    14.  MISCELLANEOUS. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions hereof or otherwise affect their construction or effect. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

    15.  LIMITATION OF LIABILITY. A copy of the Trust's Agreement and Declaration of Trust is on file with the Secretary of The Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Trust by an officer of the Trust as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any of the Trustees, officers or shareholders of the Trust individually but are binding only upon the assets and property of the Trust.

Exhibit 4 – Page 5

    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers designated below on the day and year first above written.

Attest:                  CLAYMORE ADVISORS, LLC


By:                   By:
  ----------------        ---------------------------------


Attest:                  WESTERN ASSET MANAGEMENT COMPANY


By:                   By:
  ----------------        ---------------------------------


The foregoing is accepted by:


Attest:                  WESTERN ASSET/CLAYMORE U.S. TREASURY
                            INFLATION PROTECTED SECURITIES FUND 2


By:                   By:
  ----------------        ---------------------------------

Exhibit 4 – Page 6

# Exhibit 5

**Comparison of**
**WIW Sub-Advisory Agreement Section 3(a)**
**to**
**WIW Advisory Agreement Section 3(a)**

3. INVESTMENT ADVISORY SERVICES. (a) Subject to the supervision of the ~~Trust's Board of~~ Trustees ~~(the "Trustees"),~~and the Advisor, WAM shall as requested by the Advisor ~~shall~~ regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust consistent with the Trust's investment objectives, policies, and restrictions. ~~The~~ as stated in the Trust's current Prospectus and Statement of Additional Information. WAM shall as requested by the Advisor ~~shall~~ determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the Trust's ~~Agreement and~~ Declaration ~~of Trust~~ and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies, and restrictions of the Trust, as each of the foregoing may be amended from time to time. ~~The~~WAM will as requested by the Advisor ~~will~~ place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, ~~the Advisor~~WAM shall seek to obtain for the Trust the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, ~~the Advisor~~WAM, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into ~~account~~consideration market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine~~, the Advisor~~ and communicate to WAM in writing, WAM shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay~~, on behalf of the Trust,~~ a broker that provides brokerage and research services to ~~the Advisor~~WAM or any affiliated person of ~~the Advisor~~WAM an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if ~~the Advisor~~WAM determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or ~~the Advisor's~~WAM's overall responsibilities with respect to the Trust and to other clients of ~~the Advisor~~WAM and any affiliated person of ~~the Advisor~~WAM as to which ~~the Advisor~~WAM or any affiliated person of ~~the Advisor~~WAM exercises investment discretion. ~~The Advisor~~WAM shall also ~~provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall~~ perform such other functions of management and supervision~~,~~ as may be ~~directed~~requested by the ~~Trustees~~Advisor and agreed to by WAM.

Exhibit 5 – Page 1

# Exhibit 6

**WIW New Advisory Agreement**

*Available at*    https://www.sec.gov/Archives/edgar/data/1267902/000119312518110181/
d555877ddef14a.htm

NOTE: Minor formatting changes have been made here to the version available online

Form of Proposed Advisory Agreement

This INVESTMENT MANAGEMENT AGREEMENT, made this [ ] day of [ ], 2018, by
and between Western Asset/Claymore Inflation-Linked Opportunities & Income Fund, a
Massachusetts business trust (the "Trust"), and Western Asset Management Company, a
California corporation (the "Manager").

WHEREAS, the Trust is a closed-end management investment company registered under
the Investment Company Act of 1940, as amended (the "1940 Act"); and

WHEREAS, the Trust wishes to retain the Manager to provide certain investment advisory,
management and administrative services; and

WHEREAS, the Manager is willing to furnish such services on the terms and conditions
hereinafter set forth.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein
contained, it is agreed as follows:

1. The Trust hereby appoints Western Asset Management Company as Manager of the
Trust for the period and on the terms set forth in this Agreement. The Manager accepts such
appointment and agrees to render the services herein set forth, for the compensation herein
provided.

2. The Trust shall at all times keep the Manager fully informed with regard to the securities
and other property owned by it, its funds available, or to become available, for investment, and
generally as to the condition of its affairs. It shall furnish the Manager with such other
documents and information with regard to its affairs as the Manager may from time to time
reasonably request.

3. (a) Subject to the supervision of the Trust's Board of Trustees (the "Trustees"), the
Manager shall regularly provide the Trust with investment research, advice, management and
supervision and shall furnish a continuous investment program for the Trust consistent with the
Trust's investment objectives, policies and restrictions. The Manager shall determine from time
to time what securities or other property will be purchased, retained or sold by the Trust, and
shall implement those decisions, all subject to the provisions of the Trust's Agreement and
Declaration of Trust and By-Laws, the 1940 Act, the applicable rules and regulations of the
Securities and Exchange Commission, and other applicable federal and state law, as well as the
investment objectives, policies and restrictions of the Trust, as each of the foregoing may be
amended from time to time. The Manager will place orders pursuant to its investment

Exhibit 6 – Page 1

determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, the Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, the Manager, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine, the Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay, on behalf of the Trust, a broker that provides brokerage and research services to the Manager or any affiliated person of the Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the Manager's overall responsibilities with respect to the Trust and to other clients of the Manager and any affiliated person of the Manager as to which the Manager or any affiliated person of the Manager exercises investment discretion. The Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall perform such other functions of management and supervision, as may be directed by the Trustees.

(b) The Trust hereby agrees with the Manager and with any investment adviser appointed pursuant to Paragraph 4 below (an "Investment Adviser") that any entity or person associated with the Manager or Investment Adviser (or with any affiliated person of the Manager or Investment Adviser) that is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Trust which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a-2(T) thereunder, and the Trust hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4. The Manager may enter into a contract ("Portfolio Management Agreement") with one or more investment advisers in which the Manager delegates to such investment adviser or investment advisers any or all of its duties specified in Paragraph 3 hereunder. Such Portfolio Management Agreement must meet all requirements of the 1940 Act and the rules and regulations thereunder.

5. (a) The Manager, at its expense, shall supply the Board of Trustees and officers of the Trust with statistical information and reports reasonably requested by them and reasonably available to the Manager. The Manager shall oversee the maintenance of all books and records with respect to the Trust's portfolio transactions and the keeping of the Trust's books of account in accordance with all applicable federal and state laws and regulations and shall perform such other administrative, bookkeeping or clerical duties as may be agreed upon by the parties. In

Exhibit 6 – Page 2

compliance with the requirements of Rule 31a-3 under the 1940 Act, the Manager hereby agrees that any records which it maintains for the Trust are the property of the Trust, and further agrees to surrender promptly to the Trust or its agents any of such records upon the Trust's request. The Manager further agrees to arrange for the preservation of the records required to be maintained by Rule 31a-1 under the 1940 Act for the periods prescribed by Rule 31a-2 under the 1940 Act. The Manager shall authorize and permit any of its directors, officers and employees, who may be elected as Trustees or officers of the Trust, to serve in the capacities in which they are elected. The Manager may enter into a contract with one or more other parties in which the Manager delegates to such party or parties any or all of the duties specified in this Paragraph 5(a).

(b) Other than as herein specifically indicated, the Manager shall not be responsible for the expenses of the Trust. Specifically (but without limitation), the Manager will not be responsible for any of the following expenses of the Trust, which expenses shall be borne by the Trust: advisory fees; distribution fees; interest; taxes; governmental fees; fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; the cost (including brokerage commissions or charges, if any) of securities or other property purchased or sold by the Trust and any losses in connection therewith; fees of custodians, transfer agents, registrars, administrators or other agents; legal expenses; expenses of preparing share certificates; expenses relating to the redemption or repurchase of the Trust's shares; expenses of registering and qualifying shares of the Trust for sale under applicable federal and state law; expenses of preparing, setting in print, printing and distributing prospectuses, reports, notices and dividends to Trust shareholders; costs of stationery; costs of shareholders' and other meetings of the Trust; Trustees' fees; audit fees; travel expenses of officers, Trustees and employees of the Trust, if any; and the Trust's pro rata portion of premiums on any fidelity bond and other insurance covering the Trust and/or its officers and Trustees.

6. No Trustee, officer or employee of the Trust shall receive from the Trust any salary or other compensation as such Trustee, officer or employee while he or she is at the same time a director, officer, or employee of the Manager or any affiliated company of the Manager. This Paragraph 6 shall not apply to Trustees, executive committee members, consultants and other persons who are not regular members of the Manager's or any affiliated company's staff.

7. As compensation for the services performed and expenses assumed by the Manager, including the services of any consultants, investment advisers or other parties retained by the Manager, the Trust shall pay the Manager an annual fee, payable on a monthly basis, at the annual rate of 0.35% of the Trust's average weekly assets. "Average Weekly Assets" means the average weekly value of the total assets of the Trust (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage). For purposes of calculating Average Weekly Assets, neither the liquidation preference of any preferred shares of beneficial interest outstanding nor any liabilities associated with any instruments or transactions used by the Manager to leverage the Trust's portfolio (whether or not such instruments or transactions are "covered" within the meaning of the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) is considered a liability. In addition, with respect to reverse repurchase or dollar roll transactions ("Repurchase Transactions") entered into by the Trust, Average Weekly Assets includes (a) any proceeds from the sale of an asset (the "Underlying Asset") of the Trust to a

Exhibit 6 – Page 3

counterparty in a Repurchase Transaction and (b) the value of such Underlying Asset as of the relevant measuring date. The first payment of the fee shall be made as promptly as possible at the end of the month succeeding the effective date of this Agreement. For any period less than a month during which this Agreement is in effect, the fee shall be prorated according to the proportion which such period bears to a full month of 28, 29, 30 or 31 days, as the case may be. For purposes of this Agreement and except as otherwise provided herein, the Average Weekly Assets of the Trust shall be calculated pursuant to procedures adopted by the Trustees of the Trust for calculating the value of the Trust's assets or delegating such calculations to third parties, in the event that the expenses of the Trust exceed any expense limitation which the Manager may, by written notice to the Trust, voluntarily declare to be effective with respect to the Trust, subject to such terms and conditions as the Manager may prescribe in such notice, the compensation due the Manager shall be reduced, and, if necessary, the Manager shall bear the Trust's expenses to the extent required by such expense limitation.

8. In the absence of willful misfeasance/bad faith or gross negligence on the part of the Manager, or reckless disregard of its obligations and duties hereunder, the Manager shall not be subject to any liability to the Trust or to any shareholder of the Trust, for any act or omission in the course of, or connected with, rendering services hereunder.

9. Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of the Manager who may also be a Trustee, officer, or employee of the Trust to engage in any other business or to devote his or her time and attention to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, or limit or restrict the right of the Manager to engage in any other business or to render services of any kind, including investment advisory and management services, to any other trust, firm, individual or association.

10. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such, exemptions as may be granted, issued or adopted by the Securities and Exchange Commission or its staff by any rule, regulation, or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

11. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Paragraph 12 below) until terminated as follows:

(a) Either party hereto may at any time terminate this Agreement by not more than sixty days' written notice delivered or mailed by registered mail, postage prepaid, to the other party, or

(b) If (i) the Trustees or the shareholders of the Trust by the vote of a majority of the outstanding voting securities of the Trust, and (ii) a majority of the Trustees who are not interested persons of the Trust or of the Manager, by vote cast in person at a meeting called for

Exhibit 6 – Page 4

the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; *provided, however*, that if the continuance of this Agreement is submitted to the shareholders of the Trust for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, the Manager may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder.

Action by the Trust under paragraph (a) of this Paragraph 11 may be taken either (i) by vote of a majority of the Trustees, or (ii) by the vote of a majority of the outstanding voting securities of the Trust.

12. Except as otherwise provided herein, this Agreement shall terminate automatically in the event of its assignment by the Manager and shall not be assignable by the Trust without the consent of the Manager. Any termination of this Agreement pursuant to Paragraph 11 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Trust (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff), and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Trustees who are not interested persons of the Trust or of the Manager.

13. In the event this Agreement is terminated by either party or upon written notice from the Manager at any time, the Trust hereby agrees that it will eliminate from its corporate name any reference to the name of "Western." The Trust shall have the non-exclusive use of the name "Western" in whole or in part only so long as this Agreement is effective or until such notice is given.

14. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

15. A copy of the Trust's Agreement and Declaration of Trust, as amended, is on file with the Secretary of the Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Trust by an officer of the Trust as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any of the Trustees, officers or shareholders of the Trust individually but are binding only upon the assets and property of the Trust.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized.

Exhibit 6 – Page 5

Attest:                                    WESTERN ASSET/CLAYMORE INFLATION-
                                           LINKED
                                           OPPORTUNITIES & INCOME FUND


By: _____   By: _____

Attest:                                    WESTERN ASSET MANAGEMENT COMPANY


By: _____   By: _____

Exhibit 6 – Page 6

# Exhibit 7

**Comparison of**
**WIW New Advisory Agreement Section 3(a)**
**to**
**WIW Advisory Agreement Section 3(a)**

3. (a) Subject to the supervision of the ~~Trust's~~Trust's Board of Trustees (the ~~"~~"Trustees~~");")~~, the ~~Advisor~~Manager shall regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust consistent with the ~~Trust's~~Trust's investment objectives, policies and restrictions. The ~~Advisor~~Manager shall determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the ~~Trust's~~Trust's Agreement and Declaration of Trust and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies and restrictions of the Trust, as each of the foregoing may be amended from time to time. The ~~Advisor~~Manager will place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a ~~"~~"broker~~").")~~. In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, the ~~Advisor~~Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, the ~~Advisor~~Manager, bearing in mind the ~~Trust's~~Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine, the ~~Advisor~~Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay, on behalf of the Trust, a broker that provides brokerage and research services to the ~~Advisor~~Manager or any affiliated person of the ~~Advisor~~Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the ~~Advisor~~Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the ~~Advisor's~~Manager's overall responsibilities with respect to the Trust and to other clients of the ~~Advisor~~Manager and any affiliated person of the ~~Advisor~~Manager as to which the ~~Advisor~~Manager or any affiliated person of the ~~Advisor~~Manager exercises investment discretion. The ~~Advisor~~Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall perform such other functions of management and supervision, as may be directed by the Trustees.

Exhibit 7 – Page 1

# Exhibit 8

## WIW New Sub-Advisory Agreement

*Available at*   https://www.sec.gov/Archives/edgar/data/1267902/000119312518110181/
d555877ddef14a.htm

NOTE: Minor formatting changes have been made here to the version available online

Form of Proposed Sub-Advisory Agreements

This INVESTMENT MANAGEMENT AGREEMENT made this [    ] day of
[                    ] 2018, by and between Western Asset Management Company (the "Advisor"), a
California corporation, and Western Asset Management Company Limited ("Subadviser"), a
corporation organized under English law, each of which is registered as an investment adviser
under the Investment Advisers Act of 1940, as amended.

WHEREAS, the Advisor is the adviser of Western Asset/Claymore Inflation-Linked
Opportunities & Income Fund (the "Trust"), a closed-end, management investment company
registered under the Investment Company Act of 1940, as amended (the "1940 Act"); and

WHEREAS, the Advisor wishes to retain Subadviser to provide certain investment advisory
services in connection with the Advisor's management of the Trust; and

WHEREAS, Subadviser is willing to furnish such services on the terms and conditions
hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein
contained, it is agreed as follows:

1. Appointment. The Advisor hereby appoints Subadviser as investment manager for the
Trust with respect to those assets of the Trust as may be designated by the Advisor from time to
time for the period and on the terms set forth in this Agreement. Subadviser accepts such
appointment and agrees to furnish the services herein set forth for the compensation herein
provided.

2. Delivery of Documents. The Advisor has furnished Subadviser with copies of each of the
following:

(a) The Trust's Agreement and Declaration of Trust and all amendments thereto (such
Declaration of Trust, as presently in effect and as it shall from time to time be amended, is herein
called the "Declaration");

(b) The Trust's By-Laws and all amendments thereto (such By-Laws, as presently in effect
and as they shall from time to time be amended, are herein called the "By-Laws");

(c) Resolutions of the Trust's Board of Trustees (the "Trustees") authorizing the
appointment of the Advisor as the adviser and Subadviser as investment manager and approving

Exhibit 8 – Page 1

the Investment Advisory Agreement between the Advisor and the Trust with respect to the Trust (the "Advisory Agreement") and this Agreement;

(d) The Trust's most recently filed amendment to its Registration Statement on Form N-2 under the Securities Act of 1933, as amended, and the 1940 Act, including all exhibits thereto, relating to common shares of beneficial interest of the Trust, no par value;

(e) The Trust's most recent prospectus (such prospectus, as presently in effect, and all amendments and supplements thereto are herein called the "Prospectus"); and

(f) The Trust's most recent statement of additional information (such statement of additional information, as presently in effect, and all amendments and supplements thereto are herein called the "Statement of Additional Information").

The Advisor will furnish Subadviser from time to time with copies of all amendments of or supplements to the foregoing.

3. <u>Investment Advisory Services</u>. (a) Subject to the supervision of the Trustees and the Advisor, Subadviser shall as requested by the Advisor regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust with respect to those assets of the Trust as may be designated by the Advisor from time to time consistent with the Trust's investment objectives, policies, and restrictions as stated in the Trust's current Prospectus and Statement of Additional Information. Subadviser shall as requested by the Advisor determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the Trust's Declaration and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies, and restrictions of the Trust, as each of the foregoing may be amended from time to time. Subadviser will as requested by the Advisor place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, Subadviser shall seek to obtain for the Trust the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, Subadviser, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into consideration market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine and communicate to Subadviser in writing, Subadviser shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay a broker that provides brokerage and research services to Subadviser or any affiliated person of Subadviser an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if

Exhibit 8 – Page 2

Subadviser determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or Subadviser's overall responsibilities with respect to the Trust and to other clients of Subadviser and any affiliated person of Subadviser as to which Subadviser or any affiliated person of Subadviser exercises investment discretion. Subadviser shall also perform such other functions of management and supervision as may be requested by the Advisor and agreed to by Subadviser.

(b) Subadviser will as requested by the Advisor oversee the maintenance of all books and records with respect to the investment transactions of the Trust that it implements in accordance with all applicable federal and state laws and regulations, and will furnish the Trustees with such periodic and special reports as the Trustees or the Advisor reasonably may request.

(c) The Trust hereby agrees that any entity or person associated with Subadviser (or with any affiliated person of Subadviser) which is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Trust which is permitted by Section 11 (a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Trust hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4. <u>Services Not Exclusive</u>. Subadviser's services hereunder are not deemed to be exclusive, and Subadviser shall be free to render similar services to others. It is understood that persons employed by Subadviser to assist in the performance of its duties hereunder might not devote their full time to such service. Nothing herein contained shall be deemed to limit or restrict the right of Subadviser or any affiliate of Subadviser to engage in and devote time and attention to other businesses or to render services of whatever kind or nature.

5. <u>Books and Records</u>. In compliance with the requirements of Rule 31a-3 under the 1940 Act, Subadviser hereby agrees that all books and records which it maintains for the Trust are property of the Trust and further agrees to surrender promptly to the Trust or its agents any of such records upon the Trust's request. Subadviser further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act any such records required to be maintained by Rule 31a-1 under the 1940 Act.

6. <u>Expenses</u>. During the term of this Agreement, Subadviser will pay all expenses incurred by it in connection with its activities under this Agreement other than the cost of securities and other property (including brokerage commissions, if any) purchased for the Trust.

7. <u>Compensation</u>. For the services which Subadviser will render to the Advisor and the Trust under this Agreement, the Advisor shall pay Subadviser an annual fee, payable on a monthly basis, at the annual rate of 0.35% of the Trust's average weekly assets that Subadviser manages. "Average Weekly Assets" means the average weekly value of the total assets of the Trust (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage). For purposes of calculating Average Weekly Assets, neither the liquidation preference of any preferred shares of beneficial interest outstanding nor any liabilities associated with any instruments or transactions to leverage the Trust's portfolio (whether or not such instruments or transactions are "covered" within the meaning of the 1940 Act and the rules

Exhibit 8 – Page 3

and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) is considered a liability. In addition, with respect to reverse repurchase or dollar roll transactions ("Repurchase Transactions") entered into by the Trust, Average Weekly Assets includes (a) any proceeds from the sale of an asset (the "Underlying Asset") of the Trust to a counterparty in a Repurchase Transaction and (b) the value of such Underlying Asset as of the relevant measuring date. Fees due to Subadviser hereunder shall be paid promptly to Subadviser by the Advisor following its receipt of fees from the Trust. For any period less than a month during which this Agreement is in effect, the fee shall be prorated according to the proportion which such period bears to a full month of 28, 29, 30 or 31 days, as the case may be. For purposes of this Agreement and except as otherwise provided herein, the Average Weekly Assets of the Trust shall be calculated pursuant to procedures adopted by the Trustees of the Trust for calculating the value of the Trust's assets or delegating such calculations to third parties.

8. <u>Limitation of Liability</u>. In the absence of willful misfeasance, bad faith or gross negligence on the part of Subadviser, or reckless disregard of its obligations and duties hereunder, Subadviser shall not be subject to any liability to the Advisor, the Trust or any shareholder of the Trust, for any act or omission in the course of, or connected with, Subadviser's rendering of services hereunder.

9. <u>Definitions</u>. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such exemptions as may be granted, issued or adopted by the Securities and Exchange Commission or its staff by any rule, regulation, or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

10. <u>Term</u>. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Section 12) until terminated as follows:

(a) The Trust may at any time terminate this Agreement by 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Advisor and Subadviser, or

(b) If (i) the Trustees or the shareholders of the Trust by vote of a majority of the outstanding voting securities of the Trust, and (ii) a majority of the Trustees who are not interested persons of the Trust, the Advisor or Subadviser, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; provided, however, that if the continuance of this Agreement is submitted to the shareholders of the Trust for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, Subadviser may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder, or

Exhibit 8 – Page 4

(c) Subadviser may at any time terminate this Agreement by 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Advisor.

Action by the Trust under paragraph (a) of this Section 10 may be taken either (i) by vote of a majority of the Trustees, or (ii) by the vote of a majority of the outstanding voting securities of the Trust.

11. <u>Further Actions</u>. Each party agrees to perform such further acts and execute such further documents as are necessary to effectuate the purposes hereof.

12. <u>No Assignment; Amendments</u>. This Agreement shall terminate automatically in the event of its assignment or in the event that the Advisory Agreement shall have terminated for any reason. Any termination of this Agreement pursuant to Section 10 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Trust (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Trustees who are not interested persons of the Trust, the Advisor or Subadviser.

13. <u>Non-Exclusive Right</u>. Subadviser hereby grants to the Trust the nonexclusive right and license to use the mark "Western Asset Management Company Limited" (the "Licensed Mark") in the Trust's name and in connection with the formation, issuance, marketing, promotion and operations of, or disclosure related to, the Trust. Subadviser agrees that it shall receive no compensation for any such use by the Trust. Subadviser hereby warrants and represents that it has filed applications and/or owns rights in the Licensed Mark sufficient to grant this license. No right, title, or interest in the Licensed Mark, except the right to use the Licensed Mark as provided in this Agreement, is or will be transferred to the Trust by this Agreement. Should this Agreement be terminated, the Trust agrees that it will take reasonably necessary steps to change its name to a name not including the word "Western Asset."

14. <u>Miscellaneous</u>. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions hereof or otherwise affect their construction or effect. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

15. <u>Limitation of Liability</u>. A copy of the Trust's Agreement and Declaration of Trust is on file with the Secretary of The Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Trust by an officer of the Trust as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any of the Trustees, officers or shareholders of the Trust individually but are binding only upon the assets and property of the Trust.

Exhibit 8 – Page 5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers designated below on the day and year first above written.

Attest:                                                       WESTERN ASSET MANAGEMENT COMPANY

By: _____          By: _____

Attest:                                                       WESTERN ASSET MANAGEMENT COMPANY
                                                                   LIMITED

By: _____          By: _____

The foregoing is accepted by:

Attest:                                                       WESTERN ASSET/CLAYMORE INFLATION-
                                                                   LINKED OPPORTUNITIES & INCOME FUND

By: _____          By: _____

Exhibit 8 – Page 6

# Exhibit 9

### WIW Administrative Services Agreement

*Available at*   https://www.sec.gov/Archives/edgar/data/1267902/000104746904005444/
a2127885zex-99_k2.txt

NOTE: Minor formatting changes have been made here to the version available online

ADMINISTRATIVE SERVICES AGREEMENT
WESTERN ASSET/CLAYMORE U.S. TREASURY INFLATION
PROTECTED SECURITIES FUND 2

AGREEMENT made this ____ day of _____, 2004 by and between Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund 2 (the "Fund"), a Massachusetts business trust, and Legg Mason Fund Adviser, Inc. ("Administrator"), a Maryland corporation registered as an investment adviser under the Investment Advisers Act of 1940.

WHEREAS, the Fund is a closed-end investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act"); and

WHEREAS, the Fund wishes to retain the Administrator to provide it with certain administrative services; and

WHEREAS, the Administrator is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1.  APPOINTMENT. The Administrator is hereby appointed as administrator for the Fund for the period and on the terms set forth in this Agreement. The Administrator accepts such appointment and agrees to furnish the services herein set forth for the compensation herein provided.

2.  DELIVERY OF DOCUMENTS. The Fund has caused the Administrator to be provided with copies of each of the following:

(a)  The Fund's Amended and Restated Agreement and Declaration of Trust and all amendments thereto;

(b)  The Fund's By-Laws and all amendments thereto;

(c)  Resolutions of the Fund's Board of Trustees authorizing the appointment of the Administrator as administrator for the Fund, and approving this Agreement;

Exhibit 9 – Page 1

(d)  The Fund's Registration Statement on Form N-2 under the 1940 Act and Securities Act of 1933, as amended, as filed with the Securities and Exchange Commission, including all exhibits thereto, relating to the shares of beneficial interest of the Fund, and all amendments thereto;

(e)  The Fund's most recent prospectus(es); and

(f)  The Fund's most recent statement(s) of additional information.

The Fund will cause the Administrator to be furnished with copies from time to time of all amendments of or supplements to the foregoing.

3.   ADMINISTRATIVE SERVICES. (a) The Administrator, at its expense, shall supply the Board of Trustees and officers of the Fund with all statistical information and reports reasonably required by them and reasonably available to the Administrator and shall furnish the Fund with office facilities, including space, furniture and equipment and all personnel reasonably necessary for the administration of the Fund. The Administrator shall authorize and permit any of its directors, officers and employees who may be elected as trustees or officers of the Fund to serve in the capacities in which they are elected.

(a)  The Administrator shall oversee the maintenance of all books and records with respect to the Fund's securities transactions and the keeping of the Fund's books of accounts in accordance with all applicable federal and state laws and regulations. In compliance with the requirements of Rule 31a-3 under the 1940 Act, the Administrator agrees that any records which it maintains for the Fund are the property of the Fund, and further agrees to surrender promptly to the Fund or its agents any of such records upon the Fund's request. The Administrator further agrees to arrange for the preservation of the records required to be maintained by Rule 31a-1 under the 1940 Act for the periods prescribed by Rule 31a-2 under the 1940 Act.

(b)  The Administrator shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Fund, and shall perform such other functions of administration, management and supervision, as are set forth in Schedule A hereto, as such Schedule may be amended from time to time in writing by the mutual consent of the parties.

4.   SERVICES NOT EXCLUSIVE; INDEPENDENT CONTRACTOR. The Administrator's services hereunder are not deemed to be exclusive, and the Administrator shall be free to render similar services to others. It is understood that persons employed by the Administrator to assist in the performance of its duties hereunder might not devote their full time to such service. Nothing herein contained shall be deemed to limit or restrict the right of the Administrator or any affiliate of the Administrator to engage in and devote time and attention to other businesses or to render services of any kind or nature to other parties. Unless otherwise expressly provided by this Agreement, the Administrator shall be deemed to be an independent contractor.

5.   EXPENSES. During the term of this Agreement, the Administrator will pay all expenses incurred by it in connection with its activities under this Agreement.

Exhibit 9 – Page 2

6.   COMPENSATION. For the services which the Administrator will render to the Fund under this Agreement, the Fund will pay the Administrator a fee, paid monthly, at an annual rate of $125,000. If this Agreement is terminated as of any date not the last day of a calendar month, a final fee shall be paid promptly after the date of termination, which fee shall be based on the percentage of days of the month during which the Agreement was still in effect.

7.   LIMITATION OF LIABILITY. The Administrator assumes no responsibility under this Agreement other than to render the services called for hereunder in good faith and without negligence, and shall not be responsible for any action of the Board of Trustees of the Fund in following or declining to follow any advice or recommendations of the Administrator; provided, however, that nothing in this Agreement shall protect the Administrator against any liability to the Fund or the Fund's shareholders for a loss resulting from willful misfeasance, bad faith or negligence in the performance of its duties or from reckless disregard of its obligations or duties under this Agreement.

8.   DEFINITIONS. As used in this Agreement, the term "assignment" shall have the meaning given to it by Section 2(a) of the 1940 Act, subject to such exemptions as may be granted by the Securities and Exchange Commission by any rule, regulation or order.

9.   DURATION AND TERMINATION. Unless otherwise terminated, this Agreement shall continue in effect for two years from the date of execution; and shall continue thereafter on an annual basis, provided that such continuance is specifically approved at least annually (a) by the vote of a majority of the Board of Trustees of the Fund, and (b) by the vote of a majority of the Board of Trustees of the Fund who are not parties to this Agreement or "interested persons" (as defined in the 1940 Act) of the Fund or the Administrator, cast in person at a meeting called for the purpose of voting on such approval. Notwithstanding the initial term set forth above, this Agreement may be terminated by either party hereto (without penalty) at any time upon not less than 60 days' prior written notice to the other party hereto. This Agreement will be terminated automatically and immediately in the event of its assignment.

10.   FURTHER ACTIONS. Each party agrees to perform such further acts and execute such further documents as are necessary to effectuate the purposes hereof.

11.   AMENDMENTS. No provision of this Agreement may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

12.   GOVERNING LAW. This Agreement shall be governed by the laws of The Commonwealth of Massachusetts, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

13.   COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

14.   MISCELLANEOUS. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to

Exhibit 9 – Page 3

the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions hereof or otherwise affect their construction or effect. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. Except as otherwise provided herein, this Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective successors.

15.  STATUS OF THE FUND AS A MASSACHUSETTS BUSINESS TRUST. A copy of the Fund's Agreement and Declaration of Trust, as amended, is on file with the Secretary of the Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Fund by an officer of the Fund as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any of the Trustees, officers or shareholders of the Fund individually but are binding only upon the assets and property of the Fund.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers designated below on the day and year first above written.

Attest:                         WESTERN ASSET/CLAYMORE U.S. TREASURY
                                INFLATION PROTECTED SECURITIES FUND 2

By:                      By:
  -----------------------      -----------------------------
                               Name:
                               Title:


Attest:                  LEGG MASON FUND ADVISER, INC.

By:                      By:
  -----------------------      -----------------------------
                               Name:
                               Title:


SCHEDULE A

DUTIES OF THE ADMINISTRATOR. The Administrator shall perform or arrange for the performance of the following administrative and clerical services:

(a)    Calculate or arrange for the calculation and publication of the Fund's net asset value daily (or as otherwise requested by the Fund) in accordance with the Fund's policy as adopted from time to time by the Board of Trustees;

Exhibit 9 – Page 4

(b)      Provide the Fund with administrative offices and data processing facilities as well as the services of persons competent to perform such administrative and clerical functions as are necessary to provide effective
operation of the Fund;

(c)      Maintain the Fund's expense budget and monitor expense accruals;

(d)      Arrange for payment of the Funds' expenses and the review and approval of invoices for the Fund's account and submission to a Fund officer for authorization of payment in a manner to be agreed upon;

(e)      Oversee and review calculations of fees paid to the administrator, the investment adviser, the custodian, the shareholder servicing agent, the transfer agent and any other entity providing authorized services to the Fund;

(f)      Compute the Fund's total return, expense ratios and portfolio turnover rate as well as various Fund statistical data as reasonably requested;

(g)      Prepare for review and approval by officers of the Fund, financial information for the Fund's semi-annual and annual reports, proxy statements and other communications with shareholders required or otherwise to be sent to Fund shareholders, and arrange for the printing and dissemination of such reports and communications to shareholders;

(h)      Prepare such reports as may reasonably be requested by the Board of Trustees of the Fund or the Fund's officers relating to the business and affairs of the Fund as may be mutually agreed upon and not otherwise appropriately prepared by the Fund's investment adviser, custodian, counsel, auditors or other service providers;

(i)      Prepare, or arrange for preparation, for review, approval and execution by officers of the Fund, the Fund's federal, state and local income tax returns, and any other required tax returns, as may be mutually agreed upon;

(j)      Calculate the Fund's periodic dividend distributions and annual net investment income (including net realized short-term capital gain) and net realized long-term capital gain to determine the Fund's appropriate
level of dividend distributions and the minimum annual distributions to shareholders and the tax and accounting treatment of such distributions on a per share basis, to be reviewed by the Fund's auditors;

(k)      Prepare, or arrange for preparation, for review by an officer of the Fund the Fund's periodic financial reports required to be filed with the Securities and Exchange Commission (the "SEC") on Form N-SAR and N-CSR and such other reports, forms or filings, as may be mutually agreed upon;

(l)      Prepare, or arrange for preparation, such financial information and reports as may be required by any stock exchange or exchanges on which the Fund's shares are listed, and such

Exhibit 9 – Page 5

other information and reports required by such stock exchang(es) as may be mutually agreed upon;

(m)     Prepare such financial information and reports as may be required by any banks or other institutions from which the Fund borrows funds;

(n)     Monitor and report on the Fund's issuance of preferred shares, including performing, or arranging for the performance of, any tests with respect to asset coverage or other matters required from time to time by the rating agencies rating such preferred shares and preparing, or arranging for the preparation of, maintenance reports in connection therewith as required by the rating agencies;

(o)     Coordinate the performance of administrative and professional services rendered to the Fund by others, including, without limitation, services provided by its custodian, registrar, transfer agent, shareholder servicing agent, dividend disbursing agent and dividend reinvestment plan agent, as well as accounting, auditing and such other services as may from time to time be mutually agreed;

(p)     Consult as necessary with the Fund's officers, independent accountants, legal counsel, investment adviser, custodian, accounting agent and transfer and dividend disbursing agent in establishing the accounting policies of the Fund;

(q)     Review implementation of any stock purchase or dividend reinvestment programs authorized by the Board of Trustees; and

(r)     Provide such assistance to the investment adviser, the custodian, the shareholder servicing agent and the Fund's legal counsel and auditors as generally may reasonably be required to properly carry on the business and operations of the Fund.

Exhibit 9 – Page 6

# Exhibit 10

**WIA Advisory Agreement**

*Available at*   https://www.sec.gov/Archives/edgar/data/1254370/000104746903031627/
a2118987zex-99_g1.txt

NOTE: Minor formatting changes have been made here to the version available online

INVESTMENT MANAGEMENT AGREEMENT

This INVESTMENT MANAGEMENT AGREEMENT, made this ____ day of _____, 2003, by and between Western Asset/Claymore U.S. Treasury Inflation Protected Securities Fund, a Massachusetts business trust (the "Trust"), and Western Asset Management Company, a California corporation (the "Manager").

WHEREAS, the Trust is registered as a closed-end management investment company under the Investment Company Act of 1940, as amended ("1940 Act"); and

WHEREAS, the Trust wishes to retain the Manager to provide certain investment advisory, management and administrative services; and

WHEREAS, the Manager is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1. The Trust hereby appoints Western Asset Management Company as Manager of the Trust for the period and on the terms set forth in this Agreement. The Manager accepts such appointment and agrees to render the services herein set forth, for the compensation herein provided.

2. The Trust shall at all times keep the Manager fully informed with regard to the securities and other property owned by it, its funds available, or to become available, for investment, and generally as to the condition of its affairs. It shall furnish the Manager with such other documents and information with regard to its affairs as the Manager may from time to time reasonably request.

3. (a) Subject to the supervision of the Trust's Board of Trustees (the "Trustees"), the Manager shall regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust consistent with the Trust's investment objectives, policies and restrictions. The Manager shall determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the Trust's Agreement and Declaration of Trust and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment

Exhibit 10 – Page 1

objectives, policies and restrictions of the Trust, as each of the foregoing may be amended from time to time. The Manager will place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, the Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, the Manager, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine, the Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay, on behalf of the Trust, a broker that provides brokerage and research services to the Manager or any affiliated person of the Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the Manager's overall responsibilities with respect to the Trust and to other clients of the Manager and any affiliated person of the Manager as to which the Manager or any affiliated person of the Manager exercises investment discretion. The Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall perform such other functions of management and supervision, as may be directed by the Trustees.

(b) The Trust hereby agrees with the Manager and with any investment adviser appointed pursuant to Paragraph 4 below (an "Investment Adviser") that any entity or person associated with the Manager or Investment Adviser (or with any affiliated person of the Manager or Investment Adviser) that is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Trust which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Trust hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4. The Manager may enter into a contract ("Portfolio Management Agreement") with one or more investment advisers in which the Manager delegates to such investment adviser or investment advisers any or all of its duties specified in Paragraph 3 hereunder. Such Portfolio Management Agreement must meet all requirements of the 1940 Act and the rules and regulations thereunder.

5. (a) The Manager, at its expense, shall supply the Board of Trustees and officers of the Trust with statistical information and reports reasonably requested by them and reasonably available to the Manager. The Manager shall oversee the maintenance of all books and records with respect

Exhibit 10 – Page 2

to the Trust's portfolio transactions and the keeping of the Trust's books of account in accordance with all applicable federal and state laws and regulations and shall perform such other administrative, bookkeeping or clerical duties as may be agreed upon by the parties. In compliance with the requirements of Rule 31a-3 under the 1940 Act, the Manager hereby agrees that any records which it maintains for the Trust are the property of the Trust, and further agrees to surrender promptly to the Trust or its agents any of such records upon the Trust's request. The Manager further agrees to arrange for the preservation of the records required to be maintained by Rule 31a-1 under the 1940 Act for the periods prescribed by Rule 31a-2 under the 1940 Act. The Manager shall authorize and permit any of its directors, officers and employees, who may be elected as Trustees or officers of the Trust, to serve in the capacities in which they are elected. The Manager may enter into a contract with one or more other parties in which the Manager delegates to such party or parties any or all of the duties specified in this Paragraph 5(a).

(b) Other than as herein specifically indicated, the Manager shall not be responsible for the expenses of the Trust. Specifically (but without limitation), the Manager will not be responsible for any of the following expenses of the Trust, which expenses shall be borne by the Trust: advisory fees; distribution fees; interest; taxes; governmental fees; fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; the cost (including brokerage commissions or charges, if any) of securities or other property purchased or sold by the Trust and any losses in connection therewith; fees of custodians, transfer agents, registrars, administrators or other agents; legal expenses; expenses of preparing share certificates; expenses relating to the redemption or repurchase of the Trust's shares; expenses of registering and qualifying shares of the Trust for sale under applicable federal and state law; expenses of preparing, setting in print, printing and distributing prospectuses, reports, notices and dividends to Trust shareholders; costs of stationery; costs of shareholders' and other meetings of the Trust; Trustees' fees; audit fees; travel expenses of officers, Trustees and employees of the Trust, if any; and the Trust's pro rata portion of premiums on any fidelity bond and other insurance covering the Trust and/or its officers and Trustees.

6. No Trustee, officer or employee of the Trust shall receive from the Trust any salary or other compensation as such Trustee, officer or employee while he or she is at the same time a director, officer, or employee of the Manager or any affiliated company of the Manager. This Paragraph 6 shall not apply to Trustees, executive committee members, consultants and other persons who are not regular members of the Manager's or any affiliated company's staff.

7. As compensation for the services performed and expenses assumed by the Manager, including the services of any consultants, investment advisers or other parties retained by the Manager, the Trust shall pay the Manager an annual fee, payable on a monthly basis, at the annual rate of 0.40% of the Trust's average weekly assets. "Average Weekly Assets" means the average weekly value of the total assets of the Trust (including any assets attributable to leverage) minus accrued liabilities (other than liabilities representing leverage). For purposes of calculating Average Weekly Assets, neither the liquidation preference of any preferred shares of beneficial interest outstanding nor any liabilities associated with any instruments or transactions used by the Manager to leverage the Trust's portfolio (whether or not such instruments or transactions are "covered" within the meaning of the 1940 Act and the rules and regulations

Exhibit 10 – Page 3

thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff) is considered a liability. In addition, with respect to reverse repurchase or dollar roll transactions ("Repurchase Transactions") entered into by the Trust, Average Weekly Assets includes (a) any proceeds from the sale of an asset (the "Underlying Asset") of the Trust to a counterparty in a Repurchase Transaction and (b) the value of such Underlying Asset as of the relevant measuring date. The first payment of the fee shall be made as promptly as possible at the end of the month succeeding the effective date of this Agreement. For any period less than a month during which this Agreement is in effect, the fee shall be prorated according to the proportion which such period bears to a full month of 28, 29, 30 or 31 days, as the case may be. For purposes of this Agreement and except as otherwise provided herein, the Average Weekly Assets of the Trust shall be calculated pursuant to procedures adopted by the Trustees of the Trust for calculating the value of the Trust's assets or delegating such calculations to third parties. In the event that the expenses of the Trust exceed any expense limitation which the Manager may, by written notice to the Trust, voluntarily declare to be effective with respect to the Trust, subject to such terms and conditions as the Manager may prescribe in such notice, the compensation due the Manager shall be reduced, and, if necessary, the Manager shall bear the Trust's expenses to the extent required by such expense limitation.

8. In the absence of willful misfeasance, bad faith or gross negligence on the part of the Manager, or reckless disregard of its obligations and duties hereunder, the Manager shall not be subject to any liability to the Trust or to any shareholder of the Trust, for any act or omission in the course of, or connected with, rendering services hereunder.

9. Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of the Manager who may also be a Trustee, officer, or employee of the Trust to engage in any other business or to devote his or her time and attention to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, or limit or restrict the right of the Manager to engage in any other business or to render services of any kind, including investment advisory and management services, to any other trust, firm, individual or association.

10. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such exemptions as may be granted, issued or adopted by the Securities and Exchange Commission or its staff by any rule, regulation, or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

11. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Paragraph 12 below) until terminated as follows:

   (a)  Either party hereto may at any time terminate this Agreement by  not more than sixty days' written notice delivered or mailed by registered mail, postage prepaid, to the other party, or

Exhibit 10 – Page 4

(b)  If (i) the Trustees or the shareholders of the Trust by the vote of a majority of the outstanding voting securities of the Trust, and (ii) a majority of the Trustees who are not interested persons of the Trust or of the Manager, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; PROVIDED, HOWEVER, that if the continuance of this Agreement is submitted to the shareholders of the Trust for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, the Manager may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder.

Action by the Trust under paragraph (a) of this Paragraph 11 may be taken either (i) by vote of a majority of the Trustees, or (ii) by the vote of a majority of the outstanding voting securities of the Trust.

12. Except as otherwise provided herein, this Agreement shall terminate automatically in the event of its assignment by the Manager and shall not be assignable by the Trust without the consent of the Manager. Any termination of this Agreement pursuant to Paragraph 11 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Trust (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff), and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Trustees who are not interested persons of the Trust or of the Manager.

13. In the event this Agreement is terminated by either party or upon written notice from the Manager at any time, the Trust hereby agrees that it will eliminate from its corporate name any reference to the name of "Western." The Trust shall have the non-exclusive use of the name "Western" in whole or in part only so long as this Agreement is effective or until such notice is given.

14. This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. Should any part of this Agreement be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

15. A copy of the Trust's Agreement and Declaration of Trust, as amended, is on file with the Secretary of the Commonwealth of Massachusetts, and notice is hereby given that this Agreement has been executed on behalf of the Trust by an officer of the Trust as an officer and not individually and the obligations of or arising out of this Agreement are not binding upon any

Exhibit 10 – Page 5

of the Trustees, officers or shareholders of the Trust individually but are binding only upon the assets and property of the Trust.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized.

Attest:                           WESTERN ASSET/CLAYMORE U.S. TREASURY
                                  INFLATION PROTECTED SECURITIES FUND


By:                   By:
   --------------        --------------------------------------


Attest:                           WESTERN ASSET MANAGEMENT COMPANY


By:                   By:
   --------------        --------------------------------------

Exhibit 10 – Page 6

# Exhibit 11

**Comparison of**
**WIA Advisory Agreement Section 3(a)**
**to**
**WIW Advisory Agreement Section 3(a)**

3. (a) Subject to the supervision of the Trust's Board of Trustees (the "Trustees"), the ~~Advisor~~Manager shall regularly provide the Trust with investment research, advice, management and supervision and shall furnish a continuous investment program for the Trust consistent with the Trust's investment objectives, policies and restrictions. The ~~Advisor~~Manager shall determine from time to time what securities or other property will be purchased, retained or sold by the Trust, and shall implement those decisions, all subject to the provisions of the Trust's Agreement and Declaration of Trust and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies and restrictions of the Trust, as each of the foregoing may be amended from time to time. The ~~Advisor~~Manager will place orders pursuant to its investment determinations for the Trust either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Trust, the ~~Advisor~~Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Trust the most favorable price and execution available, the ~~Advisor~~Manager, bearing in mind the Trust's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Trustees may determine, the ~~Advisor~~Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Trust to pay, on behalf of the Trust, a broker that provides brokerage and research services to the ~~Advisor~~Manager or any affiliated person of the ~~Advisor~~Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the ~~Advisor~~Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the ~~Advisor's~~Manager's overall responsibilities with respect to the Trust and to other clients of the ~~Advisor~~Manager and any affiliated person of the ~~Advisor~~Manager as to which the ~~Advisor~~Manager or any affiliated person of the ~~Advisor~~Manager exercises investment discretion. The ~~Advisor~~Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Trust, and shall perform such other functions of management and supervision, as may be directed by the Trustees.

Exhibit 11 – Page 1

# Exhibit 12

**WAFSX Advisory Agreement**

*Available at*    https://www.sec.gov/Archives/edgar/data/863520/000027630002000005/
western485bexd1xi.txt

NOTE: Minor formatting changes have been made here to the version available online

INVESTMENT MANAGEMENT AGREEMENT

This INVESTMENT MANAGEMENT AGREEMENT, made this 31st day of December, 2001, by and between Western Asset Funds, Inc., a Maryland corporation (the "Corporation"), on behalf of Western Asset Inflation Indexed Bond Portfolio (the "Fund"), and Legg Mason Fund Adviser, Inc., a Maryland corporation (the "Manager").

WHEREAS, the Corporation is registered as an open-end management investment company under the Investment Company Act of 1940, as amended ("1940 Act"); and

WHEREAS, the Corporation wishes to retain the Manager to provide certain investment advisory, management and administrative services to the Fund; and

WHEREAS, the Manager is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1. The Corporation hereby appoints Legg Mason Fund Adviser, Inc. as Manager of the Fund for the period and on the terms set forth in this Agreement. The Manager accepts such appointment and agrees to render the services herein set forth, for the compensation herein provided.

2. The Fund shall at all times keep the Manager fully informed with regard to the securities and other property owned by it, its funds available, or to become available, for investment, and generally as to the condition of its affairs. It shall furnish the Manager with such other documents and information with regard to its affairs as the Manager may from time to time reasonably request.

3. (a) Subject to the supervision of the Corporation's Board of Directors (the "Directors"), the Manager shall regularly provide the Fund with investment research, advice, management and supervision and shall furnish a continuous investment program for the Fund consistent with the Fund's investment objectives, policies and restrictions. The Manager shall determine from time to time what securities or other property will be purchased, retained or sold by the Fund, and shall implement those decisions, all subject to the provisions of the Corporation's Articles of Incorporation and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state

Exhibit 12 – Page 1

law, as well as the investment objectives, policies and restrictions of the Fund, as each of the foregoing may be amended from time to time. The Manager will place orders pursuant to its investment determinations for the Fund either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Fund, the Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Fund the most favorable price and execution available, the Manager, bearing in mind the Fund's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Directors may determine, the Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Corporation to pay, on behalf of the Fund, a broker that provides brokerage and research services to the Manager or any affiliated person of the Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the Manager's overall responsibilities with respect to the Fund and to other clients of the Manager and any affiliated person of the Manager as to which the Manager or any affiliated person of the Manager exercises investment discretion. The Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the Fund, and shall perform such other functions of management and supervision, as may be directed by the Directors.

(b) The Corporation hereby agrees with the Manager and with any investment adviser appointed pursuant to Paragraph 4 below (an "Investment Adviser") that any entity or person associated with the Manager or Investment Adviser (or with any affiliated person of the Manager or Investment Adviser) which is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Fund which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Corporation hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4. The Manager may enter into a contract ("Investment Advisory Agreement") with one or more investment advisers in which the Manager delegates to such investment adviser or investment advisers any or all of its duties specified in Paragraph 3 hereunder. Such Investment Advisory Agreement must meet all requirements of the 1940 Act and the rules and regulations thereunder.

5. (a) The Manager, at its expense, shall supply the Board of Directors and officers of the Corporation with all statistical information and reports reasonably required by them and

Exhibit 12 – Page 2

reasonably available to the Manager and shall furnish the Corporation and the Fund with office facilities, including space, furniture and equipment and all personnel reasonably necessary for the operation of the Corporation and the Fund. The Manager shall oversee the maintenance of all books and records with respect to the Fund's portfolio transactions and the keeping of the Corporation's and the Fund's books of account in accordance with all applicable federal and state laws and regulations and shall perform such other administrative, bookkeeping or clerical duties as may be agreed upon by the parties. In compliance with the requirements of Rule 31a-3 under the 1940 Act, the Manager hereby agrees that any records which it maintains for the Corporation or the Fund are the property of the Corporation, and further agrees to surrender promptly to the Corporation or its agents any of such records upon the Corporation's request. The Manager further agrees to arrange for the preservation of the records required to be maintained by Rule 31a-1 under the 1940 Act for the periods prescribed by Rule 31a-2 under the 1940 Act. The Manager shall authorize and permit any of its directors, officers and employees, who may be elected as Directors or officers of the Corporation, to serve in the capacities in which they are elected. The Manager may enter into a contract with one or more other parties in which the Manager delegates to such party or parties any or all of the duties specified in this Paragraph 5(a).

(b) Other than as herein specifically indicated, the Manager shall not be responsible for the expenses of the Corporation or any series of the Corporation, including the Fund. Specifically (but without limitation), the Manager will not be responsible, except to the extent of the reasonable compensation of employees of the Corporation and the Fund whose services may be used by the Manager hereunder, for any of the following expenses of the Fund, which expenses shall be borne by the Fund: advisory fees; distribution fees; interest; taxes; governmental fees; fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; the cost (including brokerage commissions or charges, if any) of securities or other property purchased or sold by the Fund and any losses in connection therewith; fees of custodians, transfer agents, registrars, administrators or other agents; legal expenses; expenses of preparing share certificates; expenses relating to the redemption or repurchase of the Fund's shares; expenses of registering and qualifying shares of the Fund for sale under applicable federal and state law; expenses of preparing, setting in print, printing and distributing prospectuses, reports, notices and dividends to Fund shareholders; costs of stationery; costs of shareholders' and other meetings of the Fund; Directors' fees; audit fees; travel expenses of officers, Directors and employees of the Corporation, if any; and the Corporation's pro rata portion of premiums on any fidelity bond and other insurance covering the Corporation and/or its officers and Directors.

6. No Director, officer or employee of the Corporation or Fund shall receive from the Corporation any salary or other compensation as such Director, officer or employee while he is at the same time a director, officer, or employee of the Manager or any affiliated company of the Manager. This Paragraph 6 shall not apply to Directors, executive committee members, consultants and other persons who are not regular members of the Manager's or any affiliated company's staff.

7. As compensation for the services performed and the facilities furnished and expenses assumed by the Manager, including the services of any consultants, investment

Exhibit 12 – Page 3

advisers or other parties retained by the Manager, the Fund shall pay the Manager, as promptly as possible after the last day of each month, a fee, computed daily at an annual rate of 0.20% of the average daily net assets of the Fund. The first payment of the fee shall be made as promptly as possible at the end of the month succeeding the effective date of this Agreement. If this Agreement is terminated as of any date not the last day of a month, such fee shall be paid as promptly as possible after such date of termination, shall be based on the average daily net assets of the Fund in that period from the beginning of such month to such date of termination, and shall be based on that proportion of such average daily net assets as the number of business days in such period bears to the number of business days in such month. The average daily net assets of the Fund shall in all cases be based only on business days and be computed as of the time of the regular close of business of the New York Stock Exchange, or such other time as may be determined by the Board of Directors of the Corporation. Each such payment shall be accompanied by a report prepared either by the Fund or by a reputable firm of independent accountants, which shall show the amount properly payable to the Manager under this Agreement and the detailed computation thereof. In the event that the expenses of the Fund exceed any expense limitation which the Manager may, by written notice to the Corporation, voluntarily declare to be effective with respect to the Fund, subject to such terms and conditions as the Manager may prescribe in such notice, the compensation due the Manager shall be reduced, and, if necessary, the Manager shall bear the Fund's expenses to the extent required by such expense limitation.

8. In the absence of willful misfeasance, bad faith or gross negligence on the part of the Manager, or reckless disregard of its obligations and duties hereunder, the Manager shall not be subject to any liability to the Fund or to any shareholder of the Fund, for any act or omission in the course of, or connected with, rendering services hereunder.

9. Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of the Manager who may also be a Director, officer, or employee of the Corporation or the Fund to engage in any other business or to devote his time and attention in part to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, or limit or restrict the right of the Manager to engage in any other business or to render services of any kind, including investment advisory and management services, to any other corporation, firm, individual or association.

10. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such exemptions and interpretations as may be granted by the Securities and Exchange Commission by any rule, regulation or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

11. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Paragraph 12 below) until terminated as follows:

Exhibit 12 – Page 4

(a) Either party hereto may at any time terminate this Agreement by not more than sixty days' written notice delivered or mailed by registered mail, postage prepaid, to the other party, or

(b) If (i) the Directors or the shareholders of the Fund by the vote of a majority of the outstanding voting securities of the Fund, and (ii) a majority of the Directors who are not interested persons of the Corporation or of the Manager, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of business on the second anniversary of its execution, or upon the expiration of one year from the effective date of the last such continuance, whichever is later; provided, however, that if the continuance of this Agreement is submitted to the shareholders of the Fund for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, the Manager may continue to serve hereunder in a manner consistent with the 1940 Act and the rules and regulations thereunder.

Action by the Corporation under paragraph (a) of this Paragraph 11 may be taken either (i) by vote of a majority of the Directors, or (ii) by the vote of a majority of the outstanding voting securities of the Fund.

12. This Agreement shall terminate automatically in the event of its assignment by the Manager and shall not be assignable by the Corporation without the consent of the Manager. Any termination of this Agreement pursuant to Paragraph 11 shall be without the payment of any penalty. This Agreement shall not be amended unless such amendment is approved by the vote of a majority of the outstanding voting securities of the Fund (provided that such shareholder approval is required by the 1940 Act and the rules and regulations thereunder, giving effect to any interpretations of the Securities and Exchange Commission and its staff), and by the vote, cast in person at a meeting called for the purpose of voting on such approval, of a majority of the Directors who are not interested persons of the Corporation or of the Manager.

13. In the event this Agreement is terminated by either party or upon written notice from the Manager at any time, the Corporation hereby agrees that it will eliminate from its corporate name any reference to the name of "Western." The Corporation shall have the non-exclusive use of the name "Western" in whole or in part only so long as this Agreement is effective or until such notice is given.

14. The Manager agrees that for services rendered to the Fund, or indemnity due in connection with service to the Fund, it shall look only to assets of the Fund for satisfaction and that it shall have no claim against the assets of any other series of the Corporation.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized.

Attest:                           WESTERN ASSET FUNDS, INC.

Exhibit 12 – Page 5

By: /s/ Lisa G. Hathaway          By: /s/ Ilene S. Harker
    --------------------              ------------------------------------
                                  Ilene S. Harker
                                  Vice President

Attest:                           LEGG MASON FUND ADVISER, INC.


By: /s/ Marc R. Duffy             By: /s/ Philip E. Sachs
    --------------------              ------------------------------------
                                  Philip E. Sachs
                                  Vice President

Exhibit 12 – Page 6

# Exhibit 13

**Comparison of**
**WAFSX Advisory Agreement Section 3(a)**
**to**
**WIA Advisory Agreement Section 3(a)**

3. (a) Subject to the supervision of the ~~Trust's~~ Corporation's Board of ~~Trustees~~Directors (the ~~"Trustees"),~~ "Directors"), the Manager shall regularly provide the ~~Trust~~Fund with investment research, advice, management and supervision and shall furnish a continuous investment program for the ~~Trust~~Fund consistent with the ~~Trust's~~Fund's investment objectives, policies and restrictions. The Manager shall determine from time to time what securities or other property will be purchased, retained or sold by the ~~Trust~~Fund, and shall implement those decisions, all subject to the provisions of the ~~Trust's Agreement~~ Corporation's Articles of Incorporation and ~~Declaration of Trust and~~ By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies and restrictions of the ~~Trust~~Fund, as each of the foregoing may be amended from time to time. The Manager will place orders pursuant to its investment determinations for the ~~Trust~~Fund either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the ~~Trust,~~Fund, the Manager shall seek to obtain the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the ~~Trust~~Fund the most favorable price and execution available, the Manager, bearing in mind the ~~Trust's~~Fund's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the ~~Trustees~~Directors may determine, the Manager shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the ~~Trust~~ Corporation to pay, on behalf of the ~~Trust~~Fund, a broker that provides brokerage and research services to the Manager or any affiliated person of the Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if the Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or the Manager's overall responsibilities with respect to the ~~Trust~~Fund and to other clients of the Manager and any affiliated person of the Manager as to which the Manager or any affiliated person of the Manager exercises investment discretion. The Manager shall also provide advice and recommendations with respect to other aspects of the business and affairs of the ~~Trust,~~Fund, and shall perform such other functions of management and supervision, as may be directed by the ~~Trustees.~~ Directors.

Exhibit 13 – Page 1

# Exhibit 14

## WAFSX Sub-Advisory Agreement

*Available at*   https://www.sec.gov/Archives/edgar/data/863520/000027630002000005/
western485bexd2xiv.txt

NOTE: Minor formatting changes have been made here to the version available online

### ADVISORY AGREEMENT

AGREEMENT  made this 31st day of  December,  2001,  by and between Legg Mason Fund Adviser, Inc. ("Manager"), a Maryland corporation,  and Western Asset Management Company  ("Western"),  a  California  corporation,  each of which is registered as an investment adviser under the Investment  Advisers Act of 1940, as amended.

WHEREAS, the Manager is the manager of certain of the series of Western  Asset Funds, Inc. (the  "Corporation"),  an  open-end,  management investment  company  registered  under the  Investment  Company Act of 1940,  as amended (the "1940 Act"); and

WHEREAS,  the  Manager  wishes to retain  Western  to  provide  certain investment advisory  services in connection  with the  Manager's  management of Western  Asset  Inflation Indexed  Bond  Portfolio  ("Fund"),  a series  of the Corporation; and

WHEREAS,  Western is willing to furnish such  services on the terms and conditions hereinafter set forth;

NOW,  THEREFORE,  in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1. Appointment. The Manager  hereby  appoints  Western as  investment adviser  for  the Fund  for  the  period  and on  the  terms  set  forth  in this Agreement.  Western accepts such appointment and agrees to furnish the services herein set forth for the compensation herein provided.

2. Delivery of Documents. The Manager has furnished Western with copies of each of the following:

(a) The  Corporation's  Articles  of  Incorporation  and all  amendments thereto  (such Articles  of  Incorporation,  as  presently in effect and as they shall from time to time be amended, are herein called the "Articles");

(b) The Corporation's By-Laws and all amendments thereto (such By-Laws, as  presently in effect  and as they shall  from time to time be  amended,  are herein called the "By-Laws");

(c)  Resolutions  of the  Corporation's  Board of Directors  (the "Directors") authorizing  the  appointment  of the  Manager as the  manager and Western as investment

Exhibit 14 – Page 1

adviser and approving the Investment Management Agreement between the Manager and the Corporation with respect to the Fund dated December 31, 2001 (the "Management Agreement") and this Agreement;

(d) The Corporation's most recently filed Post-Effective Amendment to its Registration Statement on Form N-1A under the Securities Act of 1933, as amended, and the 1940 Act, including all exhibits thereto, relating to shares of common stock of the Fund, par value $.001 per share;

(e) The Fund's most recent prospectus (such prospectus, as presently in effect, and all amendments and supplements thereto are herein called the "Prospectus"); and

(f) The Fund's most recent statement of additional information (such statement of additional information, as presently in effect, and all amendments and supplements thereto are herein called the "Statement of Additional Information").

The Manager will furnish Western from time to time with copies of all amendments of or supplements to the foregoing.

3. Investment Advisory Services. (a) Subject to the supervision of the Directors and the Manager, Western shall as requested by the Manager regularly provide the Fund with investment research, advice, management and supervision and shall furnish a continuous investment program for the Fund consistent with the Fund's investment objectives, policies, and restrictions as stated in the Fund's current Prospectus and Statement of Additional Information. Western shall as requested by the Manager determine from time to time what securities or other property will be purchased, retained or sold by the Fund, and shall implement those decisions, all subject to the provisions of the Corporation's Articles of Incorporation and By-Laws, the 1940 Act, the applicable rules and regulations of the Securities and Exchange Commission, and other applicable federal and state law, as well as the investment objectives, policies, and restrictions of the Fund, as each of the foregoing may be amended from time to time. Western will as requested by the Manager place orders pursuant to its investment determinations for the Fund either directly with the issuer or with any broker, dealer or futures commission merchant (collectively, a "broker"). In the selection of brokers and the placing of orders for the purchase and sale of portfolio investments for the Fund, Western shall seek to obtain for the Fund the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Fund the most favorable price and execution available, Western, bearing in mind the Fund's best interests at all times, shall consider all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into consideration market prices and trends, the reputation, experience and financial stability of the broker involved and the quality of service rendered by the broker in other transactions. Subject to such policies as the Directors may determine and communicate to Western in writing, Western shall not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Fund to pay a broker that provides

Exhibit 14 – Page 2

brokerage and research services to Western or any affiliated person of Western an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker would have charged for effecting that transaction, if Western determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker, viewed in terms of either that particular transaction or Western's overall responsibilities with respect to the Fund and to other clients of Western and any affiliated person of Western as to which Western or any affiliated person of Western exercises investment discretion. Western shall also perform such other functions of management and supervision as may be requested by the Manager and agreed to by Western.

(b) Western will as requested by the Manager oversee the maintenance of all books and records with respect to the investment transactions of the Fund in accordance with all applicable federal and state laws and regulations, and will furnish the Directors with such periodic and special reports as the Directors or the Manager reasonably may request.

(c) The Corporation hereby agrees that any entity or person associated with Western (or with any affiliated person of Western) which is a member of a national securities exchange is authorized to effect any transaction on such exchange for the account of the Fund which is permitted by Section 11(a) of the Securities Exchange Act of 1934, as amended, and Rule 11a2-2(T) thereunder, and the Corporation hereby consents to the retention of compensation for such transactions in accordance with Rule 11a2-2(T)(a)(2)(iv) or otherwise.

4. Services Not Exclusive. Western's services hereunder are not deemed to be exclusive, and Western shall be free to render similar services to others. It is understood that persons employed by Western to assist in the performance of its duties hereunder might not devote their full time to such service. Nothing herein contained shall be deemed to limit or restrict the right of Western or any affiliate of Western to engage in and devote time and attention to other businesses or to render services of whatever kind or nature.

5. Books and Records. In compliance with the requirements of Rule 31a-3 under the 1940 Act, Western hereby agrees that all books and records which it maintains for the Fund are property of the Fund and further agrees to surrender promptly to the Fund or its agents any of such records upon the Fund's request. Western further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act any such records required to be maintained by Rule 31a-1 under the 1940 Act.

6. Expenses. During the term of this Agreement, Western will pay all expenses incurred by it in connection with its activities under this Agreement other than the cost of securities and other property (including brokerage commissions, if any) purchased for the Fund.

7. Compensation. For the services which Western will render to the Manager and the Fund under this Agreement, the Manager will pay Western a fee, computed daily and paid monthly, at an annual rate of 0.20% of the average daily net assets of the Fund. The average daily net assets of the Fund shall in all cases be based only on business days and be computed as of the time of the regular close of business of the New York Stock Exchange, or such other

Exhibit 14 – Page 3

time as may be determined by the Board of Directors of the Corporation. Fees due to Western hereunder shall be paid promptly to Western by the Manager following its receipt of fees from the Fund. If this Agreement is terminated as of any date not the last day of a calendar month, a final fee shall be paid promptly after the date of termination and shall be based on the percentage of days of the month during which the contract was still in effect.

8. Limitation of Liability. In the absence of willful misfeasance, bad faith or gross negligence on the part of Western, or reckless disregard of its obligations and duties hereunder, Western shall not be subject to any liability to the Manager, the Fund or any shareholder of the Fund, for any act or omission in the course of, or connected with, rendering services hereunder.

9. Definitions. As used in this Agreement, the terms "assignment," "interested person," "affiliated person," and "majority of the outstanding voting securities" shall have the meanings given to them by Section 2(a) of the 1940 Act, subject to such exemptions and interpretations as may be granted by the Securities and Exchange Commission by any rule, regulation or order; the term "specifically approve at least annually" shall be construed in a manner consistent with the 1940 Act and the rules and regulations thereunder; and the term "brokerage and research services" shall have the meaning given in the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

10. Term. This Agreement shall become effective upon its execution, and shall remain in full force and effect continuously thereafter (unless terminated automatically as set forth in Section 12) until terminated as follows:

   a. The Corporation may at any time terminate this Agreement by not more than 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Manager and Western, or

   b. If (i) the Directors or the shareholders of the Fund by vote of a majority of the outstanding voting securities of the Fund, and (ii) a majority of the Directors who are not interested persons of the Corporation, the Manager or Western, by vote cast in person at a meeting called for the purpose of voting on such approval, do not specifically approve at least annually the continuance of this Agreement, then this Agreement shall automatically terminate at the close of continuance, whichever is later; provided, however, that if the continuance of this Agreement is submitted to the shareholders of the Fund for their approval and such shareholders fail to approve such continuance of this Agreement as provided herein, Western may continue to serve hereunder in a manner consistent with the rules and regulations thereunder, or

   c. The Manager may at any time terminate this Agreement by not less than 60 days' written notice delivered or mailed by registered mail, postage prepaid, to Western, and Western may at any time terminate this Agreement by not less than 60 days' written notice delivered or mailed by registered mail, postage prepaid, to the Manager.

Exhibit 14 – Page 4

Action by the Corporation under paragraph (a) of this Section 10 may be taken either (i) by vote of a majority of the Directors,  or (ii) by the vote of a majority of the outstanding voting securities of the Fund.

11. Further Actions. Each party agrees to perform such further acts and execute such further  documents as are  necessary  to  effectuate  the purposes hereof.

12. No Assignment;  Amendments.  This  Agreement  shall  terminate automatically in the event of its assignment or in the event that the Management Agreement  shall  have terminated for  any  reason.  Any  termination  of this Agreement  pursuant to Section 10 shall be without  the payment of any  penalty. This  Agreement  shall not be amended  unless such amendment is approved by the vote of a majority of the  outstanding  voting  securities of the Fund (provided that such  shareholder  approval  is  required by the 1940 Act and the rules and regulations  thereunder,  giving effect to any interpretations of the Securities and  Exchange Commission  and its staff) and by the vote,  cast in person at a meeting called for the purpose of voting on such approval,  of a majority of the Directors  who are not  interested  persons of the Corporation,  the Manager or Western.

13. Miscellaneous.  This Agreement  embodies the entire  agreement and understanding between the parties hereto,  and supersedes all prior  agreements and  understandings  relating to the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions  hereof or otherwise affect their  construction or effect.  Should any part of this  Agreement  be held or made  invalid by a court decision,  statute, rule or otherwise, the remainder of this Agreement shall not be  affected thereby.  This  Agreement  shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

14. Non-Exclusive  Right. In the event this Agreement is terminated or upon written notice from Western at any time, the Corporation hereby agrees that it will  eliminate  from the Fund's name any reference to the name of "Western." The Corporation,  on behalf of the Fund, shall have the non-exclusive use of the
name  "Western" in whole or in part only so long as this  Agreement is effective or until such notice is given.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their  officers  designated  below on the day and year first  above written.

Attest:                      LEGG MASON FUND ADVISER, INC.


By: /s/ Marc R. Duffy          By: /s/ Philip E. Sachs
   --------------------          -----------------------------------
                               Philip E. Sachs
                               Vice President


Attest:                      WESTERN ASSET MANAGEMENT COMPANY


Exhibit 14 – Page 5

By: /s/ Lisa G. Hathaway            By: /s/ James W. Hirschmann III
   --------------------             -----------------------------------
                                    James W. Hirschmann, III
                                    President
The foregoing is accepted by:

Attest:                    WESTERN ASSET FUNDS, INC.


By: /s/ Lisa G. Hathaway            By: /s/ Ilene S. Harker
   --------------------             -----------------------------------
                                    Ilene S. Harker
                                    Vice President

Exhibit 14 – Page 6

# Exhibit 15

**Comparison of**
**WIW Advisory Agreement Exhibit A**
**to**
**WIW Administrative Services Agreement Schedule A**

| WIW Advisory Agreement Exhibit A | WIW Admin. Services Agreement Schedule A |
|---|---|
| Prepare (or oversee the preparation) for review and approval by officers of the Trust financial information for the Trust's reports to be sent to the Trust's shareholders, and arrange for the printing and dissemination of such reports to shareholders; | (g)    Prepare for review and approval by officers of the Fund, financial information for the Fund's semi-annual and annual reports, proxy statements and other communications with shareholders required or otherwise to be sent to Fund shareholders, and arrange for the printing and dissemination of such reports and communications to shareholders; |
| Prepare (or oversee the preparation) for review by an officer of the Trust all reports required to be filed with the Securities and Exchange Commission, including reports on Forms N-SAR and N-CSR, and in the filing of such completed forms with the Securities and Exchange Commission; | (k)    Prepare, or arrange for preparation, for review by an officer of the Fund the Fund's periodic financial reports required to be filed with the Securities and Exchange Commission (the "SEC") on Form N-SAR and N-CSR and such other reports, forms or filings, as may be mutually agreed upon; |
| Assist in the dissemination to shareholders of the Trust's proxy materials and assist in the filing of such materials with the Trust's regulators, and oversee the tabulation of proxies by the Trust's transfer agent; | (g)    Prepare for review and approval by officers of the Fund, financial information for the Fund's semi-annual and annual reports, proxy statements and other communications with shareholders required or otherwise to be sent to Fund shareholders, and arrange for the printing and dissemination of such reports and communications to shareholders; |
| Determine the amounts available for distribution as dividends and distributions to be paid by the Trust to its shareholders; prepare and arrange for the printing of dividend notices to shareholders; and assist in the preparation of materials relevant to the Trust's Dividend Reinvestment Plan; | (j)    Calculate the Fund's periodic dividend distributions and annual net investment income (including net realized short-term capital gain) and net realized long-term capital gain to determine the Fund's appropriate level of dividend distributions and the minimum annual distributions to shareholders and the tax and accounting treatment of such distributions on a per share basis, to be reviewed by the Fund's auditors; |
| Oversee, as agreed by the Trust, the dissemination of the Trust's net asset value, market price and discount; | (a)    Calculate or arrange for the calculation and publication of the Fund's net asset value daily (or as otherwise requested by the Fund) in accordance with the Fund's policy as adopted from time to time by the Board of Trustees; |

Exhibit 15 – Page 1

| WIW Advisory Agreement Exhibit A | WIW Admin. Services Agreement Schedule A |
|---|---|
| Make such reports and recommendations to the Trustees as the Trustees reasonably request or deem appropriate; | (h)   Prepare such reports as may reasonably be requested by the Board of Trustees of the Fund or the Fund's officers relating to the business and affairs of the Fund as may be mutually agreed upon and not otherwise appropriately prepared by the Fund's investment adviser, custodian, counsel, auditors or other service providers; |
| Oversee the preparation and filing of the Trust's federal, state and local income tax returns and any other required tax returns; | (i)   Prepare, or arrange for preparation, for review, approval and execution by officers of the Fund, the Fund's federal, state and local income tax returns, and any other required tax returns, as may be mutually agreed upon; |
| Review the appropriateness of and arrange for payment of the Trust's expenses; | (c)   Maintain the Fund's expense budget and monitor expense accruals;<br>(d)   Arrange for payment of the Funds' expenses and the review and approval of invoices for the Fund's account and submission to a Fund officer for authorization of payment in a manner to be agreed upon; |
| Prepare (or oversee the preparation of) such information and reports as may be required by any stock exchange or exchanges on which the Trust's shares are listed; | (l)   Prepare, or arrange for preparation, such financial information and reports as may be required by any stock exchange or exchanges on which the Fund's shares are listed, and such other information and reports required by such stock exchang(es) as may be mutually agreed upon; |
| Oversee and review calculations of fees paid to the Trust's service providers; | (e)   Oversee and review calculations of fees paid to the administrator, the investment adviser, the custodian, the shareholder servicing agent, the transfer agent and any other entity providing authorized services to the Fund; |
| Oversee the Trust's portfolio and perform necessary calculations as required under Section 18 of the 1940 Act; | (n)   Monitor and report on the Fund's issuance of preferred shares, including performing, or arranging for the performance of, any tests with respect to asset coverage or other matters required from time to time by the rating agencies rating such preferred shares and preparing, or arranging for the preparation of, maintenance reports in connection therewith as required by the rating agencies; |

Exhibit 15 – Page 2

| WIW Advisory Agreement Exhibit A | WIW Admin. Services Agreement Schedule A |
|---|---|
| Consult with the Trust's officers, independent accountants, legal counsel, custodian, administrator or other accounting agent, transfer agent and dividend disbursing agent in establishing the accounting policies of the Trust and monitor financial and shareholder accounting services; | (p)    Consult as necessary with the Fund's officers, independent accountants, legal counsel, investment adviser, custodian, accounting agent and transfer and dividend disbursing agent in establishing the accounting policies of the Fund; |
| Review implementation of any share purchase programs authorized by the Trustees; | (q)    Review implementation of any stock purchase or dividend reinvestment programs authorized by the Board of Trustees; and |
| Prepare such information and reports as may be required by any banks from which the Trust borrows funds; | (m)    Prepare such financial information and reports as may be required by any banks or other institutions from which the Fund borrows funds; |
| Provide such assistance to the custodian and the Trust's counsel and auditors as generally may be required to properly carry on the business and operations of the Trust; and | (r)    Provide such assistance to the investment adviser, the custodian, the shareholder servicing agent and the Fund's legal counsel and auditors as generally may reasonably be required to properly carry on the business and operations of the Fund. |

Exhibit 15 – Page 3